Linda M. Correia (*Pro Hac Vice application pending*)
Lauren A. Khouri (*Pro Hac Vice application pending*)
CORREIA & PUTH, PLLC
1400 16th Street, NW, Suite 450
Washington, DC 20036
Phone:   (202) 602-6500
Fax:      (202) 602-6501
Email:   lcorreia@correiaputh.com
             lkhouri@correiaputh.com

J. Devlan Geddes
Katherine B. DeLong
GOETZ, BALDWIN & GEDDES, P.C.
35 North Grand
P.O. Box 6580
Bozeman, MT 59771-6580
Phone: (406) 587-0618
Fax:      (406) 587-5144
Email:  devlan@goetzlawfirm.com
            kdelong@goetzlawfirm.com
**Attorneys for Plaintiff**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA,
## MISSOULA DIVISION

| | |
|---|---|
| SHANNON SCHWEYEN,<br><br>                    Plaintiff,<br><br>     v.<br><br>UNIVERSITY OF MONTANA-<br>MISSOULA,<br><br>                    Defendant. | Case No. _____<br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

COMES NOW the Plaintiff, Shannon Schweyen, by and through her attorneys, and for her Complaint alleges as follows:

## INTRODUCTION

1.      Shannon Schweyen, former Head Coach for the University of Montana-Missoula ("UM") women's basketball program, brings this action against UM for sex discrimination in violation of Title VII of the Civil Rights Act of 1964. UM unlawfully terminated Coach Schweyen's employment with UM because two of her players had decided to enter the NCAA transfer portal, indicating their desire to explore athletic opportunities at other schools.

2.      When Athletic Director Kent Haslam reneged on his decision to extend Coach Schweyen's contract in April 2020, the only reason he gave for the decision was that two women's basketball players had entered the transfer portal. He did not fire male coaches when their players entered the transfer portal in equal and greater numbers. When questioned, Haslam claimed Schweyen's team culture was horrible, an obvious pretext for his unlawful act. This was sex discrimination.

## PARTIES

3.      Plaintiff Shannon Schweyen is an adult female resident of the State of Montana. At all times relevant hereto, Coach Schweyen was an employee of the University of Montana-Missoula within the meaning of 42 U.S.C. § 2000e(f).

4.      Defendant University of Montana-Missoula ("UM") is a public institution of higher education located in Missoula, Montana. Defendant UM is the flagship campus of the University of Montana campuses. At all times relevant hereto, UM was an employer within the meaning of 42 U.S.C. § 2000e(b).

## JURISDICTION AND VENUE

5.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331.

6.      Venue lies in this Court pursuant to 28 U.S.C. §1391, as a substantial part of the acts alleged herein occurred in Montana, and Local Rule of Procedure 3.2.

7.      Coach Schweyen filed a timely charge of sex discrimination with the Equal Employment Opportunity Commission on September 8, 2020, asserting that she was subjected to discrimination in violation of Title VII of the Civil Rights Act of 1964. On August 16, 2021, the EEOC issued a Notice of Right to Sue.

8.      At all times relevant hereto, Defendant was a party to the Cooperative and Joint Venture Agreement with the U.S. Department of the Interior, U.S. Department of Agriculture, U.S. Department of Defense, and other Partner Institutions, dated 2019-2024, to provide for the operation and maintenance of the Rocky Mountains Cooperative Ecosystem Studies Unit (CESU).

## FACTS GIVING RISE TO RELIEF

9.      Coach Schweyen attended the University of Montana as an undergraduate and earned her bachelor's degree in business administration from UM

in 1993. She was a member of Montana's "Lady Griz" basketball team throughout her college years.

10.     Schweyen was an accomplished player during her time at UM. She led UM to three Big Sky Conference regular-season titles and four NCAA tournaments. Coach Schweyen became the Big Sky Conference's only first-team Kodak All-American as a senior in 1991. In 2014, the Conference rated that honor at No. 3 on the list of "25 Greatest Women's Moments" in Big Sky history. In 2020, Schweyen ranked No. 1 on the list of "25 Greatest Female Athletes" following a yearlong countdown to commemorate 25 years of women's athletics in the Big Sky Conference. Schweyen was a two-time Big Sky MVP, a three-time Big Sky tournament MVP and a three-time Lady Griz MVP. She was also a four-time All-Academic Big Sky honoree.

11.     Schweyen finished her career as a UM student as the Big Sky's leading scorer among both men and women with 2,172 points. She still owns numerous school and Big Sky Conference records after averaging 18.7 points, 7.6 rebounds and 3.6 assists per game for her four-year career. UM retired her No. 21 jersey. In 2020, Schweyen was inducted into the Big Sky Conference first ever Hall of Fame Class.

12.     UM appointed Schweyen to the coaching staff first as a student assistant in 1992, and then as a full-time assistant in 1993.

13.     Robin Selvig, a male, served as the head coach of the Lady Griz basketball team for 38 years. Schweyen was an assistant coach for the Lady Griz for 24 years, under the leadership of head coach Robin Selvig. During that time, the Lady Griz won 14 Big Sky Conference titles and advanced to 13 NCAA tournaments. Schweyen became Selvig's top assistant during the last three years of his tenure.

14.     UM hired Kent Haslam as Associate Director of Athletics for Development in 2006 and in 2012, named him Director of Athletics.

15.     In August 2016, UM appointed Schweyen head coach of the women's basketball program. In her new role, she inherited staff and hired others, including an assistant coach, Mike Petrino.

16.     From the beginning, Schweyen could do nothing right in Haslam's eyes. Haslam exuded hostility toward Schweyen from her first conversation about her first contract for her position as Head Coach. Haslam asked Schweyen if she intended to hire an agent. Taken aback by the question, Schweyen said she was not sure. Haslam responded, "Good. I'm not going to give you more money anyway."

17.     Haslam offered Schweyen a three-year contract with a base salary of $130,000, effective September 1, 2016.

18.     At about the same time, Haslam offered Travis DeCuire, the male head coach of the men's basketball team, a three-year contract with a base salary of $155,000, effective July 1, 2016.

19.     Coach Selvig's base salary was $158,000 at the time of his retirement in 2016.

20.     UM paid its male basketball coach, doing the same job as Coach Schweyen, nearly 20 percent more in base salary in his first year as head coach than it paid Coach Schweyen in her first year as head coach.

21.     UM's difference in treatment between Coach DeCuire and Coach Schweyen regarding their respective starting salaries reflects an intent and motive to discriminate against Schweyen based on sex.

22.     When Haslam hired DeCuire, DeCuire had less coaching experience than Schweyen. Neither had been a head coach in a Division I collegiate program and DeCuire had less experience as an assistant coach as compared to Schweyen, who served as an assistant coach for a bigger program with a stronger winning record. Schweyen had double the conference championships as compared to DeCuire and had been part of the success of the Lady Griz since 1988. DeCuire coached at two four-year universities and a junior college, but during DeCuire's tenure, none of the schools' program were as successful as Montana's.

23.     Haslam told Schweyen, with UM Athletic Department staff present, that he did not want to hire her in the first place when Robin Selvig retired.

24.     At the start of the 2016-2017 season, the Lady Griz looked forward to the return of their senior forward, Big Sky Conference Preseason Player of the Year, as

6

chosen by the media and coaches. However, she tore her ACL in a preseason practice and was out for the season. Another senior forward, the next most experienced and decorated player, tore her ACL in the season opener, and was also out for the season.

25.     At the start of Schweyen's second season, the same two players were expected to return but again suffered season ending injuries at the beginning of the season, and then two other starters suffered season ending injuries mid-season. Nevertheless, with Schweyen's guidance, players matured and stepped into bigger roles in their careers than expected.

26.     In 2019, Coach Schweyen recruited an ESPN Top 100 player in the Class of 2019 and the only ranked player to sign in the Big Sky Conference.

27.     When Schweyen's initial three-year contract was due to expire, in the summer of 2019, Haslam offered Schweyen a one-year contract. Schweyen asked what she needed to do to receive a longer-term contract in the following year and he just said, "do better." Haslam did not set any metrics, did no performance evaluation, and he did not provide anything specific to measure what "better" meant.

28.     At the same time, Haslam offered DeCuire a three-year contract.

29.     During the 2019-2020 season, the Lady Griz team record improved from 14-16 overall to 17-13 overall, and 12-8 in the Big Sky Conference, the fourth best record in the Conference.

30.     The Men's basketball team finished the 2019-2020 season with an 18-13 overall record, and 14-6 in Big Sky Conference play.

31.     On March 12, 2020, Haslam and Coach Schweyen met at his request. Haslam started the meeting by stating, "I want you to know you will be back next year as our women's basketball coach. I felt like you had a good season and I am going to give you the remainder of your three-year contract."

32.     Haslam asked about incoming recruits and the roster for next year. Schweyen described in detail the incoming class of six recruits that she was looking forward to joining the roster. Haslam responded that she should expand the recruiting base and recruit from outside of Montana more. Haslam frequently urged Coach Schweyen that better recruits were available outside of Montana. Schweyen disagreed, however, noting there are plenty of good Montana girls around, including two who had been part of Idaho's success.

33.     Schweyen observed that when Coach Selvig was head coach, Haslam did not give him directions about recruitment or other team management issues like that which he gave to Schweyen.

34.     Schweyen also told Haslam about a transfer she thought might be contacting her from another school. He asked Schweyen if she thought any of her players would be leaving. She told him she anticipated that one player, a sophomore,

would be leaving because she was unhappy with her playing time and had threatened to leave the year before.

35.     After a brief conversation about Schweyen's daughters and their families, Haslam said he was going to take some time off with his family after the tournament but, "then we will get your contract ironed out."

36.     Coach Schweyen told her husband and texted her assistants to tell them the good news that they were extended for two years. She texted friends and others inside and outside the department, as well as other coaches in the area, to share the news.

37.     On March 13, 2020, Haslam told a member of the UM staff, "I want you to know we're extending Shannon Schweyen two years."

38.     On March 22, 2020, a player informed Coach Schweyen that she was entering the transfer portal as a grad transfer.

39.     The transfer portal is an NCAA database tool used in college athletics that allows athletes to make known their interest in transferring to a different school. Coaches can then access the player's information in the transfer portal and contact them for recruiting purposes. The transfer portal is available for all collegiate sports.

40.     That week, Coach Schweyen and her staff increased their efforts to identify and contact junior college players and potential recruits and transfers.

41.     On March 30, 2020, as Schweyen predicted and had told Haslam, a second player told Schweyen that she was entering the transfer portal.

42.     At the same time, members of the men's basketball and football teams were entering the transfer portal, and their departures attracted local media coverage.

43.     Schweyen called Haslam that evening to tell him and he was curt with Schweyen. Haslam said, "I'm tired of answering the media and people about why everyone is leaving." Schweyen explained that having two players in the portal was not uncommon, something Haslam should be familiar with as Athletic Director. Still, Haslam continued in an aggressive tone, interrupting, and telling her he did not care about what she was saying. Haslam said Schweyen's team culture was horrible.

44.     Schweyen was taken aback by Haslam's characterization of the team culture because he spent nearly zero time around the team, was not in a position to assess its "culture," and had not previously raised concerns about its culture with her.

45.     During the 2019-2020 season, Haslam did not have a single meeting with Schweyen discussing the women's basketball team culture or issues.

46.      Schweyen was so shocked by Haslam's reaction that she immediately called Senior Associate Athletic Director Greg Sunderburg. Schweyen recounted the conversation to Sunderburg, who said he would get back to her the next day. He did not.

47.    On April 1, 2020, Haslam called Schweyen and said, "I can't renew your contract. I am going to go in a different direction." When asked for an explanation, Haslam refused to elaborate, adding only, "You wouldn't survive it. . . . You wouldn't have a roster, Shannon." Schweyen repeated information she shared when Haslam said he was renewing her contract about her talented recruits. She told Haslam that all six of her new players would be coming in along with five returning players. Among the five returning players were the team's top two scorers and rebounders.

48.    Haslam told Schweyen UM was not renewing her contract because two of her players decided to enter the NCAA transfer portal.

49.    Schweyen tried to keep Haslam on the call, asking for an explanation for his decision, but he refused to explain further, and refused to meet with her face to face to discuss his decision. Haslam told her that Jean Gee would be calling her to discuss HR matters.

50.    Male coaches of the UM men's basketball and football teams have had several athletes in their programs enter the transfer portal and leave UM over the past five academic years, but they have not been fired.

51.    For example, UM men's basketball had four players in the transfer portal in 2016-2017, five students in the transfer portal in 2017-2018, four students in 2018-2019, and two players in 2019-2020. The male coach, Coach DeCuire, was not fired.

52.     In fact, in August 2020, 406mtsports.com published an article reporting that more than one-third of Big Sky basketball players, male and female, transferred or left the team with eligibility remaining. https://406mtsports.com/college/big-sky-conference/a-change-of-scenery-more-than-one-third-of-big-sky-basketball-players-transfer-or/article_ad5d115d-2d03-58f3-8915-de51fee3d7c5.html. However, Coach Schweyen, a woman, is the only UM coach to be fired allegedly because of the number of players she had in the transfer portal.

53.     By February 2021, so many players left the UM men's basketball team, including three contributing players, that it only had 11 players on its roster, when the team had begun with a 17-man roster. https://406mtsports.com/college/big-sky-conference/university-of-montana/third-player-leaves-montana-mens-basketball-midseason/article_89f22618-db77-5435-9c6b-fde2e774fa10.html. The male coach of the men's basketball team was not fired.

54.     UM's football team has experienced even greater changes. By May 2019, after the 2018-2019 season ended, 15 football players with remaining eligibility reportedly had left the roster. Coach Hauck, the male football coach, was not fired.

55.     Haslam criticized Schweyen when one of her players left to concentrate on her studies or because she was dissatisfied with her playing time or otherwise recognized she was on the wrong path with the Lady Griz program, yet was not critical of DeCuire or Hauck under similar circumstances for male players.

56.    This double standard was discriminatory.

57.    Haslam's statement that Coach Schweyen would not "survive" those players entering the transfer portal is pretextual also because many schools recruit students during the spring semester, which only increased with the creation of the transfer portal. At the time Haslam terminated Coach Schweyen, the team had been watching and actively recruiting in the transfer portal for potential recruits. There was no reason for Haslam to believe Schweyen could not recruit additional players, if in fact additional players were needed.

58.    Upon information and belief, Haslam's Assistant AD, Jean Gee, spoke to woman basketball players and encouraged them to enter the transfer portal.

59.    During Schweyen's last season, the team had its second highest grade point average (GPA) in Lady Griz history, which was so notable that the team won national recognition.

60.    Montana placed a high value on a team's academic success, giving coaches bonuses for their team's overall GPA. Schweyen earned such bonuses in each year she served as head coach.

61.    When news of Schweyen's termination went public, UM alumni, students, and former players poured out their support for Schweyen through social media and other forums, expressing upset that Schweyen was fired and dissatisfaction with Haslam. On Facebook, Schweyen supporters created a group called "I am with

21 Movement"—referring to Coach Schweyen's retired jersey number. The group grew to more than 1,500 members.

62.     Kent Haslam did not make a public statement about the abrupt termination of Coach Schweyen after her 32-year career with UM for three weeks.

63.     Thereafter, when he finally made himself available to answer questions from reporters about the abrupt termination, Haslam claimed he, "started the negotiation process for a contract. I did initiate those negotiations. A new contract was never formally offered, nor was it circulated for signatures."

64.     The truth was that on March 12, 2020, Haslam told Coach Schweyen, "I am going to give you the remainder of your three-year contract." On March 13, he told a member of his staff, "I want you to know we're extending Shannon Schweyen two years."

65.     When pressed for further explanation because the offer of a new contract had become well known—by Haslam telling personnel internally that Schweyen's contract would be extended for two years and because Schweyen had shared the good news with colleagues and friends—Haslam said "I just got a better understanding of what the culture was."

66.     In the brief period that passed between March 12, 2020, when Haslam told Schweyen he was renewing her contract for two years and April 1, 2020, when he reversed course, Haslam did nothing to assess the culture of the team. He did not

14

speak with Schweyen about the matter, and upon information and belief, did not speak with any of her staff or a majority of the players.

67.     During the period that passed between March 12 and April 1, 2020, neither Haslam nor any UM employee made any effort to engage in a good faith discussion about any concern that factored into UM's decision to renege on the decision to extend Schweyen's contract for two years.

68.     To the contrary, when players learned Haslam fired Schweyen, the team suffered. The 2019 ESPN top recruit that Schweyen had attracted to UM decided to leave UM because Schweyen had been fired.

69.     UM's premise that women athletes using the NCAA transfer portal signifies a problem "culture" is starkly different than how it responded to male athletes' use of the transfer portal, overlooked as a kind of "college free agency" for men with a goal of playing professionally, or getting more playing time.

70.     UM's alleged concern about the women's basketball team's "culture" was a pretext for sex discrimination.

71.     Haslam judged the same behavior by women athletes using the transfer portal with the goal of getting more playing time as a reflection of poor team culture, faulting Schweyen, an attribute he did not assign to the men's team, or fault DeCuire.

72.     During Schweyen's tenure, Haslam had very little involvement or interaction with the women's basketball team. He did not attend Lady Griz practices,

team meals, events hosted by the team's fundraising organization Hoop Club, or other functions. Haslam rarely attended games, and when he attended away games, he did not travel with the team.

73.    By contrast, Haslam's interactions with the men's basketball team players and coaches were frequent and substantial. He had frequent interactions in the office and attended games and traveled with the team.

74.    Haslam ignored other female coaching staff, as well as Schweyen. One former coach noted that Haslam never interacted with her until she announced she was leaving UM.

75.    Throughout Coach Schweyen's time as Head Coach, Haslam sought to undermine her authority and poison her students against her to drum up baseless complaints about her behavior. When Haslam received one complaint by a parent about Schweyen's coaching style and actions during a travel game, he and Jean Gee, Senior Associate Athletic Director, visited with all Lady Griz basketball athletes except for one who declined, as well as personnel from the academic advising office and the strength and conditioning center. Coaches and players alike reported that Haslam and Gee's interview questions were accusatory and assumed false information that seemed designed to "catch us at doing something wrong."

76.     The Athletic Department did not respond to complaints by parents of male players in the same way that it responded to complaints by parents of female players.

77.     The Athletic Department did not respond to complaints by parents or players against male coaches in the same way that it responded to complaints by parents or players against female coaches.

78.     Haslam and Gee again discredited Schweyen to students when one left UM for an accelerated nursing program in 2018, and they quizzed her about her departure, which was so surprising that it left the student with the impression that Haslam was trying to get some negative information about Schweyen out of her. It felt so misplaced Schweyen shared with Haslam a letter the student wrote saying she had nothing but respect for Schweyen's leadership and mentorship.

79.     When students raised similar (or any) issues with male coaches, Haslam quickly dismissed them. For example, when students raised complaints about the coaching style of the male softball coach, the Athletic Department brought him the letter immediately, asked him if it had merit, and when the male coach denied the allegations, Haslam took no further action.

80.     Haslam also demonstrated his hostility to Schweyen and another female coach in favor of DeCuire's preferences for his men's basketball team, and tolerated DeCuire's open disrespect of the woman coaches.

17

81.    For example, beginning in the spring of 2019, Schweyen and her staff worked to reschedule fall practices to accommodate the planned student-teacher schedules for two players on the team. For seven years, women's basketball had conducted 6:00 to 8:00 a.m. practices, while the men's basketball team enjoyed the prime 3:00 to 5:00 p.m. slot.

82.    Practices later than 5:00 in the evening would impair the ability of students to receive any necessary post-practice treatments or access on-campus food services before closing, and arrive at home at a decent time to resume studying.

83.    Schweyen requested the 3:00 to 5:00 slot for women's basketball practice. DeCuire, the men's basketball coach, did not want to switch or share practice times. Haslam called a meeting that included most of the men's and women's basketball coaching staff, the volleyball coaching staff, Jean Gee, and UM personnel involved in scheduling.

84.    On the morning of the meeting, DeCuire asked for the meeting to be moved back 30 minutes, strolled in late even then, and said, "If I had known I would be negotiating practice time I would be in a major metropolitan city right now." During the meeting, Haslam sat silent and allowed DeCuire to be rude and condescending to the two head women coaches in the room. Haslam asked the volleyball coach, Allison Lawrence, "When you and Travis are both on the practice floor, how do you know when to get off?" DeCuire responded, "When I tell her to."

18

85.     DeCuire remained inflexible and insisted that Haslam work the matter out and "keep her (Schweyen) out of my office." Haslam set the women's basketball team's practice time for 4:00 to 7:00 pm, but the times changed day-to-day to accommodate other needs in the facility. Men's basketball enjoyed a steady 1:00 to 4:00 p.m. daily practice slot, with no disruption.

86.     On September 5, 2019, Schweyen sent an email to Haslam opposing DeCuire's disrespectful and unprofessional behavior toward herself and the volleyball coach over the course of three meetings and his failure to rectify it. Haslam angrily responded to Schweyen's challenge to DeCuire's bullying behavior and more favorable treatment of DeCuire and the men's basketball program.

87.     Schweyen then communicated with Lucy France, and complained that DeCuire's bullying behavior and attitude about the unfair practice times were discriminatory. Schweyen said she opposed the way DeCuire tried to intimidate the female coaches by rudely interrupting and talking over them. France took notes of their discussion and in response, Haslam and Gee later brought Schweyen in for a meeting at which they excused DeCuire's behavior.

88.     UM recently announced a spectacular $2 million locker room upgrade for the men's team, while the women's basketball team has been left with a tiny, outdated, water leak stained facility that has been off-putting to some recruits. No

such planned remodel of the women's locker room was ever discussed with Schweyen despite the stark, observable problems and differences.

89.     In late April 2020, UM announced that assistant coach Mike Petrino, a male, would be named the interim head coach of the women's basketball team, and UM would conduct a national search for a head coach after the 2020-21 season.

90.     On April 22, 2020, UM formally announced Petrino as Head Coach of the Lady Griz. Petrino has never served as a Head Coach before and had started his career with UM only four years earlier, in 2016.

91.     UM has represented on its website and to the media that Petrino started coaching Division I women's basketball in 2011, and then "was on Linda Lappe's staff at Colorado in 2015-16," implying he held significant coaching roles. Actually, Petrino did not coach, but was demoted to video coordinator at the University of Wyoming (not an assistant coach position), and rosters of the Colorado team show that Petrino was let go after a one-year stint as the director of recruiting & video, not an assistant coach.

92.     Haslam's statements to the media that Petrino coached in the Pac 12 were deliberately false.

93.     In April 2021, UM named Brian Holsinger, a male, head coach of the UM women's basketball team.

94.     The UM women's basketball team was one of the most esteemed programs in all of women's basketball.

95.     UM's termination of Schweyen has been devastating to her. Coach Schweyen devoted 32 years to women's basketball at UM. At all times she set high standards for herself, her players, and her staff. She has suffered bouts of sleeplessness, nausea, anxiety, and loss of the opportunity to coach at her alma mater and continue the tradition of Lady Griz Basketball.

96.     Coach Schweyen anticipated continuing as coach for the balance of her career as many coaches in the region have at the Division I level. She lost the opportunity to coach one of the most promising female athletes in the region, who left UM after learning Coach Schweyen would not return for the 2020-21 season, and the opportunity to continue the tradition of success of the Montana program.

## COUNT ONE
### (Discrimination in violation of
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2)

97.     Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-97 of this Complaint with the same force and vigor as if set out here in full.

98.     UM evaluated Coach Schweyen's performance more harshly than her male counterparts because of her gender, and such act constitutes sex discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2.

99.     UM targeted Coach Schweyen for criticism because of her sex, and such act constitutes sex discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2.

100.    UM decided not to renew Coach Schweyen's contract, terminating her long-standing, impressive career at UM, because of her gender, and such act constitutes sex discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2.

101.    As a direct and proximate result of UM's unlawful acts, Coach Schweyen suffered and continues to suffer lost earnings and benefits, emotional pain, suffering, professional and personal embarrassment, humiliation, and loss of enjoyment of life.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief against Defendant:

1.      Enter judgment in favor of Plaintiff Shannon Schweyen and against Defendant University of Montana-Missoula;

2.      Order permanent injunctive relief to reinstate Plaintiff Schweyen into the position of head coach of the women's basketball team with all employment benefits, or award front pay in lieu thereof;

3.      Award Plaintiff lost back pay and front pay, lost retirement benefits, compensatory damages, and all compensation and benefits of employment she would have received absent sex discrimination;

4.      Award Plaintiff her court costs and expenses, including reasonable attorneys' fees;

5.      Award Plaintiff pre-judgment interest and post-judgment interest;

6.      Declare Defendant's conduct in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2;

7.      Grant such other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims.

Dated this 11th day of November, 2021.

/s/ J. Devlan Geddes

J. Devlan Geddes
Katherine B. DeLong
GOETZ, BALDWIN & GEDDES, P.C.
35 North Grand Ave.
P.O. Box 6580
Bozeman, MT 59771-6580
Phone:      (406) 587-0618
Fax:         (406) 587-5144
Email:      devlan@goetzlawfirm.com
              kdelong@goetzlawfirm.com


Linda M. Correia (*Pro Hac Vice application pending*)
Lauren A. Khouri (*Pro Hac Vice application pending*)
CORREIA & PUTH, PLLC
1400 16th Street, NW, Suite 450
Washington, DC 20036
Phone:      (202) 602-6500
Fax:         (202) 602-6501
Email:      lcorreia@correiaputh.com
              lkhouri@correiaputh.com