Paul G. Lannon *(Pro Hac Vice)*
Andrew E. Silvia *(Pro Hac Vice)*
Ashley V. Hart *(Pro Hac Vice)*
HOLLAND & KNIGHT LLP
10 St. James Ave.
Boston, MA 02116
Telephone: (617) 523-2700
Facsimile:  (617) 523-6850
paul.lannon@hklaw.com
andrew.silvia@hklaw.com
ashley.hart@hklaw.com

Elizabeth A. Kaleva
Kevin A. Twidwell
Elizabeth A. O'Halloran
KALEVA LAW OFFICE
1911 S. Higgins Ave.
P.O. Box 9312
Missoula, MT 59807-9312
Telephone: (406) 542-1300
Facsimile:  (406) 721-1003
eakaleva@kalevalaw.com
ktwidwell@kalevalaw.com
bohalloran@kalevalaw.com

*Attorneys for Defendant University of Montana-Missoula*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SHANNON SCHWEYEN,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>UNIVERSITY OF MONTANA-MISSOULA,<br><br>　　　　　　Defendant. | CV 21-138-M-DLC<br><br>**DEFENDANT UNIVERSITY OF MONTANA-MISSOULA'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

# <u>TABLE OF CONTENTS</u>

**Page**

FACTUAL BACKGROUND.................................................................................2

ARGUMENT ....................................................................................................6

I.    ALLEGEDLY DISCRIMINATORY ACTS BEFORE MARCH 12, 2020 ARE TIME-BARRED...............................................................6

II.   SCHWEYEN CANNOT ESTABLISH A PRIMA FACIE CASE OF SEX DISCRIMINATION BECAUSE SHE WAS NOT ADEQUATELY PERFORMING HER JOB, AND SIMILARLY SITUATED MALES WERE NOT TREATED MORE FAVORABLY. ...........................................7

    A.   Schweyen did not meet UM's legitimate expectations for her performance.........................................................................8

    B.   Haslam treated Schweyen more favorably than male comparators...........10

III.  SCHWEYEN CANNOT ESTABLISH THAT HASLAM'S REASONS FOR ALLOWING HER CONTRACT TO EXPIRE WERE PRETEXTUAL............................................................................12

    A.   The same person who hired Ms. Schweyen, declined to discipline her, extended her contract, and gave her a raise also made the decision not to retain her................................................................12

    B.   Other allegations of disparate treatment do not establish pretext or discriminatory animus...............................................................15

    C.   The University's attempt to retain Schweyen in a new role and avoid terminating her employment counters any claim of sex discrimination....24

IV.  NOT ONLY WERE THE UNIVERSITY'S ACTIONS BASED ON LEGITIMATE BUSINESS REASONS, BUT THEY WERE NECESSARY TO PROTECT THE HEALTH AND WELFARE OF ITS STUDENT-ATHLETES. ...............................................................26

CONCLUSION ...................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bradley v. Harcourt, Brace & Co.*,
   104 F.3d 267 (9th Cir. 1996) ...........................................................................13

*Coghlan v. Am. Seafoods Co.*,
   413 F.3d 1090 (9th Cir. 2005) ....................................................................13, 14

*Fritz v. U.S. Postal Serv.*,
   No. CV-060187-M-RKS, 2008 WL 11348013 (D. Mont. Nov. 7,
   2008) ................................................................................................................15

*Huggins v. Walbro, LLC*,
   789 Fed. Appx. 37 (9th Cir. 2019)...................................................................14

*Jones v. Bayer Healthcare LLC*,
   302 Fed. Appx. 590 (9th Cir. 2008)...................................................................8

*Lamb-Bowman v. Del. State Univ.*,
   39 Fed. Appx. 748 (3d Cir. 2002)....................................................................23

*Minnis v. State of Wash.*,
   675 Fed. Appx. 728 (9th Cir. 2017)...................................................................8

*Potera-Haskins v. Gamble*,
   519 F. Supp. 2d 1110 (D. Mont. 2007).......................................................15, 26

*Potera-Haskins v. Montana State Univ.-Bozeman*,
   No. CV-05-22-BU-SHE, Dkt. No. 216, slip op. (D. Mont. Aug. 10,
   2010) ...........................................................................................................26, 27

*Rusthoven v. Victor Sch. Dist. No. 7*,
   No. CV 14-170-M-DLC, 2014 WL 6460190 (D. Mont. Nov. 17,
   2014) ..................................................................................................................7

*Salvagni v. Placer Dome U.S., Inc.*,
   No. CV 97-74-BURWA, 1999 WL 34764338 (D. Mont. Feb. 8,
   1999) ..................................................................................................................6

*Schechner v. KPIX-TV*,
  686 F.3d 1018 (9th Cir. 2012) ............................................................14

*Thiel v. Veneman*,
  859 F. Supp. 2d 1182 (D. Mont. 2012)..................................................7

*Tornabene v. Nw. Permanente, P.C.*,
  156 F. Supp. 3d 1234 (D. Or. 2015) ......................................................8

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013)................................................................................7

*Vasquez v. Cnty. of Los Angeles*,
  349 F.3d 634 (9th Cir. 2003) ......................................................7, 8, 12

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002) ............................................................12

*Warmington v. Bd. of Regents of Univ. of Minn.*,
  455 F. Supp. 3d 871 (D. Minn. 2020), *aff'd*, 998 F.3d 789 (8th Cir.
  2021) ....................................................................................................22

*Warmington v. Bd. of Regents of Univ. of Minn.*,
  998 F.3d 789 (8th Cir. 2021) ..............................................................19

## Statutes

42 U.S.C. § 2000e-5(e)(1)............................................................................6

Not all great players make great coaches. That truth applies equally to men and women, and directly to plaintiff Shannon Schweyen. Schweyen's four-year tenure as head coach of the women's basketball team at defendant University of Montana-Missoula ("UM" or the "University") was marred by her teams' lack of success on the court and by a troubling pattern of complaints raised by student-athletes and parents concerning Schweyen's conduct and the harmful environment she fostered for her student-athletes. Those problems came to a head in March 2020, when upon hearing that Schweyen would be returning as head coach, multiple student-athletes and parents approached the University, unsolicited, to express serious concerns about player health and welfare under Schweyen. Two student-athletes entered the transfer portal because they did not want to play under Schweyen. Two more informed administrators that they would transfer or quit if Schweyen returned and that more may do the same. Because Schweyen had reported that only one player was likely to transfer, the Athletic Director lost trust in her ability to lead the team in a positive direction. To protect student health and welfare and preserve the program, amidst the onset of COVID restrictions, the University was forced to act quickly, selecting the most senior assistant coach to lead the team as interim head coach.

Schweyen's contract expired on its terms not because she is a woman but because after four years she was unable to create a healthy, positive, winning

experience for the "Lady Griz." Based on the undisputed material facts, summary judgment should enter for the University on Schweyen's sole claim of disparate treatment based on sex in violation of Title VII.

## Factual Background

Schweyen was a phenomenal student-athlete for the Lady Griz in the late 1980s and early 1990s. After her playing days, she became an assistant coach under Robin Selvig, who coached the Lady Griz for 38 years, from 1978 to 2016. Def.'s Statement of Undisputed Material Facts ("SOF") ¶¶ 5-6. Selvig developed the University's women's basketball team into a nationally renowned program, posting an overall win-loss record of 865-286 (75%), winning the Big Sky regular season a record 23 times, winning the Big Sky Conference tournament 24 times, and making the NCAA tournament 21 times. SOF ¶ 6. Schweyen was one of his assistant coaches for over 20 years and was the lead recruiting coordinator for the program. SOF ¶¶ 7-8.

When Selvig announced his retirement in the summer of 2016, Kent Haslam, the Athletic Director, nominated Schweyen as Selvig's successor. SOF ¶¶ 9, 18. Schweyen was Haslam's "first" and "only" choice for the job; he did not consider any other candidates. SOF ¶¶ 18-19. Rather than a typical national search, Haslam had Schweyen meet informally with a few other administrators. SOF ¶¶ 12-13. He offered Schweyen a three-year contract—the maximum duration allowed at the time.

SOF ¶¶ 22-23. Schweyen became head coach of the Lady Griz in September 2016. SOF ¶ 22.

Schweyen inherited a monumentally successful program and in four years destroyed it. In Schweyen's four years, with many of the same players and with all players she recruited, Schweyen's teams went 52-69 (43% win percentage), including 1-7 against rival Montana State, with no NCAA tournament, WNIT appearances, or conference championships, and just a single game won at the conference tournament. SOF ¶¶ 28, 82-85.

Given Schweyen's dismal on-court performance, the University could have terminated her employment and not offered her a new contract when hers expired in 2019. *See* Silvia Decl. Ex. 45 (Expert Report of Cheryl L. Levick, Mar. 16, 2023 ("Levick Report")) at 5-6. But Haslam decided to give Schweyen another chance, offering her a one-year contract at a higher salary. *Id.*; SOF ¶¶ 74, 79-80. Schweyen's fourth year was her most successful competitively—for the first time she had the team over .500. SOF ¶ 81. Pleased with the on-court progress, Haslam told Schweyen on March 12, 2020 that he intended to offer her a two-year contract renewal and that they would iron out the details over the next few weeks. SOF ¶¶ 88, 93. In that meeting, Haslam asked Schweyen about the environment on the team, and she represented that it had improved and identified only one potential transfer. SOF ¶¶ 90-91.

Schweyen told others of Haslam's plan to renew her, and word spread quickly, while the COVID-19 pandemic hit and UM went remote. SOF ¶¶ 94-95. When student-athletes learned about Schweyen's potential extension, five of them met unsolicited with Haslam or Jean Gee (Senior Associate Athletic Director) to express concerns. SOF ¶ 96. Of the six returning players who had played significant minutes in 2019-20, four of them informed Haslam that they had decided to leave or were considering leaving if Schweyen returned.[1] SOF ¶¶ 126-131.

The student-athletes and parents with whom Haslam spoke in March 2020 raised complaints about student health and welfare consistent with those raised by numerous players during the four prior years. SOF ¶¶ 32-34, 40-43, 48-55, 68-71, 99-108. At least 14 different student-athletes complained to the Athletic Department about Schweyen, and at least nine student-athletes quit or transferred from the team during Schweyen's four years.[2] SOF ¶¶ 31-35, 39, 48-55, 69, 86, 99-108, 124.

Year after year, similar concerns about Schweyen were raised by student-athletes and their parents: negativity, lack of communication, favoritism, inappropriate conduct, emotional manipulation, mind games, and more. *See* SOF ¶¶ 32-34, 40-43, 48-55, 68-71, 99-108, 151. Student-athletes complained that

---

[1] These six returning players were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮ entered the transfer portal, and ▮▮▮▮▮▮▮▮▮▮▮▮▮ informed administrators they were planning to leave if Schweyen returned. ▮▮▮▮▮▮▮▮ later entered the transfer portal.
[2] Only one player, ▮▮▮▮▮▮▮▮, ever transferred into Schweyen's team, and within a year she quit because of Schweyen. SOF ¶¶ 86-87.

Schweyen was mentally abusive towards them, demeaning, and criticized them personally, attacking their character, rather than coaching them on what they should be doing to improve. SOF ¶¶ 54, 101, 105, 151(a)-(b). Schweyen inserted herself in team gossip, pitted players against each other, talked about them behind their backs, and showed favoritism towards her daughters and a few others at the expense of everyone else on the team. SOF ¶¶ 50, 55, 151(d)-(e), (j), (l). Student-athletes had anxiety about meeting with Schweyen but feared reporting Schweyen's misconduct even more, as they had seen Schweyen retaliate against others by cutting playing time if they complained. SOF ¶¶ 151(f)-(g). She destroyed the confidence of the young women and created a toxic, abusive environment. SOF ¶¶ 54, 151(a), (h)-(i), (k). Even now, some student-athletes from Schweyen's teams refuse to pick up a basketball and seek mental-health treatment to recover from their trauma. SOF ¶ 150.

In spring 2018, Haslam had investigated the complaints at that time against Schweyen. SOF ¶¶ 40-50, 53. He found no policy violations and imposed no discipline. SOF ¶¶ 59-60. Instead, he issued Schweyen a written memorandum with recommendations for improvement. SOF ¶¶ 57, 61-63. Haslam believed—based on Schweyen's representations—that the team environment had since improved. SOF ¶¶ 91-92. In March 2020, he learned that was not the case. SOF ¶¶ 96-108. Haslam lost trust in Schweyen's ability to lead the team in a positive manner. SOF ¶ 114.

In light of the pandemic, a national search for a new head coach was not possible, so Haslem turned to Schweyen's most senior assistant coach, Mike Petrino, offering him a position as interim head coach for the 2020-21 season. SOF ¶¶ 132-34. When Petrino stepped in, he learned he had only seven confirmed players, including five incoming recruits. SOF ¶¶ 137. Fortunately, Petrino was able to convince many of those who planned to leave if Schweyen returned to stay and play under him. SOF ¶¶ 138-43. In his one year as interim head coach, Petrino had fewer losses than in any season under Schweyen. SOF ¶ 145.

Haslam's decision to allow Schweyen's contract to expire in 2020 was based on the poor performance of the women's basketball program, the unacceptable environment for student-athletes on the team, and the intent of many student-athletes to leave the program if Schweyen remained as coach. SOF ¶ 118.

## Argument

## I.   Allegedly discriminatory acts before March 12, 2020 are time-barred.

Schweyen filed her charge of discrimination with the EEOC on September 8, 2020—180 days after Haslam indicated on March 12, 2020 that he intended to offer her a new contract. Thus, any acts before March 12, 2020 are time-barred. *See* 42 U.S.C. § 2000e-5(e)(1); *Salvagni v. Placer Dome U.S., Inc.*, No. CV 97-74-BURWA, 1999 WL 34764338, at *1 (D. Mont. Feb. 8, 1999) (discriminatory acts

that occurred more than 180 days before EEOC filing are time-barred).[3] The only allegedly discriminatory act within the statutory period is the decision in March 2020 to let Schweyen's contract expire.[4]

## II. Schweyen cannot establish a *prima facie* case of sex discrimination because she was not adequately performing her job, and similarly situated males were not treated more favorably.

Schweyen has no direct evidence of sex discrimination; there were no comments or remarks based on her sex. SOF ¶ 163. The *McDonnell-Douglas* burden-shifting analysis applies to her claims.

To establish a *prima facie* case of disparate treatment based on sex, a plaintiff must show "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 n.5 (9th Cir. 2003); *see Rusthoven v. Victor Sch. Dist. No. 7*, No. CV 14-170-M-DLC, 2014 WL 6460190, at *3 (D. Mont. Nov. 17, 2014). Overall, Schweyen must establish that Haslam, the supervisor who took the adverse action, acted with discriminatory intent or motive. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013);

---

[3] The March 2019 decision to offer Schweyen a one-year contract and the University's handling of the practice-time issue in September 2019 both fall outside the limitations period.

[4] The continuing-violation doctrine does not apply to the disparate treatment alleged here. *See, e.g.*, *Thiel v. Veneman*, 859 F. Supp. 2d 1182, 1197-98 (D. Mont. 2012) (citing *Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 113-17 (2002)) (for claims of disparate treatment, the continuing violation exception does not apply to discrete acts that are individually actionable).

*Vasquez*, 349 F.3d at 642. Schweyen cannot demonstrate that she was meeting job-performance expectations, that comparator males were treated more favorably, or that discriminatory animus played any role in Haslam's decision not to renew her contract.

**A.      Schweyen did not meet UM's legitimate expectations for her performance.**

Schweyen cannot state a *prima facie* case of sex discrimination because she was not meeting her employer's legitimate expectations. *See, e.g.*, *Minnis v. State of Wash.*, 675 Fed. Appx. 728, 730 (9th Cir. 2017) (affirming summary judgment for employer on Title VII gender-discrimination claim where plaintiff could not establish she was performing according to her employer's legitimate expectations); *Jones v. Bayer Healthcare LLC*, 302 Fed. Appx. 590, 591 (9th Cir. 2008) (similar). She bears the burden of presenting "evidence consisting of 'positive performance reviews, admissions by the employer, or even expert testimony as to an employer's legitimate expectations for the job at issue.'" *Tornabene v. Nw. Permanente, P.C.*, 156 F. Supp. 3d 1234, 1243 (D. Or. 2015). The evidence in this case establishes the contrary: Schweyen failed to meet expectations.

Schweyen's losing records and lack of postseason success demonstrate without doubt that she was not meeting performance expectations. Under Schweyen's predecessor, the team had 21 NCAA tournament appearances and 24 conference tournament champion titles in 38 years, for an overall record of 865-286.

SOF ¶ 6. In four years under Schweyen, her teams won a single game at the Big Sky tournament, never qualified for the NCAA tournament or WNIT, beat rival MSU only once in eight tries, and had a losing record (52-69 overall). SOF ¶¶ 28, 82-85. Her on-court performance did not meet UM's longstanding, legitimate, and reasonable expectations for its women's basketball program. *See* Levick Report at 5.

Additionally, Schweyen failed to meet the University's legitimate expectations for the health and welfare her student-athletes. Schweyen had been investigated in response to student-athlete and parent complaints about her conduct as coach and received a memorandum with detailed recommendations for her to improve her performance. SOF ¶¶ 53, 57, 61-63; *see* Levick Report at 6 (issuing April 2018 memorandum was reasonable and prudent effort to improve performance). By March 12, 2020 Haslam believed Schweyen's performance had improved and warranted a new contract, but that belief was premised on reports from Schweyen that the team environment had improved and that she only expected one student to transfer from the team. SOF ¶¶ 88, 90-92. Over the following weeks, Haslam learned that was far from the truth, that the team environment had worsened, and that several key players were planning to leave. SOF ¶¶ 99-108. Either Schweyen was so out of touch with her players that she had no idea half of them were planning to leave, or she intentionally misrepresented the situation to Haslam.

SOF ¶ 114. Either way, Schweyen was not meeting UM's legitimate expectations for head coaches.

**B.     Haslam treated Schweyen *more* favorably than male comparators.**

Schweyen alleges only one decision-maker discriminated against her based on sex: Haslam. SOF ¶¶ 264-65. Schweyen cannot establish a *prima facie* case because Haslam treated Schweyen *more favorably* than male head coaches who were the subject of repeated complaints by student-athletes and parents or had losing records. Two male coaches ███████████████████████████████████████ ███████ ) and a male coach ██████████████████████████████████████ were subject to multiple complaints by student-athletes and parents regarding their conduct and treatment of student-athletes.[5] SOF ¶¶ 248-56. Haslam nonrenewed all three—all male—for similar reasons as Schweyen. *Id.*

During his time as Athletic Director, Haslam has nonrenewed only five coaches (█████████████████████████████ and Schweyen), and Schweyen is the *only* female. SOF ¶ 246. On this record, there is no evidence of sex discrimination.

Comparing Schweyen to coaches with a similar lack of competitive success further demonstrates the preferential treatment she received. Despite three losing seasons with no NCAA tournament appearances and no conference tournament

---

[5] The University accepts for purposes of this motion only that the ████████ and ███████ head coaches are comparators.

championships, Haslam offered Schweyen another contract with increased salary. SOF ¶¶ 74, 79-80. He wanted to give her an opportunity to turn things around. SOF ¶ 74.The University did not, however, extend that same opportunity to ███████, the male head coach ████████████████ from 2015-2017. SOF ¶ 258.

████████ contract was not renewed based on his program's underachievement following three seasons of *winning* records and an overall record of 21-14, largely because the team missed the postseason for *two* years in a row. *Id.* After the ████████ team lost the last regular-season game of 2017 to rival Montana State, Haslam decided not to renew ████. *Id.* When lower-seeded Northern Arizona upset Schweyen's team in the last game of its 2019-20 season, Haslam told her he was considering offering a two-year renewal. SOF ¶¶ 81, 88. ████ was not renewed after his third year for going 21-14 with one NCAA playoff appearance; Schweyen was renewed with a pay raise after her third year, when she had gone 35-56 with no NCAA playoff appearances. SOF ¶¶ 67, 79-80, 258. Thus, Haslam treated Schweyen *more favorably* than male head coaches who failed to meet reasonable performance and conduct expectations.[6]

---

[6] Schweyen asserts Travis DeCuire (men's basketball head coach) and Bobby Hauck (football head coach) are "comparators," but the evidence contradicts that assertion. DeCuire and Hauck have had consistently winning seasons and have never been the subject of repeated complaints by student-athletes and parents. SOF ¶¶ 257, 261. Moreover, football and men's basketball are the top two revenue-generating sports for the University, and therefore demand the most attention from the Athletic Director. SOF ¶ 166; *see infra* part III. B. (addressing Schweyen's other allegations concerning DeCuire and Hauck).

**III.   Schweyen cannot establish that Haslam's reasons for allowing her contract to expire were pretextual.**

Haslam decided in late March 2020 not to offer Schweyen a contract because of the continued pattern of complaints he received from student-athletes and the number of key student-athletes threatening to leave the program if Schweyen remained. SOF ¶ 118. This information was contrary to what Schweyen had represented to him just days earlier. SOF ¶¶ 90-91, 114. Schweyen disagrees with the complaints, but she cannot establish that the complaints were never made or that Haslam's response to the complaints was a pretext for sex discrimination.

"A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez*, 349 F.3d at 641; *see Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062-63 (9th Cir. 2002). To call into question the employer's articulated reason, the plaintiff "must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez*, 349 F.3d at 642. Schweyen cannot meet this legal burden.

**A.   The same person who hired Ms. Schweyen, declined to discipline her, extended her contract, and gave her a raise also made the decision not to retain her.**

That Haslam hired Schweyen in 2016, declined to discipline her in 2018, and extended her a new contract with a pay raise in 2019 significantly raises the bar for Schweyen to establish that this same actor then decided to let her contract expire

because she is a woman. "[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996). The "same-actor inference is "a 'strong inference' that a court must take into account on a summary judgment motion." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1098 (9th Cir. 2005) ("evidence rarely is 'sufficient ... to find that the employer's asserted justification is false' when the actor who allegedly discriminated against the plaintiff had previously shown a willingness to treat the plaintiff favorably."). A case can survive summary judgment in the face of the same-actor inference "only ... if a plaintiff can muster the extraordinarily strong showing of discrimination necessary to defeat [it]." *Id.* at 1097. Schweyen has adduced no such strong evidence.

The same actor (Haslam), with full knowledge of Schweyen's sex, made the decision to hire her, extend her, and not renew her. SOF ¶¶ 22, 74, 114. He also made the decision in April 2018 not to discipline her in response to complaints. SOF ¶ 60. Indeed, at least as of March 12, 2020, Haslam intended to offer Schweyen a new contract. SOF ¶ 92. So what changed between March 12 and April 1? Not Schweyen's sex. What changed in those three weeks was the negative response from Schweyen's student-athletes to the news that she might be returning, and there is no evidence that Haslam's genuine response to those reports was pretextual. SOF ¶¶ 96,

13

101-110. In such circumstances, the same-actor inference warrants summary judgment in the University's favor.

Granting summary judgment on these facts is consistent with Ninth Circuit precedent. *See Huggins v. Walbro, LLC*, 789 Fed. Appx. 37, 38 (9th Cir. 2019) (applying same-actor inference absent plaintiff establishing a "strong case of bias" and affirming summary judgment where CEO promoted plaintiff and, months later, took adverse action); *Schechner v. KPIX-TV*, 686 F.3d 1018, 1021-26 (9th Cir. 2012). In *Schechner*, the trial court granted summary judgment on age and gender discrimination claims where the same actor signed plaintiffs to new contracts just months or years before making the decision to lay them off. *Id.* at 1021. Similarly, here, Haslam signed Schweyen's most recent contract and gave her a pay raise in July 2019—just *nine months* before his nonrenewal decision, and he offered to negotiate a two-year renewal just *three weeks* before deciding not to renew. *See id.* at 1026; SOF ¶¶ 74, 79-80, 88.

It makes no sense that Schweyen would be Haslam's number-one choice for the job, that he would hire her, extend her a new contract, give her a raise, and intend to extend her again—all while knowing she is a female—and then suddenly turn against her and allow her contract to expire because she is a female. The same-actor inference, coupled with the University's legitimate reasons for its decision, defeats any suggestion of pretext. *See Coughlan*, 413 F.3d at 1099 (affirming summary

14

judgment where plaintiff could not "rebut the strong inference of nondiscrimination that arises under the same-actor rule," in light of employer's asserted legitimate reasons); *see also Fritz v. U.S. Postal Serv.*, No. CV-060187-M-RKS, 2008 WL 11348013, at *5 (D. Mont. Nov. 7, 2008) (concluding no pretext in age case based on same-actor inference where same supervisor hired and terminated plaintiff).

### B. Other allegations of disparate treatment do not establish pretext or discriminatory animus.

#### 1. That Petrino is male does not indicate pretext or discrimination.

That a male interim coach succeeded Schweyen does not suggest pretext or discrimination. Because Petrino was only a temporary, interim coach, he did not replace her for Title VII purposes. *See Potera-Haskins v. Gamble*, 519 F. Supp. 2d 1110, 1118-19 (D. Mont. 2007) (male interim head coach following termination of female women's basketball coach at Montana State "was not a replacement" under Title VII).[7] Furthermore, UM treated Schweyen *more favorably* than Petrino in the terms and duration of their respective contracts. UM paid Schweyen a markedly *larger* salary and offered her *longer* term contracts with performance incentives, demonstrating that there was no disparate treatment towards Schweyen as a woman. SOF ¶¶ 22, 136.

---

[7] The University later conducted a national search for the head coach and hired Brian Holsinger, whom Schweyen acknowledges is qualified for the position. SOF ¶¶ 147-48.

### 2. Schweyen's compensation as compared to DeCuire's does not suggest discrimination or pretext.

The fact that DeCuire was paid an initial base salary of $140,000 when Schweyen was offered $130,000 does not demonstrate discrimination or pretext. SOF ¶¶ 22, 217-18. The coaches of men's basketball teams are often paid more the coaches of women's teams because of the difference in the money generated by the sport (for example, men's teams play "guarantee games" where the program is paid to play; that money in turn goes towards head coaches' salaries) and other factors. SOF ¶ 219; Levick Report at 4. Schweyen knew DeCuire's salary at the time she received her offer from Haslam but made no attempt to negotiate a higher salary. SOF ¶ 181; *see also* Levick Report at 4 (determining Haslam offered Schweyen an appropriate initial salary, higher than the average and median in the conference). DeCuire had previous head coaching experience, while Schweyen did not. SOF ¶ 210. Further, Haslam viewed as a positive DeCuire's range of experience coaching at different universities, from Old Dominion to California Berkeley. SOF ¶¶ 211-12. Plus, UM had to compete against other job offers to DeCuire. SOF ¶¶ 213. Schweyen never had any offers to coach elsewhere. SOF ¶¶ 24, 214.

Even still, Haslam offered DeCuire a salary *below* the conference average for men's basketball teams, while he offered Schweyen a salary *above* average for women's basketball teams. Levick Report at 4-5. The difference in pay was based on legitimate business reasons and does not support a claim of sex discrimination.

16

### 3. Comparisons with the number of student-athletes transferring from other sports are misleading and do not demonstrate pretext.

The fact that student-athletes transferred from the men's basketball and football teams without those coaches losing their jobs does not establish pretext. Schweyen cannot dispute that the reasons those players transferred was meaningfully different. *See* SOF ¶¶ 238-41, 244-45. Student-athletes left, or threatened to leave, the Lady Griz in droves because of complaints about how Schweyen mistreated them. SOF ¶¶ 69-71, 86, 99, 101, 103-107, 240; Levick Report at 6. Not a single student-athlete has been identified who reported transferring because of poor or inappropriate treatment by DeCuire or Hauck—never mind a dozen. SOF ¶¶ 244-45. Moreover, the number of transfers from the football team, with a roster of over 100 players, cannot be compared to a basketball roster of less than 15 players. SOF ¶ 168.

Haslam's decision not to extend a new contract was not based on two players entering the transfer portal. SOF ¶ 118. It was based on the number of student-athletes who complained about Schweyen and threatened to transfer or quit if she remained, jeopardizing the ability to field a competitive team. SOF ¶¶ 114, 116, 118. As Petrino explained, when he was named interim head coach, there were only seven players committed to be on the team, including incoming recruits. SOF ¶ 137. Others agreed to stay or come back only after Schweyen was let go. SOF ¶¶ 138-42. No

similar situation has occurred under the men's basketball or football coaches. Any such comparison is misguided.

### 4. Haslam's comments at or regarding Schweyen's hiring do not demonstrate discriminatory animus.

As purported proof of Haslam's bias against her, Schweyen alleges that Haslam told her not to bother hiring an agent because he was not going to pay her more, and separately, commented to her that "they made me hire you." Neither allegation supports her claim of sex discrimination. The testimony of witnesses and contemporaneous records establish unambiguously that Schweyen was Haslam's first and only choice to succeed Selvig. SOF ¶ 18.

The allegation regarding agents and not paying more than offered contains no reference to sex, and there is no evidence that Haslam took a different negotiating position with respect to male coaches. SOF ¶¶ 178-81. Haslam reasonably expected Schweyen to negotiate for greater pay, but she did not. SOF ¶ 180; *see* Levick Report at 5.

The alleged comment by Haslam to Schweyen and Ryan Martin that he "had" to hire Schweyen is equally vacuous. Once again, there is no reference to her sex. To the contrary, Schweyen alleges Haslam was comparing her hire to that of Hauck, a male head coach. SOF ¶ 182. The comment also says nothing about whether Haslam actually wanted to hire Schweyen, regardless of whether he "had" to hire

her. Indeed, the comment can be reasonably read as confirming she was the obvious choice for the job.

Further, the context confirms that the alleged comment was intended as a joke. Haslam purportedly made the comment in public, to Schweyen and Ryan Martin, in the UM Hall of Champions (where Schweyen is honored). *See id.* Martin interpreted it as an awkward joke that fell flat, and Schweyen did not react or say anything in response. SOF ¶¶ 185-87. Haslam's conduct afterwards—imposing no discipline in the spring 2018 investigation, extending her a second contract, giving her a raise, and intending to extend her a third contract—demonstrates he wanted to hire her and supported her. He made this alleged comment in 2018, and yet he hired her again in 2019! These statements (if made) do not demonstrate pretext or discrimination.

### 5. Haslam supported Schweyen during her employment.

Schweyen seeks evidence of pretext in how frequently Haslam attended women's basketball games compared to men's basketball and football, and how much time he spent with those coaches compared to Schweyen. That effort is futile for two reasons. First, such evidence is immaterial to the nonrenewal decision in 2020 based on student-athlete complaints at that time. *See, e.g.*, *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 798 (8th Cir. 2021) (affirming dismissal of Title VII claim by female head coach where facts indicated university treated plaintiff differently from other coaches but did not show sex discrimination was the

reason for her termination). Second, any purported differences in time spent with these teams and coaches reflects legitimate, nondiscriminatory reasons. Football and men's basketball are the top two revenue-generating sports for the University and attract more donors. SOF ¶ 166. Haslam's time at games and traveling with teams often depends on whether he can meet with donors and other supporters. SOF ¶ 165. There is no evidence that such reasons are pretextual.

Haslam supported Schweyen in many other ways. When Schweyen complained about ████████, the assistant assigned to her program, Haslam reassigned ████ and let Schweyen hire her own candidate. SOF ¶ 234-37. When Schweyen complained about the trainer assigned to the team, Haslam let that trainer go and reassigned the lead trainer to her team. SOF ¶ 232. When Schweyen complained about practice times, Haslam met with the interested parties and facilitated a resolution that allowed the women's team to switch from morning practices. SOF ¶¶ 189-201. Haslam supported Schweyen.

### 6. Haslam's suggestions to improve Schweyen's performance do not evidence pretext or discrimination.

Confusingly, Schweyen claims that Haslam did not provide her with enough in-person support and guidance, but also claims that he more closely supervised her than he did DeCuire, Hauck, or her predecessor Selvig. This contradictory assertion provides no evidence of pretext or discriminatory animus.

Haslam spoke with Schweyen about recruiting and other team issues to support her. Schweyen cannot say whether he had similar conversations with other coaches, but if he did not, it is because he did not need to—they were having success and were not the subject of multiple complaints about their conduct. *See* SOF ¶¶ 173-76. Of course Haslam more closely managed the worst-performing coach of the three who reported directly to him. Haslam had no business telling Selvig how to recruit when Selvig was producing winning teams year after year. Because Schweyen was not, it was reasonable for Haslam to become more involved.

Likewise, that Haslam questioned whether Schweyen's daughters were receiving full scholarships to play but did not question Hauck about his son's football scholarship does not demonstrate discrimination. Schweyen's daughters were borderline players who could not keep their spots on the team after Schweyen was no longer coaching. SOF ¶¶ 207, 209. Hauck's son, by contrast, is an All-American and arguably the best safety to ever play in the conference. SOF ¶ 208. Why would Haslam question Hauck about having a generational talent on his team?

When Haslam suggested to Schweyen that her team should eat more meals together, that was in direct response to student-athletes complaining about the lack of team meals and how it hurt the team environment. SOF ¶ 174. None of these comments evidences pretext or discriminatory animus.

### 7. The practice-time issue does not demonstrate disparate treatment or pretext.

Schweyen's practice-time issue does not establish pretext or discriminatory animus because there are undisputed, nondiscriminatory explanations. Schweyen first requested a change in practice times for her fourth year as head coach after many student-athletes had registered for fall classes. SOF ¶ 195. DeCuire responded that he had no problem with alternating practice times, but that it was too late for the fall semester because his players had already enrolled in classes based on the anticipated schedule. SOF ¶¶ 197-99. Schweyen involved Haslam, who scheduled multiple meetings to facilitate a resolution. SOF ¶ 196. In the end, *both* the men's and women's teams practiced in the afternoon. SOF ¶ 200. DeCuire's frustration with the process was not because Schweyen is a woman, but because she waited until it was too late to change the schedule for the upcoming season.[8]

### 8. Schweyen's other complaints regarding team-related support do not establish discrimination or pretext.

Courts have routinely held that allegations concerning different treatment between men's and women's teams does not establish discriminatory motive under Title VII. *See Warmington v. Bd. of Regents of Univ. of Minn.*, 455 F. Supp. 3d 871, 882 (D. Minn. 2020) (allegations that women's teams lacked budgets and benefits

---

[8] To the extent Schweyen argues ▮▮▮▮▮ conduct was bullying or discriminatory towards her, that is irrelevant because he was a coworker and was not involved in the nonrenewal decision. *See* SOF ¶ 265. Schweyen has not asserted a hostile work environment or harassment claim.

provided to men's teams "say nothing about whether [plaintiff's] sex was a motivating factor in the University's decision to terminate her employment," "do not plausibly permit an inference" of discrimination under Title VII, and warrant dismissal), *aff'd*, 998 F.3d 789 (8th Cir. 2021); *see also Lamb-Bowman v. Del. State Univ.*, 39 Fed. Appx. 748, 750 (3d Cir. 2002) (affirming summary judgment for university because allegations of sex discrimination based on alleged funding and resource disparities between women's and men's teams failed to establish university discriminated against female women's basketball coach because of her sex under Title VII). Here, none of Schweyen's allegations of different treatment establish discriminatory animus by Haslam.

Schweyen's claims that men's basketball and other men's teams received preferential treatment are belied by the undisputed facts. With respect to locker rooms, UM remodeled the women's locker room while she was coach. SOF ¶ 202. Although the men's basketball locker room was recently upgraded to a new space, Schweyen was aware of plans to upgrade the women's locker room to a new space too. SOF ¶¶ 203-04.

Similarly, while Schweyen claims that the University told her she had to raise money to travel to an international tournament in Cancun, she acknowledges that the same obligation applied to the men's teams. SOF ¶¶ 220-23. In fact, the men's basketball team was *paid* to participate in international tournaments; her teams did

not earn any such invitations. SOF ¶ 224. In sum, none of these issues evidences discriminatory intent by Haslam in the nonrenewal decision.

### 9. If Haslam responded to student-athlete and parent to complaints differently, it was to Schweyen's benefit.

UM agrees with Schweyen's assertion that Haslam did not respond to the student-athlete and parent complaints about her the same way it responded to complaints against male head coaches. In fact, the University gave Schweyen *greater leeway* and more chances to improve her performance. The male head coaches the University received complaints about (█████████) were all let go from their coaching positions more quickly than Schweyen. SOF ¶¶ 248-56; *see supra* part II. B.. Those are the only coaches who were the subject of complaints even close to those levied against Schweyen. No other coach has been the subject of as many serious, consistent complaints. SOF ¶ 257. Although Haslam may not have informed Schweyen of every complaint as he received them, he has explained his nondiscriminatory reasons for doing so: to avoid burdening her when complaints were duplicative and allow her to focus on coaching and player relations. SOF ¶ 258. There is no evidence that his reasons were pretextual.

### C. The University's attempt to retain Schweyen in a new role and avoid terminating her employment counters any claim of sex discrimination.

During their call on April 1, 2020, Haslam informed Schweyen that he would not be extending her a new contract and that Gee would contact her regarding human

resources issues and how to communicate the decision internally and externally. SOF ¶ 116. Schweyen's employment with the University would not end until June 30, pursuant to the terms of her contract. SOF ¶ 117. She had ample opportunity to resign, but she chose not to. Rather than wait to speak with Gee, Schweyen contacted friends, UM's former athletic director, attorneys, and spoke with the press that same day. SOF ¶ 119. News of her nonrenewal leaked as a result of her communications and left the University without a chance to coordinate a public communications strategy with her.

Nonetheless, the University worked to *retain* Schweyen as an employee and offered her a different role on campus, as Schweyen shared with her friends. SOF ¶¶ 158, 160-62. It was never UM's desire for Schweyen—one of the school's most celebrated athletes—to be publicly terminated. UM offered to transition her to a public-facing role in the President's Office. SOF ¶¶ 158-59. But Schweyen's husband expressed to friends that "she had no interest in working for the University that had just let her go." SOF ¶ 161. It was Schweyen—not the University—who communicated publicly and with the press about the nonrenewal, and Schweyen who refused an offer for an amicable resolution that may have avoided any alleged reputational damage. That the University wanted to keep her as an employee refutes any claim of disparate treatment with male coaches who were not renewed and not offered continuing employment in other roles.

**IV.   Not only were the University's actions based on legitimate business reasons, but they were necessary to protect the health and welfare of its student-athletes.**

Acting in response to student-athletes' complaints and threats to leave the program was a legitimate business reason and the right decision for the health, safety, and welfare of the University's student-athletes. *See Potera-Haskins v. Montana State Univ.-Bozeman*, No. CV-05-22-BU-SHE, Dkt. No. 216, slip op. at 16 (D. Mont. Aug. 10, 2010) (finding no pretext in termination of female head coach of women's basketball team at Montana State in face of complaints regarding plaintiff's conduct from players). In *Potera-Haskins*, student-athletes complained that the Montana State women's basketball coach was rude, degrading, blamed them for her mistakes, discouraged them from talking to assistant coaches, was self-centered and took no personal interest in the players, pitted players against each other, had poor communication with players, and made a handful of inappropriate comments like "I can't stand you" and "You'll never amount to anything." *Id.* at 6, 8-9. Six players quit or transferred from that team because of conflicts with the coach and unhappiness with how they were treated. *Id.* at 5. When Montana State made the decision to end the coach's employment, five players informed the athletic department administrators that they "intended to leave if Plaintiff remained." *Id.* at 10. These facts are eerily similar to the present case.

Ruling in favor of Montana State, Judge Haddon wrote:

> The facts of this case underscore the obligation and the responsibility a university assumes, as MSU did in this case, to protect the well-being of its students. Not only was the University justified in terminating Plaintiff, it may have been derelict in meeting its responsibilities if it had not done so. If any criticism of what it did could be said to be justified it would be that action should have been taken sooner than it was.

*Id.* at 16. Haslam and UM acted swiftly and appropriately in March 2020 given the severity of student-athlete complaints and their similarity to those previously raised throughout Schweyen's tenure. *See* Levick Report at 6, 8. Had the University not taken the steps it did, the impact on the student-athletes could have been far worse.

As one of Schweyen's former student-athletes explains:

> *Playing for Coach Schweyen has had a lasting impact on my emotional wellbeing. I have been in therapy for years because of the trauma and emotional and verbal abuse I experienced during my time playing for her. I felt useless, hopeless, and manipulated . . . . I was angry and depressed. A big part of my identity was being [a] basketball player, but since leaving UM, I hate being associated with being a basketball player because it triggers the awful memories of playing for Coach Schweyen. When people notice my height and innocently comment, "Oh, are you a basketball player?" it upsets me and brings me right back to those depressing feelings. I have not picked up a basketball since my last game. Because of Coach Schweyen, I've lost all passion for the game I used to love.*

The University made the right decision for the wellbeing of its student-athletes.

27

**Conclusion**

The University chose not to renew Schweyen as the head coach of its storied women's basketball program in the face of losing records, no significant success in the post-season or against rival Montana State, increasing player transfers, and unending complaints of mistreatment, miscommunication, and an unhealthy environment for student-athletes on her team. The University acted in the best interest of its student-athletes and made the necessary coaching change. Schweyen's claims are without merit or logic: Haslam would not have hired her, declined to discipline her, renewed contract after three losing seasons, given her a raise, and then considered another contract if he had intended to discriminate against her because she is a woman. Nor would he have nonrenewed three male coaches who were the subject of similar student-athlete and parent complaints, and another male coach who underperformed (but had more success than Schweyen) if he favored male coaches.

For these reasons, summary judgment should enter for UM.

DATED this 20th day of March, 2023.

*/s/ Andrew E. Silvia*
Paul G. Lannon *(Pro Hac Vice)*
Andrew E. Silvia *(Pro Hac Vice)*
Ashley V. Hart *(Pro Hac Vice)*
HOLLAND & KNIGHT LLP
10 St James Ave
Boston, MA 02116
617.523.2700 (Office)
617.523.6850 (Fax)
paul.lannon@hklaw.com
andrew.silvia@hklaw.com
ashley.hart@hklaw.com

*/s/ Kevin A. Twidwell*
Elizabeth A. Kaleva
Kevin A. Twidwell
Elizabeth A. O'Halloran
KALEVA LAW OFFICES
1911 S. Higgins Ave.
P.O. Box 9312
Missoula, MT 59807-9312
406.542.1300 (Office)
406.721.1003 (Fax)
eakaleva@kalevalaw.com
ktwidwell@kalevalaw.com
bohalloran@kalevalaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I certify that this brief contains 6,470 words according to the word count provided by Microsoft Word in 14-point font, exclusive of the caption, certificates of service and compliance, and tables of contents and authorities.

HOLLAND & KNIGHT LLP
Attorneys for Defendant

*/s/ Andrew E. Silvia*
Andrew E. Silvia

29

## CERTIFICATE OF SERVICE

I, the undersigned counsel, Attorneys for Defendant, hereby certify that on this 20th day of March, 2023, I served a copy of the foregoing by CM/ECF, which will send notice to all counsel of record.

HOLLAND & KNIGHT LLP
Attorneys for Defendant


*/s/ Andrew E. Silvia*
Andrew E. Silvia