Linda M. Correia (*Pro Hac Vice*)
Lauren A. Khouri (*Pro Hac Vice*)
CORREIA & PUTH, PLLC
1400 16th Street, NW, Suite 450
Washington, DC 20036
Phone:   (202) 602-6500
Fax:       (202) 602-6501
Email:    lcorreia@correiaputh.com
              lkhouri@correiaputh.com

J. Devlan Geddes
Katherine B. DeLong
GOETZ, GEDDES & GARDNER, P.C.
35 North Grand
P.O. Box 6580
Bozeman, MT  59771-6580
Phone: (406) 587-0618
Fax:     (406) 587-5144
Email:  devlan@goetzlawfirm.com
            kdelong@goetzlawfirm.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA

| | |
|---|---|
| SHANNON SCHWEYEN,<br><br>                    Plaintiff,<br><br>    v.<br><br>UNIVERSITY OF MONTANA-<br>MISSOULA,<br><br>                    Defendant. | CV 21-138-M-DLC<br><br>**FILED UNDER SEAL**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS..................................................................................1

STANDARD OF REVIEW.............................................................................13

ARGUMENT...................................................................................................14

    I.      Defendant's Motion is Premised on Disputed Facts..................................14

    II.     Plaintiff Presents Abundant Evidence from Which a Jury May
           Conclude Defendant Discriminated Against Schweyen..........................18

         a.  Plaintiff establishes her prima facie case of discrimination................18

         b.  Haslam's hostility toward and differential treatment of
             Schweyen compared to male comparators is evidence of
             pretext..................................................................................................19

         c.  Defendant's piling on of allegations against Plaintiff is
             evidence of pretext..............................................................................22

         d.  Evidence of altered and missing documents is evidence of pretext......24

         e.  Defendant's subsequent offer to retain Plaintiff is inadmissible
             and irrelevant to the actions of the Athletic Department.....................25

         f.  The fact that Haslam was the official decisionmaker tasked
             with hiring Schweyen does not overcome compelling
             evidence of pretext..............................................................................26

    III.    Defendant's Conduct and Actions May Be Used to Prove Its
           Discriminatory Intent...............................................................................27

CONCLUSION.................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*Beck v. UFCW, Local 99*, 506 F.3d 874 (9th Cir. 2007)............................................19

*Bouman v. Block*, 940 F.2d 1211 (9th Cir. 1991)........................................................19

*Chuang v. Univ. of Cal. Davis*, 225 F.3d 111 (9th Cir. 2000)............................13, 24

*Daoud v. Avamere Staffing & Home Care*,
336 F. Supp. 2d 1129 (D. Or. 2004)...........................................................................21

*Goka v. Bobbitt*, 862 F.2d 646 (7th Cir. 1988).........................................................14

*Harrington v. George Fox Univ.*,
No. 3:18-cv-00846-HZ, 2021 U.S. Dist. LEXIS 30331
(D. Or. Feb. 17, 2021).................................................................................................22

*Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564 (9th Cir. 2004).......................22

*Hunt v. Cromartie*, 526 U.S. 541 (1999)...................................................................14

*Jetter v. Knothe Corp.*, 324 F.3d 73 (2d Cir. 2003)....................................................26

*Lyons v. England*, 307 F.3d 1092 (9th Cir. 2002)................................................27-28

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)............................27

*Neushul v. Regents of the Univ. of Cal.*,
No. CV 15-6286 FMO (ASx), 2017 U.S. Dist. LEXIS 234739
(C.D. Cal. Aug. 28, 2017)...........................................................................................23

*Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116 (9th Cir. 2009).......................20

*Noyes v. Kelly Servs.*, 488 F.3d 1163 (9th Cir. 2007)................................................14

*Porter v. Cal. Dep't of Corr.*, 419 F.3d 885 (9th Cir. 2004)..............................20, 27

*Potera-Haskins v. Montana State Univ.-Bozeman*,
No. CV-05-22-BU-SHE, Dkt. No. 216, (D. Mont. Aug. 10, 2010)....................16-17

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)....................13, 26

*Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678 (9th Cir. 2017)..........................20

*Salvagni v. Placer Dome U.S.*, Inc.,
No. CV 97-74-BU-RWA, 1999 U.S. Dist. LEXIS 23507
(D. Mont. May 26, 1999)............................................................................27

*Tornabene v. Nw. Permanente, P.C.*,
156 F. Supp. 3d 1234 (D. Or. 2015).........................................................19

*Zacharias v. Guardsmark, LLC*,
No. 12-174 (RHK/FLN), 2013 U.S. Dist. LEXIS 3787
(D. Minn. Jan. 10, 2013)...........................................................................25

### *Rules*

Fed. R. Civ. P. 56(a).................................................................................14

## STATEMENT OF FACTS

A year before Robin Selvig retired as head women's basketball coach, Kent Haslam told Eric Sprunk, a UM donor and then-Chief Operating Officer for Nike, he was "a big fan of Mike Petrino," who "would do a great job" as head coach of the Lady Griz. *See* Pl's L.R 56.1(b)(2) Add'l Facts ¶1 (hereinafter "Pl's SOF"). Sprunk wrote that he hoped "Petrino takes the reigns from [Selvig]," suggesting Haslam and Sprunk had previously discussed Petrino by noting "I'm pulling for the guy." *Id.* Haslam trusted Sprunk; when he hired Travis DeCuire as men's head basketball coach, Haslam asked Sprunk to visit with DeCuire to get his opinion. *Id.*

When Selvig retired, UM President Royce Engstrom instructed Haslam to conduct a search with "at least a similar flavor to it as the Travis search." Pl's SOF ¶2. He otherwise thought Haslam would "run the risk of people concluding Lady Griz basketball isn't as important as men's, football, etc." *Id.* Engstrom's instruction proved prescient, because Haslam had not indicated any intention of conducting a national search to find a new Lady Griz head coach. *Id.* Haslam asked his staff and Sprunk to visit individually with Schweyen, and he had Schweyen put together a packet with her goals and intentions for the position. Pl's SOF ¶3. Haslam told Engstrom, "I don't simply want to hand it over to her." *Id.* Schweyen, an assistant coach to Selvig for over two decades and recognized as the Big Sky Conference Top

Female Athlete of All Time, was seen by many in the community as the obvious choice to replace Selvig. *Id*.

When Haslam offered Schweyen the job, he asked her if she intended to hire an agent. Pl's SOF ¶4. She told him she was not sure, and he sharply cut in and said "it's gonna be a waste of your money, I'm not going to pay you anymore – I'm not going to pay you what I paid Robin and it will be a waste of your money." *Id*. Haslam showed Schweyen a piece of paper that had $130,000 written down and said, "this is what I'm going to pay you." *Id.*

When UM does not conduct a national search, it must obtain a recruitment exception. Pl's SOF ¶5. The August 4 email requesting the exception requested a base annual salary of $135,000 to $155,000. *Id*. UM paid Selvig $158,000. *Id*. Haslam told an employee from the Commissioner of Higher Education he intended to pay Schweyen about $137,000, but on the same day, emailed Engstrom to tell him that he planned to offer Schweyen $130,000 to $135,000. *Id*. Engstrom asked what Selvig and the Montana State University coach made. *Id*. UM often hired new employees at the same salary or higher than their predecessors to stay competitive with rivals like MSU. Pl's SOF ¶6. The MSU women's basketball coach was making $151,000 at the time. *Id*.

Engstrom asked, "do we have an equity problem if we don't pay her as much as the men?" Pl's SOF ¶7. Haslam replied, "we do not have a problem;" Haslam said

he asked Jean Gee and she said it was fine if the salaries were "close." *Id.*[1] Still, after raising the equity concern, Engstrom responded to an earlier email, approving the higher $135,000 to $155,000 salary range. *Id.* The next day, Haslam emailed Schweyen a contract for her signature with a $130,000 salary. *Id.*

When Haslam hired DeCuire, DeCuire had no Division I head coaching experience and less assistant coach experience than Schweyen. Pl's SOF ¶8. DeCuire participated in one group phone interview instead of several individual interviews. *Id.* Haslam offered DeCuire more than his predecessor Wayne Tinkle, who had been head coach for eight years and made a base salary of $135,000. *Id.* DeCuire had an agent, but $140,000 was Haslam's first offer. *Id.*

Schweyen's contract emphasized academic success as "paramount," with graduation as "the primary goal for student athletes." Pl's SOF ¶9. In at least the last three of her years as head coach, Schweyen earned performance incentives, offered in her contract, for earning a team GPA above 3.0. *Id.*

### Schweyen's first season

Schweyen's first season as a head coach looked promising. Pl's SOF ¶10. Returning senior ███████████████████ had already broken Schweyen's long-standing scoring record and was the Big Sky Conference preseason player of the

---

[1]      Gee never saw Engstrom's email; Haslam instead told her Engstrom was worried about Travis DeCuire's salary as a comparator. *Id.*

year. *Id*. ████████████████ were expected to collectively score 40 points per game. *Id*. Then, at the start of the season, ████████████ suffered season-ending injuries. *Id*. With the two starters unexpectedly out, Schweyen quickly invited ████████████████████████████ to come back and play. The injuries also resulted in younger, inexperienced players on the court who would typically be expected to score about 5 points per game. Pl's SOF ¶11.

The injuries garnered significant press coverage, but Haslam never offered Schweyen, a brand-new coach, sympathy or support, instead saying she should "quit talking about [her] injuries to the media." Pl's SOF ¶12. He remembers telling her to "hang in there" and "tough breaks" when he would see her, did not recall the nature of the injuries or their positions, or any details of their prior successes. *Id*.

The next season, both ████████████ were again injured. Pl's SOF ¶13. Despite that, Schweyen doubled the team's wins from the season before. *Id*. Schweyen successfully recruited a transfer student who became eligible to play in January 2018 and averaged more than ten points per game. *Id*.

### *Lack of support for Schweyen and her team*

Haslam did not meet annually with Schweyen to discuss her performance, as both her contract and UM policy required. Pl's SOF ¶14. Haslam failed to meet with Schweyen at the end of her first season. *Id*. In their first one-on-one end of season

meeting in spring 2019, they discussed only the expiration of her contract and not support, budget, or specific goals. *Id*.

Haslam spent noticeably less time with Schweyen than DeCuire. Pl's SOF ¶15. He "spent many hours in the men's basketball office" right next to Schweyen's office but "never stepped into [Schweyen's] office to check on" the coaching staff. *Id*. Assistant coach Sonya Stokken observed that Haslam would not congratulate them after wins and "did not have an interest in the Lady Griz program at all." *Id*.

Haslam attended men's basketball practices about once per week. Pl's SOF ¶16. He also has attended "more than 50 percent" of the men's basketball games. *Id*. By contrast, he rarely attended women's basketball practices or games during Schweyen's tenure, attending by his own estimate about ten home games per year. *Id*. He spent little time observing the team, did not know the players, and traveled with the women's team once in four years. *Id*.

In 2018, Haslam told Schweyen, "I didn't want to hire you, but they made me," referring to UM boosters. Pl's SOF ¶17. Assistant AD Ryan Martin was present for the comment and found it "awkward" and "uncomfortable;" "I would've said that a whole lot different […] if I felt uncomfortable, [Schweyen] would feel uncomfortable too." *Id*.

5

Haslam also gave Schweyen grief about ███████████████ on the team but not male coaches who also ███████████████ on the team they coached. Pl's SOF ¶18.

Schweyen told Director of Communication Joel Carlson that Haslam showed a lack of support and hostility toward her. Pl's SOF ¶18. Two of her assistants and soccer coach Mark Plakorus shared the same observations about Haslam's treatment of Schweyen. *Id.*

In early 2017, Carlson emailed Haslam and Greg Sundberg asking whether UM should publicly promote the women's upcoming appearance at the "Cancun Challenge," a valuable early-season opportunity for the team to compete against strong non-conference teams on a neutral playing site, noting they "hyped up" the men's involvement in similar tournaments. Pl's SOF ¶19. Haslam directed Carlson not to advertise it, because an appearance "a long ways away at a beach resort" would look like they "weren't using resources in a responsible way." *Id.* When the women's team was next invited to compete in the tournament, the administration told Schweyen the women's basketball team could only compete if they paid for it out of private funding dollars, because it "wasn't in the best interest of the program." *Id.*

The year before, UM "hyped up" the men's basketball team's appearance at a tournament in St. Thomas, Virgin Islands. Pl's SOF ¶20. The men's team played a

2017 tournament in Malibu and one in the Bahamas, among others. *Id*. Team trips help with recruiting and bonding. Pl's SOF ¶21. DeCuire saw that team bonding led to success on the basketball court. *Id*.

During the 2018-2019 season, the women's team was also selected to play in the Women's Basketball Invitational post season tournament. Pl's SOF ¶22. Gee forwarded the invitation to Haslam and suggested "the financials don't make sense." *Id*. The team did not play in the post-season tournament. *Id*.

Schweyen reported to UM that the women's locker room badly needed repairs. Pl's SOF ¶23. An upgrade had "been talked about for a long time." *Id*. In 2023, Sundberg said UM had "big renovation plans in the near future" including a new women's basketball locker room. *Id*. Haslam had promised the exact same renovation as "exciting facility plans ahead" in September 2018, but it is still not complete. *Id*.

### Injuries Heal, Complaints Begin

The 2017-2018 season ended with the team doubling its wins from the prior season, from 7 to 14—even with player injuries. Pl's SOF ¶24. Instead of meeting with Schweyen to discuss her team's impressive growth, Haslam initiated an inquiry in response to two clearly inflammatory letters from disgruntled former-athlete parents, ███████████████████. *Id*. Haslam and Gee met with players and asked pointed, suggestive questions about Schweyen's alleged misconduct. Pl's SOF

¶25. One coach noted, "[i]t felt like they had already made up their minds about the allegations." *Id*. Yet, they could not find any substantiation for the serious allegations. *Id*. In contrast, when UM received complaints about male coaches, an administrator met with the coach but otherwise took little action. Pl's SOF ¶26.

After concluding their inquiry, Haslam and Gee suggested Schweyen "watch [her] language,"[2] organize more group dinners, and learn from mentors. Pl's SOF ¶28. Schweyen spoke regularly with at least three coaching mentors. *Id*. Schweyen increased the frequency of team meals while on the road, continued to host meals in her home and an annual retreat for team bonding. *Id*. In 2019, ████████, a parent who previously expressed dissatisfaction with Schweyen, thanked Schweyen and her staff: "you have played a tremendous role into making ████ the wonderful, strong young person that she is. I thank you for what you have done." *Id*.

The former-athlete's parent, however, continued targeting Schweyen. In summer 2018, the staff learned that a former parent contacted incoming recruits to tell them not to come to UM, forcing them to contact recruits to reassure them. Pl's SOF ¶29. A year later, long after his daughter graduated, ████ again emailed Haslam, telling him to fire Schweyen. *Id*.

---

[2]     Selvig, DeCuire, and Hauck all used vulgar language on the court and field. Pl's SOF ¶27.

*2019 Contract Renewal*

Per UM's employee handbook, head coaches for men's and women's basketball and football "are employed under a 3-year contract." Pl's SOF ¶30. UM adopted standard three-year contracts for these coaches specifically because one-year contracts previously put coaches at a recruiting disadvantage, with recruits opting for the stability of a head coach under a longer contract. *Id*.

Schweyen's initial 3-year contract required she and Haslam meet annually "to mutually discuss the option to enter into a new 3-year agreement." Pl's SOF ¶31. But Haslam only met with Schweyen about her contracts in the years they expired. *Id*. DeCuire signed new three-year contracts in 2014, 2016, 2018, and 2019, to avoid ever "coaching in the last year of [his] contract." *Id*.

On April 4, 2019, Haslam offered Schweyen an atypical one-year contract. Pl's SOF ¶32. Schweyen explained to Haslam that the shorter contract would hurt recruiting efforts and asked for feedback. *Id*.  Haslam instructed her to "do better," without providing specifics or metrics. *Id*.

*Practice Schedules*

In April 2019, Schweyen reported an equity concern to Haslam and Gee. Pl's SOF ¶33. For years, the men's basketball team reserved a shared practice facility during the "premium" time slot, in the mid-afternoon, while the women's team practiced during the less-preferred morning slot. *Id*. Schweyen requested to use the

mid-afternoon slot because of academic conflicts, but DeCuire insisted on keeping the slot. *Id*. Schweyen emailed Haslam and Gee asking for help to figure out something "fair and equitable to all involved." Pl's SOF ¶34. Gee told Haslam the conflict could be a Title IX violation, especially because Schweyen viewed the morning slot as less desirable. *Id*. Haslam arranged a meeting with the coaches, then stood by as ███████████████████████ and refused to compromise. *Id*. Schweyen reported to general counsel France that she felt discriminated against by ███████████ behavior. *Id*.

### *Haslam Renews & Reneges on Schweyen's Two Year Contract*

Schweyen responded to Haslam's "do better" instruction by winning three more games in 2019-2020 than the prior year and delivering her first winning season. Pl's SOF ¶35. She successfully recruited the best high school player in Montana, ESPN 100 nationally-ranked ███████████, to join her team as a freshman. *Id*.

The morning after the season's last game, in Boise on March 12, Haslam met with Schweyen. Pl's SOF ¶36. Schweyen had "never had one meeting with him" that season. *Id*. Haslam told Schweyen "she'd done a good job," he "was proud" of the team, he was giving her the remaining two years of her contract, and the details could be "ironed out" after spring break. *Id*. Schweyen shared the good news with her husband and assistant coaches. *Id*. Meanwhile, Haslam notified Carlson about the extension so he could prepare a press release. Pl's SOF ¶37.

In the March 12 meeting, Schweyen told Haslam that ███████████ might enter the transfer portal. Pl's SOF ¶38. The NCAA recently changed its rules to make transferring schools easier for student-athletes, which led to an uptick of transfer interest. *Id*. In late March, ███████ and another player, ████████████, both entered the portal. Pl's SOF ¶39. Schweyen called Haslam on March 30 to update him, knowing the situation was not "unusual" after the NCAA changes. *Id*. To her alarm, Haslam, who never yelled, yelled at Schweyen that he was "tired of having to answer these questions about all these people leaving." *Id*.

Unbeknownst to Schweyen, Haslam had recently visited with five of her student-athletes. Pl's SOF ¶40. He contacted ███████████ after she entered the transfer portal. *Id*. ██████████████████ expressed dissatisfaction but did not indicate plans to transfer. *Id*. ████████████ said she would "most likely transfer," which she had threatened every year. *Id*. ████████ wanted a guaranteed redshirt year to stay at UM, which Haslam could not promise. *Id*. ████████ played 10.1 minutes per game that season and never started. *Id.* Haslam did not tell any of the players to speak directly to Schweyen about their concerns nor he did not ask for Schweyen's perspective. *Id*.

Haslam did not visit with satisfied student-athletes. ███████████ thought that Schweyen coming back was "good news." Pl's SOF ¶41. ██████████████████ ███████████████████, liked Schweyen's encouragement, feedback, and advice. *Id*.

11

████████████████████████████████, saw Schweyen's return as "a big relief." *Id*. ████████████████ were also returning. *Id*. Schweyen had already signed six new recruits for the next season. *Id*. Even if every player who allegedly threatened to transfer actually did, Schweyen would have had 11 players secured for the fall roster, which DeCuire said is "plenty […] enough to field a team." *Id*. In fact, DeCuire's roster reduced to 11 players the following season because of transfer portal entries. *Id*.

Since 2018, DeCuire has had at least 20 players enter the transfer portal, but Haslam never expressed any concern. *Id*.

On the morning of April 1, Schweyen met with her staff to discuss the upcoming season and how to adjust for player transfers. Pl's SOF ¶42. Later that day, Haslam called Schweyen and said he would not renew her contract, despite their earlier agreement. *Id*. He cited the players in the transfer portal, saying too many players had left or "would leave," giving her "not much of a roster." *Id*. Schweyen reiterated that two players in the portal was "not uncommon" and reminded him of the players returning. *Id*. He refused to tell her who had threatened to leave. *Id*. She pressed Haslam for more explanation or a meeting, but he refused to meet with her. *Id*.

Haslam failed to inform Schweyen about parent complaints in any timely or constructive manner; Schweyen learned "from the general public" that a parent

contacted Haslam about her and learned ██████████ wrote a letter nine months

later. Pl's SOF ¶43. UM acknowledges that coaches have to know about complaints

to be expected to change their behavior. *Id*.

On April 3, President Bodnar and Haslam heard that a community member,

██████████ had contacted players to convince them to transfer or intentionally

lose games to get Schweyen fired. Pl's SOF ¶44. They found this "unbelievable."

*Id*. In fact, ██████ had messaged ██████ in late March, saying she was "too good

of a player to waste [her] career." *Id.*

When Haslam offered Petrino the job of interim head coach, Petrino said, "are

you sure this is a good idea?", indicating that removing Schweyen was "going to

hurt the program." Pl's SOF ¶45. After Schweyen's departure, ██████ transferred.

*Id*.

Haslam decided not to renew the contracts of three male coaches. UM allowed

all three the opportunity to resign. Def. SOF 246-257

## STANDARD OF REVIEW

A "plaintiff in an employment discrimination action need produce very little

evidence in order to overcome an employer's motion for summary judgment."

*Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124-29 (9th Cir. 2000) (citing

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). Where

discrimination is at issue, "motivation is itself a factual question" and for a jury to

decide. *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999). *See also* Fed. R. Civ. P. 56(a);

*Noyes v. Kelly Servs.*, 488 F.3d 1163, 1169-73 (9th Cir. 2007).

## ARGUMENT

### I.   Defendant's Motion is Premised on Disputed Facts

While Defendant's one-sided story may be appropriate to tell a jury, it fails

summary judgment because it does not present material undisputed facts, applies

every conceivable inference in its favor, and asks this Court to resolve credibility

determinations for the movant, all of which are inappropriate at this stage. Though

a motion is advocacy, it should not recite self-serving facts, twist others with

inferences, and ignore facts that contradict them, as Defendant as done here. *See

Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988) ("purpose of the summary

judgment rule … is to isolate and dispose of *factually unsupported* claims or

defenses") (cleaned up).

Defendant claims there are no material facts in dispute, but that is not true.

For example:

- Defendant asserts as undisputed that Schweyen was "Haslam's number-one
  choice for the job," Def. Br. 14, but Schweyen testified Haslam told her "I
  didn't want to hire you." While Haslam denied the statement, Martin testified
  that Haslam did make what Martin passed off as a "joke" about being forced
  to hire Schweyen. When Selvig announced his retirement, Haslam told UM's

President that every person he heard from with "advice" told him to "just promote Shannon . . . [b]ut, I don't want to simply hand it over to her." *See* Pl's SOF ¶¶3, 17.

- Defendant asserts as undisputed that "Haslam treated Schweyen more favorably than male head coaches," with reference to three coaches Haslam terminated, allegedly, because of parent and student complaints, Def. Br. 10, but Defendant knows all three of the male coaches were allowed the opportunity to resign and publicly leave UM on good terms when Schweyen was not. Pl's SOF ¶26, Def. SOF 246-257.

- Defendant asserts as undisputed that Haslam "made the decision in April 2018 not to discipline [Plaintiff] in response to complaints" as evidence that he treated her more favorably than male coaches, Def. Br. 13, but Haslam had no reason to discipline her because UM "did not corroborate any of the serious allegations against Shannon." Pl's SOF ¶25.

- Defendant asserts that the significant transfer portal numbers from men's basketball and football do not show pretext because they did not leave for the same reasons as Lady Griz players, Def. Br. 17, but Haslam testified he did not know and did not ask why students on teams coached by men were leaving in droves—numbers so noticeable it resulted in multiple news articles—and

15

did not speak with them about it or, obviously, terminate them like Schweyen. Pl's SOF ¶41.

Defendant's assertion that *Potera-Haskins v. Montana State University-Bozeman* is "eerily similar" to this case is a perfect example of its misrepresentation of the facts in its favor and serves as a road map for what the University should have done, but did not do here. *Potera-Haskins* is not a summary judgment decision, but an order *after* a four-day bench trial that included 21 witnesses.[3] *Potera-Haskins v. Montana State Univ.-Bozeman*, No. CV-05-22-BU-SHE, Dkt. No. 216, slip op. at 2 (D. Mont. Aug. 10, 2010) (Haddon, J.). The Court did what only a fact-finder can, "weigh[ed] the evidence, particularly the witnesses' testimony, taking into account all factors which may bear on credibility." *Id.* at 4, 15-16.

In that case, when MSU received complaints about plaintiff, it formed a committee of neutral officials to investigate. *Id.* at 5-6. The committee met with departing players and others, but plaintiff refused to meet with the committee to give her side of the story. The committee issued a written report with specific findings, that plaintiff's style was "out of control, rude, degrading, hysterical, and unstable." *Id.* at 6. Although they discussed dismissing plaintiff at the time, the Athletic Director developed a program and had "[s]everal meetings" with plaintiff to help her

---

[3]     Only the Title IX retaliation claim proceeded to trial. *See Potera-Haskins v. Gamble*, 519 F. Supp. 2d 1110, 1118-19 (D. Mont. 2007).

improve. *Id.* 6-7. Later, MSU learned she was violating NCAA rules by making players practice more than 20 hours a week and other administrators reported observing problematic behavior. Still, again, MSU conducted an investigation and gave the coach "[s]pecific directions," orally and in writing. *Id.* 8. When players continued to complain about the same behavior, MSU reconvened the committee and conducted a second investigation where not a single player had anything positive to say about plaintiff. They recommended to the president that plaintiff's contract not be renewed. *Id.* 10. The president agreed and gave plaintiff an opportunity to resign. *Id.* When she refused to do so, MSU terminated her. *Id.* at 12.

Here, in contrast to *Potera-Haskins*, UM's historic practice[4] and Schweyen's own contract requiring annual performance reviews, Haslam failed to conduct one during her time at UM. He did not have "several meetings" with her after giving her feedback; he admits that when he gave her the 2018 memo, he provided her with no specific examples of how she could adopt his recommendations or what he was looking to observe after she implemented any feedback, and he did not ask or know about her progress. Pl's SOF ¶14. MSU repeatedly met with Potera-Haskins, provided feedback, gave her time to improve, and provided feedback again. Not so with Schweyen, who testified:

---

[4]    Haslam's predecessor Jim O'Day conducted "time-consuming" reviews each year for his direct reports. Pl's SOF ¶14.

I never received that kind of thing from Kent. I never had one meeting with him my last year; not one. He came into my office literally one time about tickets to Robin Selvig's movie, and that was literally one of the few and only times I had him step into my office my last year. And if I was truly, in his mind, not renewed because of all those reasons, wouldn't my last year, when I'm supposed to be doing better, wouldn't there be some checkups? Wouldn't there be some periodic meetings? Wouldn't there be some, you know, emails or some kind of communication to help me as a coach, because his job is supposedly to help and support.

*Id*. If *Potera-Haskins* is "eerily similar" to Schweyen's case in any way, it is that it should also proceed to trial.

## II.   Plaintiff Presents Abundant Evidence from Which a Jury May Conclude Defendant Discriminated Against Schweyen.

### a.   Plaintiff establishes her prima facie case of discrimination.

Defendant misguidedly suggests Plaintiff must be tripped up on one element at the *prima facie* stage ("that she was qualified for the job and her performance was satisfactory"). Def. Br. 8-10. Defendant seeks to use the fact that Haslam renewed Schweyen's contract as a sword and a shield, but it cannot have it both ways. The evidence Defendant cites to claim Haslam supported Plaintiff—that Haslam hired Schweyen, extended her contract, and gave her a raise during her time at UM, Def. Br. at 12-15—is affirmative evidence that Plaintiff *was meeting* Defendant's expectations for her performance. The case Defendant cites makes this clear: evidence that Plaintiff's contract was previously renewed is evidence that her performance was at least "satisfactory," which is all that is necessary to meet a *prima*

*facie* burden. *See Tornabene v. Nw. Permanente, P.C.*, 156 F. Supp. 3d 1234, 1242-43 (D. Or. 2015).

Any contention that Plaintiff did not meet Defendant's performance expectations ignores that the only evidence of any direction Haslam gave Plaintiff when renewing her contract in 2019 was to tell her to "do better." And she did. *See* Pl's SOF ¶13. Regardless, on this point, Defendant is just reasserting what it claims is its alleged legitimate, non-discriminatory reason for terminating Schweyen, which is improper under the law. *Beck v. UFCW, Local 99*, 506 F.3d 874, 883 (9th Cir. 2007) ("Once the defendant produces sufficient evidence to satisfy this burden, the McDonnell Douglas framework -- with its presumptions and burdens – disappear") (cleaned up); *Bouman v. Block*, 940 F.2d 1211, 1223 (9th Cir. 1991) ("Whether a prima facie case was made is no longer relevant" after assertion of legitimate justification).

### b. Haslam's hostility toward and differential treatment of Schweyen compared to male comparators is evidence of pretext.

Plaintiff demonstrates Haslam's hostility toward her in many ways, from insults like telling Schweyen she is "just worried about laying in the sun and having fun in the sun" when she wanted her team to attend a tournament they had attended for years when Selvig was head coach, to significant differences in treatment, like allowing male coaches to depart from their job at UM with dignity, announcing a termination as a resignation, but not allowing Schweyen the same treatment. Haslam

told Schweyen he was not renewing her contract because of players entering the transfer portal, but took no action about the number of players entering the transfer portal on the men's team; numbers so significant it caught media attention. He paid her less than her male counterpart despite Schweyen having more relevant experience, and UM's President explicitly raising the concern that he might have an equity problem if he did so. This is textbook evidence of discrimination. *See, e.g.*, *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1128 (9th Cir. 2009) (evidence that defendant failed to treat plaintiff "in the same manner that it treated similarly deficient male[s]" provided evidence of pretext); *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 896 (9th Cir. 2005) (procedural and treatment irregularities support an inference of pretext); *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2017) ("the ultimate question is . . . one that is most appropriately conducted by the factfinder") (internal quotation marks omitted).

The differences between Haslam's treatment of Schweyen compared to male coaches outnumber the similarities. Haslam spent time visiting with male coaches, but not Schweyen. He brought any complaints about male coaches to them immediately and took their word for it when they denied the allegations; for Schweyen, he sat on allegations and then called in students to ask them if the allegations were truthful. A jury could reasonably view Haslam hiding allegations from Schweyen, only to then try to hold them against her in defending this lawsuit

three years after he had dismissed them as unsubstantiated, as evidence that he did not want her to remedy concerns and improve. Gee, among other witnesses, agreed that an employee cannot address concerns they do not know about, or respond to feedback they have not been given. *See cf. Daoud v. Avamere Staffing & Home Care*, 336 F. Supp. 2d 1129, 1137 (D. Or. 2004) ("Of course, nothing in the law required defendant to give plaintiff a warning or tell plaintiff about the alleged client complaints; not doing so, however, supports a reasonable inference the complaints did not trigger plaintiff's termination.).

Plaintiff's assertion of Haslam's hostility here is sufficient to create a dispute of material fact, but she does not stand alone. Carlson testified that Petrino, Rodgers (now Stokken), and Plakorus confided in him that Haslam did not show support to Schweyen. Stokken attests that Haslam did not show support for Schweyen, did not show interest in Schweyen's program, and created an unhealthy team dynamic by validating parent concerns and trying to "catch" Schweyen and the coaching staff doing something wrong. Pl's SOF ¶18. This contemporaneous evidence may lead a jury to find Schweyen more credible than Haslam or other UM witnesses.

### c. Defendant's piling on of allegations against Plaintiff is evidence of pretext.

Defendant's reliance on post-hoc information is evidence of pretext. Once in litigation, Defendant cannot justify its actions with information it did not have at the time. *See* Def. Br. 26-27. Taking two affidavits for example, out of 62 paragraphs of negative comments about Plaintiff, only *seven* detail information the students claim to have conveyed to Haslam and that matches up with Haslam's contemporaneous notes. Def. SOF ¶151.

When Haslam terminated Schweyen, he told her he was doing so because she had too many players entering the transfer portal. Pl's SOF ¶36. Now, Defendant fills its motion with inadmissible hearsay and rebuffed allegations to claim Schweyen was a threat to student safety. New and conflicting explanations for its conduct may lead a jury to conclude pretext. *See Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569-70 (9th Cir. 2004) (shifting reasons evidence of pretext); *Harrington v. George Fox Univ.*, No. 3:18-cv-00846-HZ, 2021 U.S. Dist. LEXIS 30331, at *23-27 (D. Or. Feb. 17, 2021) ("post-hoc explanations that are inconsistent" with employer admissions may lead a "reasonable juror could conclude that Defendant's post-hoc explanation is unworthy of credence").

Defendant fails to acknowledge two critical facts. First, Defendant did not contemporaneously—and still has not—verified in any way any allegation against Schweyen. To the contrary, Petrino and Stokken expressly disclaim that Schweyen

was abusive. So do several players. ███████ stated she "never saw Coach Schweyen speak to any player in a problematic way. [She] never saw her humiliate players or treat them poorly. Pl's SOF ¶41. ████████████ stated she never saw Schweyen personally attack players and that she "always felt like Coach Schweyen cared about [her] and [her] teammates. *Id*. ███████ shared she really enjoyed playing for Schweyen and the team environment. *Id*. She testified that she never heard Schweyen personally insult, abuse, or demean a player. *Id*. This creates disputes of material facts, but a jury may credit Haslam's failure to speak with Schweyen or students who supported Schweyen as evidence that he was not interested in getting to the truth.

The *Neushul* case is instructive. *See Neushul v. Regents of the Univ. of Cal.*, No. CV 15-6286 FMO (ASx), 2017 U.S. Dist. LEXIS 234739 (C.D. Cal. Aug. 28, 2017). There, a coach brought claims for discrimination and retaliation after the school terminated her under the auspices of student complaints and transferring players. *Id.* *29-35. The court denied summary judgment, finding that "even assuming defendant had put forth admissible evidence relating to student and parent complaints regarding Neushul's coaching, plaintiff responded with admissible evidence from other student-athletes praising her coaching ability." *Id.* The court also found the fact that the school never disciplined plaintiff and that students transferred during years where she continued to be employed as evidence of pretext.

The same evidence exists here, plus evidence to undermine the credibility of certain students' accounts. For example, ▮▮▮▮ testified she recognized a divide that she believed was because of playing time; she does not recall players complaining about anything else. Pl's SOF ¶41.

### d.  Evidence of altered and missing documents is evidence of pretext.

With two different versions of one parent complaint letter and testimony about missing documents, a jury may infer Defendant has something to hide and that is discrimination. *See Chuang*, 225 F.3d at 1124-29 ("employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable"). In discovery, Defendant produced one version of a parent letter and Schweyen produced another version, testifying that she received her copy from Haslam; a copy that Haslam has not been able to recover. Pl's SOF ¶43. The letter Defendant produced in litigation included allegations missing from the letter Haslam handed Schweyen contemporaneously, including allegations that Schweyen told his daughter "are you F***ing stupid" and "are you f***ing deaf," and that "Shannon and at least one player were seen to have been taking multiple shots of hard alcohol." *Id*. The letter Defendant produced said "there are four girls" who had decided to transfer, but the letter handed to Schweyen contemporaneously said three. *Id.* A jury may view these discrepancies and question the accuracy of all the correspondence that could have been altered by Haslam.

UM witnesses have also testified about destroyed documents, including talking points that Haslam used at the press conference where he announced Petrino as interim head coach, and the list of questions Haslam used when speaking with the women's basketball players about Schweyen in 2018. *Id.* Both documents were created by Haslam and not produced in this case. *Id.* A jury may infer discrimination from missing or altered documents. *See Zacharias v. Guardsmark, LLC*, No. 12-174 (RHK/FLN), 2013 U.S. Dist. LEXIS 3787, at *22-24 (D. Minn. Jan. 10, 2013) (collecting cases).

### e.  Defendant's subsequent offer to retain Plaintiff is inadmissible and irrelevant to the actions of the Athletic Department.

Defendant claims that because a different office with different employees offered Schweyen a different position it somehow cancels out Haslam's behavior and nonrenewal of Schweyen's contract. Def. Br. 24-25. This "offer" was part of settlement discussions with an attorney and UM's general counsel. It came with a settlement agreement and release of claims authored by UM's general counsel that identifies the job as consideration for the release. Pl's SOF ¶46. This is inadmissible under Federal Rule of Evidence 408.

Even if it was somehow admissible and relevant, the offer does not undo UM's adverse employment action against Plaintiff. The position had no relation to the Athletic Department, Haslam had no role in the negotiations, it was for one year, and it was one third her coach's salary. *Id.* If anything, a jury may conclude that UM was

25

not truthful when it claimed that Schweyen was a threat to the safety of its students, since it seems unlikely that it would want such a person serving in a "public-facing role in the President's Office." Def. Br. at 25. "[T]he factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Reeves*, 530 U.S. at 147.

### f. The fact that Haslam was the official decisionmaker tasked with hiring Schweyen does not overcome compelling evidence of pretext.

Defendant asserts that because Haslam hired Schweyen and maintained her employment for three seasons, he could not have discriminated against her. Def. Br. 12-16. A jury may reject Defendant's interpretation and view the testimony that Haslam said he did not want to hire Schweyen, paid her less than her male counterpart, ignored her presence as a head coach except when finding an opportunity to be critical, and made sure that the public knew she was forced out unlike her male counterparts, all as evidence of pretext. *See Rosales v. Career Sys. Dev. Corp.*, 2009 U.S. Dist. LEXIS 101808, at *43 (E.D. Cal. Nov. 1, 2009) ("there is little support in the Ninth Circuit for the proposition that the same-actor inference warrants summary judgment for defendant where, as here, plaintiff has established a prima facie case and adduced evidence of pretext").

Further, the "same actor inference" goes away if the jury credits Schweyen's corroborated testimony that Haslam did not want to hire her but felt forced to by boosters and because of her prominence in the women's basketball community. *See*

*Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003) ("This rationale has usually been applied in circumstances where the person making the hiring decision had no collateral incentive to hire any particular candidate. Here, in contrast, Defendants wanted to acquire Plaintiff's company, and in order to succeed in that desire, they were forced to hire Plaintiff."); *cf. Porter*, 419 F.3d 888-89 (finding triable issue in retaliation claim where adverse employment action happened at the earliest opportunity). A jury may credit Haslam's written admission that he liked Petrino for the job, before Selvig retired, and ultimately had Petrino fill in for Schweyen, as evidence that he did not want to hire Schweyen—and ultimately got what he wanted.

### III.   Defendant's Conduct and Actions May Be Used to Prove Its Discriminatory Intent

Defendant argues that acts before March 12, 2020, 180 days before Schweyen filed her EEOC charge, are time-barred, Def. Br. at 6-7, but Defendant's cited opinion was reconsidered and reversed on that issue. In *Salvagni v. Placer Dome U.S., Inc.*, the court clarified that the 180-day limitation period applied to the Montana Human Rights Act claim and not "the longer 300-day limitation period of Title VII" that applies. *Salvagni v. Placer Dome U.S.*, Inc., No. CV 97-74-BU-RWA, 1999 U.S. Dist. LEXIS 23507, at *8-11 (D. Mont. May 26, 1999).

Nevertheless, past conduct may be used to prove intent or as evidence of pretext. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Lyons v. England*, 307 F.3d 1092, 1110-11 (9th Cir. 2002). It may "offered for its probative

27

value in assessing whether the employer's justifications for its present conduct lack credibility" and may also serve as circumstantial "proof of the employer's intent to discriminate." *Id.* at 1112; *Chuang*, 225 F.3d at 1128.

**CONCLUSION**

Plaintiff respectfully requests Defendant's Motion for Summary Judgment be denied.

Date: April 10, 2023                    Respectfully submitted,


_____
J. Devlan Geddes
Katherine B. DeLong
GOETZ, GEDDES & GARDNER, P.C.

Linda M. Correia
Lauren A. Khouri
CORREIA & PUTH, PLLC

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2023, I am filing the foregoing through the Court's NextGen Pacer System (also known as the CM/ECF system), which will serve a copy on all counsel of record.

_____
Lauren A. Khouri

## CERTIFICATE OF COMPLIANCE

This filing complies with D. Mont. Local Rules because, excluding exempted parts, this filing contains 6,491 words and has been prepared in a proportionally spaced typeface using Microsoft Word in 14pt Times New Roman font.

_____
Lauren A. Khouri