# EXHIBIT 1

2023 WL 6445830
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

SHERONDA POWELL, Plaintiff,

v.

DOANE UNIVERSITY, Defendant.

NO. 8:20-CV-0427
|
Filed: 10/03/2023

**MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGEMENT AND
MOTION TO EXCLUDE EXPERT TESTIMONY**

Brian C. Buescher United States District Judge

**\*1** Plaintiff Sheronda Powell has sued her former employer defendant Doane University for sex discrimination and retaliation under Title VII, 42 U.S.C. § 2000e-2, and Title IX, 20 U.S.C. § 1681(a). Filing 1. Doane filed a Motion for Summary Judgment on the entirety of Powell's Complaint. Filing 83. Doane also filed a Motion to Exclude Expert Testimony of Powell's expert, Dr. Laura Burton. Filing 80. For the reasons stated herein, the Court grants Doane's Motion for Summary Judgment and denies its Motion to Exclude Expert Testimony as moot.

**I. INTRODUCTION**

**A. Factual Background**

Both Doane and Powell provided Statements of Facts and Responses to those Statements. Filing 85; Filing 100-2; Filing 100-3; Filing 112. Unless otherwise indicated, the facts set out in this section are undisputed. Although the identification of the parties and the statement of the general timeline of events are largely undisputed, many of the events that gave rise to Powell's termination are disputed.

*1. The Parties Involved*
Plaintiff Sheronda Powell is an African-American female. Filing 1 at 5 (¶ 30). Powell began working for Doane

University as the head coach of the women's basketball team in August 2019. Filing 85 at 1 (¶ 1). Powell played collegiate basketball at Michigan State University and had experience as an assistant coach at several other universities. Filing 100-3 at 1–2 (¶¶ 3–9). The job description for Powell's position as the head coach of the Doane women's basketball team included the "responsibility to manage the sport and student athletes in the best interest of Doane University[,] ... to prove [sic] effective leadership to the team and the women's basketball program[,] ... maintaining the basketball practice and competition environment to provide an exceptional practice and game day environment for Doane student-athletes," and "supervising the Assistant Coach and Graduate Assistant." Filing 85 at 2 (¶¶ 7–8). Powell was an at-will employee. Filing 85 at 1 (¶ 5). Powell's direct supervisor was Athletic Director Matt Franzen. Filing 85 at 1–2 (¶ 6). Powell's employment with Doane ended on November 25, 2019. Filing 85 at 1 (¶ 4).

Defendant Doane University is a private liberal arts college in Crete, Nebraska. Filing 85 at 1 (¶ 2). Matt Franzen was the Athletic Director (AD) at Doane University during Powell's employment and had direct supervisory responsibility over her. Filing 85 at 1–2 (¶ 6). AD Franzen was responsible for interviewing and hiring Powell. Filing 85 at (¶¶ 12–13). Laura Northup was the Director of Human Resources and Title IX Coordinator at Doane during Powell's employment. Filing 85 at 2–3 (¶ 14).

Marissa Webb, an African-American female, served as Assistant Coach to the Doane women's basketball team during part of Powell's employment. Filing 85 at 5 (¶ 27). Powell personally selected Webb to serve as Assistant Coach. Filing 85 at 5 (¶ 27). Assistant Coach Webb resigned on November 22, 2019. Filing 85 at 10 (¶ 55). The parties disagree about when Assistant Coach Webb's resignation became effective. According to Doane, Assistant Coach Webb's resignation was effective December 7, 2019. Filing 85 at 10 (¶ 55). According to Powell, Assistant Coach Webb did not actually quit until the end of the basketball season. Filing 100-2 at 26 (¶ 55).

**\*2** Daymarcco Green served as Graduate Assistant to the Doane women's basketball team during part of Powell's employment. Filing 85 at 5 (¶ 27). Green is an African-American male. Filing 85 at 5 (¶ 27). Powell personally selected Green to serve as Graduate Assistant. Filing 85 at 5 (¶ 27). Green resigned on November 6, 2019, two-and-a-half months after he began his position. Filing 85 at 7 (¶ 33).

*2. The Events that Led to Powell's Termination*

The Court will focus on material facts "that might affect the outcome of the suit under the governing law." *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (internal quotations and citations omitted). The material facts in this case belong in one of six categories: (a) Powell's alleged problems with her team's uniforms and technology; (b) Powell's alleged problems with the athletic training and medical care available to her players; (c) AD Franzen's handling of Powell's disputes with Webb; (d) coaches' and players' complaints about Powell made to AD Franzen and HR; (e) coaches' and a player's resignations from the Doane women's basketball team; and (f) Powell's termination.

a. Powell's Alleged Problems with
Team Uniforms and Technology

The parties agree that Powell communicated problems with uniforms and gear. Filing 85 at 4 (¶ 14). The parties also agree that Doane budgeted money for Powell to use to purchase equipment for the team and that AD Franzen put Powell in touch with a vendor to purchase uniforms and gear for the team. Filing 85 at 3 (¶¶ 15-16). The parties dispute why problems arose regarding uniforms and gear and how they were handled.

Powell contends that she lacked the equipment needed for the Doane women's basketball team. Filing 100-3 at 2 (¶ 13). Powell contends the team did not have necessary gear including "game uniforms, practice uniforms, shoes, backpacks, travel suits and other things like t-shirts and sweatpants." Filing 100-3 at 2 (¶ 14). She alleges that the men's basketball team had no issues with their necessary gear. Filing 100-3 at 3 (¶ 16).[1] Powell expressed concerns regarding the deficient gear to AD Franzen. Filing 100-3 at 3 (¶ 15). Powell contends that when the uniform and shoes arrived, they were deficient—some had already been used and worn. Filing 100-3 at 3 (¶ 18). She further alleges that when the uniforms were washed, they shrunk, despite have been washed according to instructions. Filing 100-3 at 3 (¶ 19). In addition, Powel contends the coaches' pants were several inches too short. Filing 100-3 at 3 (¶ 21). Powell claims she repeatedly asked AD Franzen for assistance with the uniforms but contends she was provided none until the season was very close to beginning. Filing 100-3 at 3-4 (¶¶ 22–24). According to Powell, the vendor, who was chosen by someone other than Powell, did not inform Powell until after she had already

ordered the uniforms that she should order men's sizes rather than women's sizes. Filing 100-3 at 4 (¶ 25–26). By the time Powell's employment with Doane ended in November 2019, the uniform and gear issues had not yet been fully resolved. Filing 100-3 at 4 (¶ 27).

Doane disputes Powell's version of events regarding her team's uniforms. Filing 85 at 3–4 (¶¶ 15–22). Doane contends AD Franzen and the vendor discussed uniform options with Powell and advised her that ordering in women's sizes would result in the uniforms being smaller than expected. Filing 85 at 3–4 (¶¶ 17–18). Contrary to Powell's allegations, Doane contends that AD Franzen was responsive to Powell's issues and helped her resolve the issue. Filing 85 at 4 (¶¶ 21–22).

**\*3** Powell also contends she had problems with getting an iPad for her team. The parties agree that the scoreboard required an iPad to run the controls. Filing 85 at 4 (¶ 23). The parties also agree that AD Franzen told Powell to use her fundraising budget to purchase an iPad. Filing 85 at 4–5 (¶ 23). The parties do not dispute that Powell's mother donated $250 to Powell so she could purchase the iPad. Filing 85 at 5 (¶ 25). Powell contends that she "had to beg and plead to get an iPad" and that AD Franzen told Powell to pay for an iPad out of her budget knowing she "did not have any money in her account." Filing 100-3 at 4–5 (¶¶ 30, 36–37). Doane argues that Powell purchased the iPad using a fundraising account and that Doane only later learned that the account included funds from Powell's mother. Filing 85 at 5 (¶ 25).

b. Powell's Alleged Problems with Athletic
Training and Medical Care for her Players

Powell complained to AD Franzen on August 27, 2019 that some of her players were having health issues and that the athletic trainer was not attending the team's 6:00 a.m. workouts. Filing 85 at 5 (¶ 29). AD Franzen responded to Powell's complaint as follows:

Right now the athletic trainers are focused in on their fall sports so I wouldn't expect a whole lot of attention as you are starting practices very early.

Nobody should be practicing until they are cleared by the sports med department having all of their paperwork in....

So I would recommend making sure that your roster is fully cleared with the athletic trainer before moving forward. But

they won't provide practice coverage for winter sports in August.

Filing 85 at 6 (¶ 30). Beyond this reply, the parties dispute whether and how Powell's complaints were addressed.

Powell alleged that she had issues getting athletic training and medical care for her players and that, at one point, she had six or seven players on the bench with medical and/or training issues, which she never saw happening with the men's teams. Filing 100-3 at 5 (¶ 39–40). Powell claims that she had to carry a player to the training room for medical attention, which she never saw happening with the men's teams, either. Filing 100-3 at 5 (¶ 41). Powell contends that she reported these concerns to AD Franzen, who proceeded to tell the athletic trainer that "she was just a first year coach." Filing 100-3 at 6 (¶ 42). Doane argues that AD Franzen addressed Powell's student-athlete health matters, including by asking Doane's Director of Sports to meet with Powell and to review Powell's specific complaints. Filing 85 at 6 (¶ 31).

c. AD Franzen's Handling of Powell's Disputes with Webb

The parties agree that Powell met with AD Franzen and Director Northup on November 12, 2019. Filing 85 at 9 (¶ 47). The reason for this meeting and the events that occurred therein are largely disputed. However, the parties agree that at some point AD Franzen used the phrase "female thing" or "something along the same line," although the parties hotly contest the context of AD Franzen's comment. Filing 100-3 at 6 (¶ 46); Filing 113 at 17–18.

Powell contends that she told AD Franzen on October 25, 2019 that she believed she was going to have to fire Assistant Coach Webb due to issues she was having with Webb. Filing 100-3 at 6 (¶ 43). Powell also contends that on November 12, 2019, she met with AD Franzen and Director Northup to ask for their assistance regarding Powell's disputes with Assistant Coach Webb. Filing 100-3 at 6 (¶ 45). Powell asserts that AD Franzen responded that Powell's problems with Assistant Coach Webb were "a female thing." Filing 100-3 at 6 (¶ 46).

Doane disputes Powell's characterization of the November 12, 2019, meeting and the context in which AD Franzen made the "female thing" comment. In Doane's telling, AD Franzen and Director Northup met with Powell to address complaints made against her, as discussed below. Filing 85 at 9 (¶ 47). Doane quotes AD Franzen's testimony to support its

contention that Powell has taken the "female thing" comment out of context:

> **\*4**  [AD Franzen:] I don't think I would have used that phrase ["a female thing"], but what we were trying to do -- this was after [Assistant Coach] Marissa [Webb] had come forward with her complaints [about Powell]. And we were trying to set up a meeting between the two to see if we could, essentially, start over with their relationship and mend it and save -- kind of save -- save the relationship and/or save Marissa as a -- to stay as an assistant coach. And I brought up that it -- I thought it would be better if we could get the two in a room. And we needed an intermediary. It would be better to have [Director] Laura [Northup] be that person rather than me because the communication would flow better if it was a female mediating rather than the male department head. Now, I don't remember how I worded it at the time, but I am -- I am 99 percent sure that's where that came from.

Filing 113 at 18. In short, Doane contends that AD Franzen's comment was "in the context of attempting to figure out how to mend the relationship between Plaintiff and Assistant Coach Webb." Filing 113 at 18.

d. Coaches' and Players' Complaints about Powell Communicated to AD Franzen and Director Northup

Powell's coaches, players, and the parents of a player lodged complaints about Powell to AD Franzen and Director Northup in the weeks preceding Powell's termination. Filing 85 at 7–9 (¶¶ 34, 45, 48–49). Powell contends that neither AD Franzen nor Director Northup communicated these complaints to her. Filing 100-3 at 7–9 (¶¶ 54–58, 68). Conversely, Doane argues that AD Franzen and Director Northup met with Powell on November 12, 2019, to address the reported complaints. Filing 85 at 9 (¶ 47). Powell disputes the veracity of the

allegations contained within the complaints but not that these complaints were lodged against her. Filing 100-3 at 11 (¶ 90).

### i. Allegations about Powell Made by Her Coaches

On November 7, 2019, Assistant Coach Webb made numerous allegations regarding Powell to AD Franzen and Director Northup. Filing 85 at 9 (¶ 47). Assistant Coach Webb alleged that Powell told her, among other things: that she was second tier; that no other program would want her; that she needed to do the grunt work; that she needed to be spoon-fed; that she needed to find another job on at least three occasions; that she had not earned the right to sit on the bench during games; that it was disrespectful to get lunch before a game; that she should not talk to other coaches because they are trying to set her up; that she could not talk to players; and that other coaches and programs were spying on her. Filing 85 at 7–8 (¶¶ 36–44). Assistant Coach Webb also alleged that Powell would yell at her in front of the players and "had created a negative environment for her and an unwelcome work and school environment for Assistant Coach Green, the student-athletes and herself." Filing 85 at 7–8 (¶ 36, 38). Powell disputes the veracity of all of these allegations. Filing 100-3 at 8–9 (¶¶ 59–67) (Powell specifically denying each of these allegations). However, Powell does not dispute that Assistant Coach Webb made these complaints. Filing 85 at 7 (¶ 34).

On November 11, 2019, Graduate Assistant Green alleged to AD Franzen and Director Northup that Powell operated like a dictator. Filing 85 at 8 (¶ 45). He asserted that Powell's "student-athletes did not want to be there and dreaded their experience ... [which] was true for all of the team, and not just a few of the players." Filing 85 at 9 (¶ 46). He also alleged that Powell told him and Assistant Coach Webb that Powell would never give them a reference. Filing 85 at 9 (¶ 46). Powell disputes the veracity of all these allegations. Filing 100-3 at 8–9 (¶¶ 57–58, 74). However, like with Assistant Coach Webb, Powell does not dispute that Graduate Assistant Green made these complaints to AD Franzen and Director Northup. Filing 85 at 8–9 (¶¶ 45–46).

### ii. Allegations about Powell Made by Student-Athletes and Parents

**\*5** The Court turns first to allegations made by student-athletes against Powell in a meeting with AD Franzen and

Director Northup on November 15, 2019. Filing 85 at 9 (¶ 48). It is undisputed that Powell's players expressed anxiety and dread about playing basketball for Powell. Filing 85 at 9 (¶ 48). It is also undisputed that the student-athletes documented and submitted a list of complaints against Powell organized under the following categories: "Disrespectful to Players, Coach Webb, and Coach Green"; "Unorganized"; "Coach Powell creates an unsafe environment"; "Coach Powell uses fear, humiliation and degrading, disrespectful behaviors as 'teaching' tools"; "Coach Powell puts basketball OVER education"; "Invasion of Privacy/Not treating us like adults"; "Inappropriate Yelling/Poor Communication"; "Bible Vers[e]s/Scripture Used Wrongly"; and "A completely different Coach/Person when AD Franzen sat in on practice." Filing 77 (Exhibit D).[2] Relevant portions of the list of complaints are as follows:

**Disrespectful to Players, Coach Webb, and Coach Green**

Example: Coach Powell knows nothing about us outside of basketball. The relationship piece is not there. Feels more like a dictatorship

Example: Yelling at Coach Green

- Made Coach Green go scrape the ice off of the vans so they would be ready to drive for Coach Powell instead of staying with the team to watch film

Example: Yelling at Coach Webb regarding [Student A] practicing

- Coach Powell yelled at Coach Webb in front of the entire team. She said to Coach Webb, "I told you to tell me to tell [Student A] to dress out for practice. I told you!"

- Also an example of Coach Powell not being organized

Example: Coach Powell yells at us for nodding our heads in response to her talking to us

Example: 11.8.19 Coach Powell said – "those who just came back are a cancer to the team"

Example: 11.8.19 Kicked the whole varsity team out of practice 30 minutes in (for no real reason)

- Coach Powell was the ONLY coach yelling during practice

- Coach Webb and Coach Green did not yell at the team to do better

- Coach Powell never addressed kicking the team out of practice

Example: 11.12.19 Daymarcco in regards to leaving the program in a week. Us: "You are so happy about it" Him: "well would you not be?"

Example: 11.4.19 Daymarcco referring to Powell and our season thus far.. "If you can make it through this, you can make it through anything." "Y'all are so mentally strong." "You will never go through hell like this in your life again."

Example: Powell got mad at [Student B] and [Student C] for going to their Grandma's funeral

**Unorganized**

Example: Suspended [Student B] and [Student C] for not reminding Coach Powell they had an educational conference to go to. [Student B] and [Student C] told Coach Powell in September that they had the conference. Coach Green and Coach Webb were aware of [Student B] and [Student C] going to the conference.

- "Since there is two of you, I am making it a two week suspension"

- Coach Powell should have written down when [Student B] and [Student C] would be gone on a calendar, along with all other player's commitments outside of basketball

...

**Coach Powell creates an unsafe environment**

Example: Coach Powell did not allow/have varsity players to stretch before practice on November 5th, and most days yells at us to hurry up our stretching because "we are taking too long"

Example: Coach Powell did not let the team stretch before running lines on November 8[.] Coach Webb asked Coach Powell if the team could stretch before going 100% and Coach Powell said "no"

Example: Yells at the team to rush through stretching every day at practice[.] We get 8 minutes to stretch and never go over the time, we are always done 2-3 minutes early and she still yells at us to rush

Example: 11.14.19 30 minutes into practice, players had to ask to stretch

Example: Must come to practice even if you are sick and throwing up, and then can get sent home by the trainer or nurse. Ex: 6 am: no nurse or trainer available so sick players have to sit in the gym

**\*6  Coach Powell uses fear, humiliation and degrading, disrespectful behaviors as "teaching" tools**

Example: With a show of hands, the question was asked in a varsity player only meeting, who was enjoying basketball this season, and not a single person raised their hand.

Example: 11.5.19 Emotionally abusive towards [Student D]. Coach Powell said, "you are so annoying and pissing me off" ... This does not help the player understand what she needs to improve on or learn

Example: 10.23.19 Powell said to [Student E] "why are you letting her dribble between you- she can't even dribble"

Example: 10.25.19 told [Student F] "you don't even wanna hear what I have to say about you because it would offend you"

Example: 10.30.19 told [Student G] that "she is very unathletic, most unathletic on the team, but still dropped 24 points, but cant dribble over a piece of paper"

Example: 10.28.19 "[Student H] and [Student I] wish they have half the talent you have [Student F]"

Example: 11.1.19 "this game is disgusting and everyone is laughing at you"

Example: 11.1.19 "if I wanted you to not rebound and play bad, I might as well put [Student J] in"

Example: 11.5.19 to [Student E] "you're a hard worker, just with half the talent of others"

**Coach Powell puts basketball OVER education**

Example: Coach Powell told us we could not take a class that went past 2pm or a night class next semester (2020). In order to do so, we had to get permission from Coach Powell.

- [Student K] told Coach she had to take a class that goes to 2:45 pm. Coach Powell replied, "she may take it, but there's

no guarantee that practice won't be at 2:00 pm. If we can do it."

Example: Coach Powell makes [Student L] stay 10-15 minutes after when she needs to leave morning practice for student teaching.

...

**Invasion of Privacy/Not treating us like adults**

Example: Players must text the coaches every time they leave Crete and when they come back to Crete

- Treating us like children

- This is not properly preparing young adults for the "real world"

- Asked [Student E] for a note from student teaching, got a signed note from teacher, said "For your teachers note, I will need something a little more official. Sorry, anyone could have wrote that. Thanks"

- [Student E] immediately had her teacher send an email to Coach Powell explaining I was at Norris with him student teaching, Powell responded to the email, "I don't mean to be rude but who are you and why are you emailing me?"

**Inappropriate Yelling/Poor Communication**

Example: Yelling at [Student M] regarding defense when [Student M] was on offense

- Coach actually never apologized to me, she just said "ok" and rolled her eyes when another player on the team told coach that [Student M] wasn't on defense Example: Yelled at [Student L] for running the "wrong" play

- Coach eventually had to apologize for yelling because [Student L] was right

...

**Bible Vers[e]s/Scripture Used Wrongly**

Example: 11.2.19: Told us that God says in the Bible "if you know what to do and you don't do it that is sinning and you will be punished" She said this relates to basketball because you know how to run the plays and if you don't that is a sin in basketball and you will be punished. Basically → "you'll go to hell for running a play wrong"

**\*7** Example: Saying during a prayer before November 8th practice telling us that we have bad spirits (demons) in our bodies and that's why we are the way we are.

Example: when dealing with the things she does/says.. "God telling me to say and do this"

**A completely different Coach/Person when AD Franzen sat in on practice**

- Did not yell at the team/individuals once

- Was smiling

- Did not prayer or say anything related to God (usually every practice this occurs)

- The team got three times as many water breaks

- We usually only get 1 a practice

- During stretching, never told the team "hurry up, you are taking way to long"

- The team gets told this at least twice every practice while stretching

- Keep in mind: We get 8 minutes to stretch and never go over the time, we are always done 2-3 minutes early and she still yells at use [sic]

Filing 77 (Exhibit D) (emphasis in original).

Powell disputes the veracity of the allegations contained within the complaints. Filing 100-3 at 9–11 (¶¶ 71–87). Powell does not dispute that these complaints were made against her. Filing 85 at 9 (¶ 48). AD Franzen and Director Northup also received an anonymous letter dated November 17, 2019, from the parents of one of Powell's student-athletes who alleged similar misconduct by Powell. Filing 85 at 9 (¶ 49).[3] Powell does not dispute that Doane officials received this letter. Filing 85 at 9 (¶ 49).

**\*8** At the time they decided to terminate Powell, AD Franzen and Director Northup had received from Powell's coaches, players, and their parents. Filing 76; Filing 77; Filing 85 at 7–9 (¶¶ 34, 45, 48–49). The complaints against Powell included the following: Powell regularly humiliated and degraded her coaches and players; Powell communicated poorly with her players; Powell created an unsafe environment for her players; Powell subordinated

her player's education and families to basketball; Powell communicated inappropriately with her coaches and players; Powell used religion to threaten her players; and Powell acted differently and was less negative to her players when she was being observed by AD Franzen. *See* Filing 76; Filing 77; Filing 85 at 7–9 (¶¶ 34, 45, 48–49).

### e. Coaches' and a Player's Resignations from Powell's Team Caused Doane Officials to Fear that More Players Would Quit

The parties agree that several members of Powell's team quit in the weeks leading up to her resignation. On November 6, 2019, two-and-a-half months after beginning in her position, Graduate Assistant Green resigned. Filing 85 at 7 (¶ 33). On November 18, 2019, a freshman member of the Doane women's basketball team "quit because her grades were slipping and there was too much anxiety around basketball." Filing 85 at 9 (¶¶ 50–51). On November 18, 2019, AD Franzen wrote in an email to Director Northup that he was "afraid that more players will start quitting now that one of the better freshmen pulled the trigger." Filing 85 at 10 (¶ 52). The next day, AD Franzen wrote in an email to Director Northup:

> [T]he whole thing is unprecedented. I don't even have anything to compare to when trying to talk about steps moving forward.... I have seen Division 1 programs make coaching changes mid-year when things are clearly not going to work. I've never seen it at the small college level. But at this point, all options are on the table. If [Assistant Coach] Marissa [Webb] leaves, I would really worry about our team following her out the door....

Filing 85 at 10 (¶ 53).

On November 22, 2019, Assistant Coach Webb gave notice of her resignation. Filing 85 at 10 (¶ 55). That same day, AD Franzen and Director Northup met with Powell's players and informed them that Assistant Coach Webb had resigned. Filing 85 at 10 (¶ 56). Powell's players cried and expressed fear of going to practice without the "buffer" that Assistant

Coach Webb provided between the players and Powell. Filing 85 at 11 (¶ 57).

### f. Powell's Termination

Doane alleges that AD Franzen asked for Powell's resignation, Filing 85 at 11 (¶ 58), while Powell claims that she was fired, Filing 100-3 at 1 (¶ 2), but both parties agree that Powell's employment with Doane ended on November 25, 2019. The parties heatedly dispute why Powell was terminated. Doane alleges that it terminated Powell because "with both assistant coaches quitting mid-season, the student-athlete's expressing fear of Plaintiff, and the observed low morale of the team, only one month into the season ... [i]t was apparent that the damage Plaintiff had caused was irreparable, and the best thing for Doane, the team and the Plaintiff would be to part ways." Filing 85 at 11 (¶¶ 58–59). Doane refers the Court to Director Northup's deposition testimony:

Q. Why didn't you decide to give [Powell] a corrective action [before terminating her]?

A. [Director Northup] At that point, it truly was the team was all ready to walk out the door; some players had already. It wasn't just a, a handful of players; it was the entire varsity team that had met with us in such a short period of time.

Not only that, it was not just the players; everything was corroborated by both of her coaches, which had also quit, [Powell] was the one that hired them[,] so it wasn't like she — they were somebody that [ ] wasn't on board or she wasn't on board with from the get-go.

**\*9** The amount of concerns, the reaction of the players when we had both the first conversation and the follow-up conversation with them, they were crying. They were talking about the amount of anxiety that they were having around just going to basketball practice and how it was impacting their mental well-being and their physical well-being.

It was just a huge problem, and we didn't feel that it was something that could be fixed at that point.

Too much damage had been done in such a short period of time that we felt like it was just the best decision to part ways at that time, for both [Powell] and for the team. We didn't see [Powell] could turn it around, based on the egregiousness of the concerns.

Filing 85 at 11 (¶ 60). Doane also points to AD Franzen's testimony that "the problem was significant enough that within a matter of -- it felt like a matter of days the entire coaching staff had resigned and the team was on the verge." Filing 85 at 11–12 (¶ 61). In sum, Doane alleges it fired Powell because it had received complaints alleging that Powell engaged in "egregious[ ]" misconduct and because "in a matter of days the entire coaching staff had resigned and the team was on the verge" of quitting. Filing 85 at 11–12 (¶ 60–61).

Powell offers entirely different reasons for her termination, namely, that she was fired because of her sex and in retaliation for complaining of discrimination. Filing 1 at 15–18 (¶¶ 123–141). Powell contends that "[s]he was never asked if anything in the complaint[s] was true, which means Defendant did not investigate [the complaints]." Filing 100-1 at 25. Powell alleges that "she was discriminated against based on her gender and retaliated against for bringing forward concerns based on gender." Filing 100-1 at 3. Specifically, Powell argues that "AD Franzen fired Coach Powell for problems with her assistant coach," Webb, "within two weeks of making [the 'female thing'] comment." Filing 100-1 at 9–10. In sum, Powell asserts that AD Franzen's "female thing" comment and Director Northup's failure to "investigate[ ] to get both sides of the story" show that Doane discriminated against Powell because of her sex. *See* Filing 100-1 at 24–26.

### B. Procedural Background

Powell filed a charge of discrimination with the EEOC on March 10, 2020. Filing 100-6 at 186. She filed her Complaint with the Court on October 16, 2020. Filing 1. Her Complaint contains two causes of action: sex discrimination and retaliation under Title VII, and sex discrimination and retaliation under Title IX. Filing 1 at 15–18 (¶¶ 123–141). In her Prayer for Relief, Powell requests compensatory and punitive damages, equitable relief, and attorney's fees and costs. Filing 1 at 18–19. Doane filed its Answer on December 11, 2020. Filing 12. On April 26, 2023, Doane filed a Motion to Exclude Expert Testimony by Powell's proffered expert Dr. Laura Burton, Filing 80, and a Motion for Summary Judgment, Filing 83.

### II. ANALYSIS

### A. Applicable Standards

Under Rule 56 of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense— on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

**\*10** Somewhat more specifically, the Eighth Circuit Court of Appeals has explained,

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." [ *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)] (quotations omitted). A fact is "material" if it may "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue is genuine if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (quotations omitted).

*Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1047–48 (8th Cir. 2022). To put the "materiality" requirement slightly differently, " '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Rusness*, 31 F.4th at 614 (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019), in turn quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.' " *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins.*, 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr.*

*of Richmond, Inc.*, 34 F.4th 649 (8th Cir. 2022); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019).

The parties bear specific burdens on a motion for summary judgment. "The moving party bears the burden of showing the absence of a genuine dispute. *Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir.) (citing Fed. R. Civ. P. 56(a)), *reh'g denied*, No. 20-2884, 2022 WL 1564097 (8th Cir. May 18, 2022). Thus, " '[t]he movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.' " 🔖 *Mensie v. City of Little Rock*, 917 F.3d 685, 688 (8th Cir. 2019) (quoting 🔖 *Torgerson*, 643 F.3d at 1042).

The burden on the resisting party is [as follows]:

> The party opposing summary judgment must "cit[e] particular materials in the record" or show that the "materials cited do not establish the ... absence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "A mere 'scintilla of evidence' is insufficient to defeat summary judgment, and if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." 🔖 *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015), quoting 🔖 *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010).

**\*11** Similarly, if the movant has supported its motion for summary judgment, the party opposing summary judgment "may not simply rest on the hope of discrediting the movant's evidence at trial." *United States v. 3234 Washington Ave. N.*, 480 F.3d 841, 844 (8th Cir. 2007) ("*3234 Washington*"). Where the testimony of the movant's witnesses is critical, if the testimony is "positive, internally consistent, unequivocal, and in full accord with the documentary exhibits," "then the opposing party cannot force a trial merely to cross-examine the witness or in the hope that something might turn up at the trial." *Id.* at 845 (quotations omitted); *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016). But summary judgment is improper where specific facts "even partially" undermine the witness's credibility in a material way. *3234 Washington*, 480 F.3d at 845.

*Erickson*, 31 F.4th at 1048. Thus, " '[t]o show a genuine dispute of material fact, a party must provide more than

conjecture and speculation. Rather the nonmovant has an affirmative burden to designate specific facts creating a triable controversy.' " *Rusness*, 31 F.4th at 614 (quoting *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019)).

## B. Preliminary Matters

The Court turns to four preliminary matters. First, in addition to its Motion for Summary Judgment, Doane filed a Motion to Exclude Expert Testimony of Laura Burton. Filing 80. Powell "seeks to offer social science evidence through her designated expert, Dr. Laura Burton." Filing 96 at 2. More specifically, Powell seeks to "prove her claims through the use of evidence relating to gender-based stereotypes." Filing 96 at 2. The Court does not need to decide whether such evidence can be admitted under Federal Rule of Evidence 702 or 703, or under the tests described in 🔖 *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and 🔖 *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999), because evidence of gender-based stereotypes cannot change the outcome of this case. As explained in detail below, summary judgment is appropriate because Powell cannot show that Doane's legitimate, nondiscriminatory reasons for firing her were pretextual and because Powell never engaged in statutorily protected activity. Therefore, Doane's Motion to Exclude Expert Testimony of Laura Burton, Filing 80, is denied as moot.

Second, Powell stated in her Complaint that her claim is "for gender discrimination and race discrimination in her employment in violation of her rights under state and federal law." Filing 1 at 1 (¶ 1). However, in her Resistance to Defendant's Motion for Summary Judgment, Powell clarifies that she is only pursuing gender-based claims and that she "did not pursue other causes of action. Any references in the pleadings were typos and unintentional. The section of the Complaint that addresses the causes of action plainly makes clear the claims were for gender discrimination and retaliation." Filing 100-1 at 41. Thus, the Court concludes that Powell has waived any race-based claims, and the Court will not consider any such claims.

Third, in the "summary of the claims" in Powell's Complaint, she alleged that the action is pursuant to "the Nebraska Fair Employment Practice Act [NFEPA], Ch. 20-301, et seq." Filing 1 at 2 (¶ 8). However, NFEPA is not mentioned elsewhere in her Complaint or "Resistance" to summary

judgment. *See generally* Filing 1; Filing 100. Thus, the Court concludes that this was likely another "typo" in Powell's Complaint and does not consider that Powell raised any claim under NFEPA. Alternatively, if Powell pleaded a claim under NFEPA, the analysis is no different under NFEPA than under Title VII, which is discussed below. *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005) ("Both the Nebraska Supreme Court and our court have stated the NFEPA is patterned after Title VII, and, therefore, it is appropriate to consider federal court decisions construing the federal legislation when considering questions under the NFEPA.") (cleaned up). Because Powell does not explain why a NFEPA claim would fare any better than her Title VII claims, summary judgment on her NFEPA claim is similarly appropriate.

**\*12** Fourth, Powell argues that she can recover punitive damages from Doane because it acted with "reckless indifference." Filing 100-1 at 38–39. However, as explained below, Doane is not liable to Powell, so Powell cannot recover punitive damages.

### C. Sex Discrimination under Title VII and Title IX

Doane and Powell agree that the analysis for Powell's sex discrimination claims is the same under Title VII and Title IX. Filing 86 at 5; Filing 100-1 at 6. Title VII states, "It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a). Title IX states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Eighth Circuit has rejected the argument "that because the language of the two statutes ... is slightly different, the elements of proof are slightly different." *Brine v. Univ. of Iowa*, 90 F.3d 271, 276 (8th Cir. 1996). The *Brine* court explained that "for employment discrimination cases, the Title VII standards for proving discriminatory treatment should apply to claims arising under Title IX." *Id.* (internal quotations and citations omitted). Thus, the Court will analyze together Powell's sex discrimination claims arising under both statutes.

"[A]n employee may survive an employer's motion for summary judgment in one of two ways": by direct evidence, or by indirect evidence under the *McDonnell Douglas* burden-shifting framework. *McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009). The Eighth Circuit elaborated:

> The employee may produce direct evidence of discrimination, which is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." If the employee lacks direct evidence of discrimination, he can survive summary judgment by showing a genuine dispute for trial under the burden-shifting framework established in *McDonnell Douglas*.

*McCullough*, 559 F.3d at 861. The Eighth Circuit has also described the applicable burden-shifting framework as follows:

> To establish a prima facie retaliation claim under *McDonnell Douglas*, a plaintiff must show (1) she engaged in protected conduct, (2) she was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action. If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the action. If the employer does so, the burden shifts back to the plaintiff to demonstrate that the stated reason is pretextual.

*Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 811 (8th Cir. 2018) (cleaned up). Thus, to survive summary judgment, Powell must be able to show direct evidence of discrimination or a genuine dispute for trial under the *McDonnell Douglas* [4] burden-shifting framework.

**\*13** Powell contends that she can establish direct evidence of discrimination or alternatively that can she survive summary

judgment under the *McDonnell Douglas* burden-shifting framework. Filing 100-1 at 8, 11. Doane responds that the record contains no direct evidence of discrimination or evidence that can give rise to an inference of discrimination (*i.e.*, there is no "indirect evidence"). Filing 86 at 12; Filing 113 at 16. Alternatively, Doane asserts that it has a legitimate, non-discriminatory reason for terminating Powell and that Powell cannot demonstrate that Doane's reason was pretextual. Filing 86 at 15. The Court agrees with Doane that Powell cannot survive summary judgment by showing direct evidence of discrimination or under the *McDonnell Douglas* burden-shifting framework.

### 1. There Is No Direct Evidence of Discrimination

Powell contends that she can show direct evidence of sex discrimination because "[i]n response to Coach Powell (female) bringing up her concerns, AD Franzen [(male)] told her that her problems with her assistant coach (female) were 'a female thing.' " Filing 100-1 at 9. Powell further argues that "the relationship between the assistant coach and the problems that existed between the assistant coach and Coach Powell were a large part of the reason that Plaintiff Powell was terminated." Filing 100-1 at 10. Powell also notes that "[w]ithin two weeks of making this comment, AD Franzen fired Coach Powell for problems with her assistant coach." Filing 100-1 at 9–10. Powell further contends that AD Franzen was a decisionmaker in the decision to fire Powell, which Doane does not dispute. Filing 100-1 at 9; *see generally* Filing 86; Filing 113. Conversely, Doane contends that there is "no direct evidence of sex discrimination." Filing 113 at 16. Specifically, Doane argues that "Franzen's single, isolated, two-phrase [sic] utterance, taken out of context, [does not] constitute[ ] direct evidence of discriminatory motivation for Mr. Franzen's decision to recommend termination of plaintiff." Filing 113 at 16. The Court agrees with Doane.

The Supreme Court has stated that "a plaintiff can prove disparate treatment ... by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic." 🚩*Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015). The Eighth Circuit has stated that direct evidence "shows a strong causal connection between the alleged discriminatory animus and the adverse employment action." *Smothers v. Rowley Masonic Assisted Living Cmty., LLC*, 63 F.4th 721, 727 (8th Cir. 2023). "Direct evidence most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *Perry v. Zoetis, LLC*, 8 F.4th 677, 682 (8th Cir. 2021) (internal quotations

and citation omitted). Thus, to show direct evidence of discrimination, Powell must show that "without inference" AD Franzen's comment shared a "strong causal connection" with her termination. Powell cannot make this showing.

According to Powell, the context of AD Franzen's comment on November 12, 2019, is as follows:

> Powell told AD Franzen that Assistant Coach Webb would not follow Coach Powell's directives that were being given to her, challenged the instructions she was given, that Coach Powell believed she was going to have [to] fire Assistant Coach Webb[.] [When] Coach Powell asked her supervisors for assistance ... AD Franzen told her that her problems with her assistant coach (female) were "a female thing."

Filing 100-3 at 6 (¶¶ 45–46). In short, according to Powell, AD Franzen described the dispute between Powell and Assistant Coach Webb as "a female thing." Powell contends that "[w]ithin two weeks of making this comment, AD Franzen fired Coach Powell for problems with the assistant coach." Filing 100-3 at 7 (¶ 49). Doane disputes this characterization of the context surrounding AD Franzen's comment. Doane contends that AD Franzen's comment was "in the context of attempting to figure out how to mend the relationship between Plaintiff and Assistant Coach Webb." Filing 113 at 18. Doane asserts that AD Franzen meant that "[i]t would be better to have [Director] Laura [Northup] be that person [to mediate between Powell and Assistant Coach Webb] rather than [him] because the communication would flow better if it was a female mediating rather than the male department head." Filing 113 at 18. In other words, Doane argues that AD Franzen indicated by his comment that Director Northup was better suited to mediate because the dispute was between females. The Court concludes that, viewed in the light most favorable to Powell, a reasonable juror could accept Powell's version of events. *Grinnell Mut. Reinsurance Co.*, 34 F.4th at 652. However, this does not mean that a reasonable juror could find that Powell's version of events is evidence that she was fired because of her sex.

**\*14** If AD Franzen's comment were the only piece of evidence bearing on Powell's termination, perhaps the comment could show "a strong causal connection" between AD Franzen's "discriminatory attitude" and Powell's termination "without inference." *Smothers*, 63 F.4th at 727; *Perry*, 8 F.4th at 682. However, the record is rich with evidence bearing on the reasons for Powell's termination which have nothing to do with sex discrimination, such that no reasonable juror could find the "strong causal connection" required to be "direct evidence." *Smothers*, 63 F.4th at 728 ("A reasonable fact finder could not conclude from this scant evidence that age actually motivated [the employee's] suspensions. Accordingly, we find no direct evidence of age discrimination."). On November 6, 2019, Graduate Assistant Green resigned. Filing 85 at 7 (¶ 33). On November 12, 2019, AD Franzen allegedly described Powell's dispute with Assistant Coach Webb as "a female thing." Filing 100-3 at 6 (¶¶ 45–46). On November 15, 2019, Powell's student athletes met with AD Franzen and Director Northup, where they expressed "dread" about playing for Powell and submitted their lengthy list of complaints detailing Powell's allegedly abusive and erratic behavior. Filing 85 at 9 (¶ 48); Filing 77 (Exhibit D). On November 17, 2019, AD Franzen and Director Northup received a letter from the parents of one of Powell's student-athletes that made similar allegations against Powell and warned that players would quit the team. Filing 76 (Exhibit C). On November 18, 2019, a freshman player of Powell's team quit. Filing 85 at 9 (¶ 50). On November 22, 2019, Assistant Coach Webb resigned. Filing 85 at 10 (¶ 55). That same day, AD Franzen and Director Northup met with Powell's players and informed them that Assistant Coach Webb had resigned. Filing 85 at 10 (¶ 56). Powell's players cried during this meeting because Assistant Coach Webb would no longer be able to act as a protective "buffer" between themselves and Powell. Filing 85 at 11 (¶ 57). On November 25, Powell was terminated. Filing 100-3 at 1 (¶ 2).

In sum, the record shows beyond dispute that many things motivated AD Franzen and Director Northup to terminate Powell, namely, numerous complaints of her misconduct and the occurrence and risk of her players and coaches quitting the team. In comparison, the only potential evidence of "alleged discriminatory animus" is a single comment by AD Franzen calling a dispute between Powell and her subordinate "a female thing." *Smothers*, 63 F.4th at 727. Dismissing all the countervailing evidence suggesting that Powell was not fired because of her sex would require a monumental inference. *Cf. Perry*, 8 F.4th at 682 ("Direct evidence most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias."). Therefore, no reasonable jury could find that AD Franzen's comment "shows a strong causal connection" between an intent to discriminate based on sex and Powell's termination. *Schlif*, 687 F.3d at 948; *Smothers*, 63 F.4th at 727.

### 2. Powell Cannot Show a Genuine Dispute for Trial with Indirect Evidence under the McDonnell Douglas Burden-Shifting Framework

"Absent direct evidence," courts "must apply the McDonnell Douglas three-part burden-shifting analysis" to discrimination claims. *Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 826 (8th Cir. 2006) (footnote omitted). The first step of the burden-shifting analysis "requires a plaintiff to make out a prima facie case of discrimination." *Young*, 575 U.S. at 228. The Court will assume without deciding that Powell can make out her prima facie case because her claim fails at a subsequent step under the *McDonnell Douglas* burden-shifting framework. See *Banford v. Bd. of Regents of Univ. of Minnesota*, 43 F.4th 896, 900 (8th Cir. 2022) ("Even assuming that [the employee] could establish a prima facie case of discrimination, she has not met her burden of showing that [the employer's] legitimate, nondiscriminatory justification for nonrenewal is pretextual.").

#### a. Doane Proffered a Legitimate, Nondiscriminatory Reason for Terminating Powell

Assuming that Powell satisfied the first step of the *McDonnell Douglas* analysis by establishing a prima facie case of discrimination, the second step is for Doane "to articulate a legitimate non-discriminatory reason for its employment action." *Id.* "The employer's burden of providing a legitimate, nondiscriminatory reason for an adverse employment action is not onerous." *Henry v. Hobbs*, 824 F.3d 735, 739 (8th Cir. 2016) (citing *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012)). Doane has articulated its reason for terminating Powell:

> Doane terminated Plaintiff's employment after it received unsolicited complaints, from three sources: Mr. Green, Ms. Webb, and approximately all members of the varsity team. All of them reported

the same or similar concerns and complaints. The two individuals Plaintiff hand-selected to assist her quit their jobs two (2) months after they began their employment at Doane. A student-athlete quit basketball as a result of terrible anxiety she experienced playing basketball for Plaintiff causing her grades to slip. And, the remaining varsity team expressed, emotionally, dread and anxiety playing for Plaintiff and even begged for a "buffer," since both Ms. Webb and Mr. Green resigned their position.

**\*15**  Filing 86 at 13. As described above, Powell does not dispute that AD Franzen and Director Northup knew about the numerous complaints against Powell, knew that three members (two coaches and a player) of Powell's team quit in rapid succession, and knew that Powell's players dreaded playing for her. *See* Filing 76; Filing 77; Filing 85 at 7–9 (¶¶ 34, 45, 48–49). Firing an employee due to numerous complaints of misconduct against her is plainly legitimate and nondiscriminatory. *Cf. Allen v. City of Pocahontas, Ark.*, 340 F.3d 551, 558 (8th Cir. 2003) ("Defendants, however, offered a legitimate, non-discriminatory reason for terminating Allen: insubordination and tenant complaints."). Thus, Doane has met its light burden under the second step of the *McDonnell Douglas* burden-shifting framework of articulating a legitimate and nondiscriminatory reason for firing Powell.

### b. Powell Cannot Show that Doane's Proffered Justification for Terminating Her Is Pretextual

The third step under the *McDonnell Douglas* burden-shifting framework shifts the burden back to Powell "to demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination." 🚩 *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 515 (8th Cir. 2011). "[A] plaintiff may establish pretext by showing that the employer did not truly believe the employee engaged in the conduct justifying termination, [but] a plaintiff may not establish pretext simply by showing that the employer's 'honest' belief was erroneous,

unwise, or even unfair." *Main v. Ozark Health, Inc.*, 959 F.3d 319, 325 (8th Cir. 2020). In addition, a plaintiff may demonstrate pretext by "showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Smothers*, 63 F.4th at 728. Powell does not argue that Doane "(3) shifted its explanation" of its decision to terminate her. *Id.* Therefore, the Court will first consider whether Powell can show that Doane "did not truly believe the employee engaged in the conduct justifying termination" before turning to whether Powell can establish that Doane "(1) failed to follow its own policies" or (2) "treated similarly-situated employees in a disparate manner," *i.e.*, whether there is evidence that male coaches in similar situations to Powell were not fired. *Id.*; *Main*, 959 F.3d at 325.

### i. Powell Cannot Show that Doane Did Not Believe She Engaged in Misconduct

Powell argues at length that the complaints against her were untrue. *See, e.g.*, Filing 100-1 at 20 ("Plaintiff was *not* afforded a conversation with Ms. Northup regarding the complaints made against her by assistant coaches Marissa Webb and Daymarcco Green. *Had* HR Director Northup or AD Franzen talked with Plaintiff about the things Ms. Webb and Mr. Green relayed to them, they would have discovered the things these assistant coaches were saying were untrue.") (emphasis in original); Filing 100-1 at 21 ("Had Defendant spoken with Plaintiff about these allegations, at a *minimum*, Ms. Northup would have learned that the allegations were false or disputed, either way requiring further investigation.") (emphasis in original). Powell fundamentally "misunderstands what it means to prove the falsity of the employer's explanation." *Main*, 959 F.3d at 324. It does not matter whether the complaints against Powell were true; instead, whether Doane honestly believed that Powell engaged in the behavior is the only material consideration. The Eighth Circuit explained:

> If an employer, in explaining a termination, says it believed that the employee violated company rules, then proof that the employee never violated company rules does not show that the employer's explanation was false. That proof shows only that the employer's belief was mistaken. To

prove that the employer's explanation was false, the employee must show that the employer did not truly believe that the employee violated company rules.

**\*16** *Main*, 959 F.3d at 324–25.

There is no evidence suggesting that Doane did not actually believe that Powell was responsible for the misconduct of which she was accused by her students and coaches. Rather, there is more than sufficient evidence supporting Doane's belief to demonstrate that no reasonable juror could conclude it was not honest. As explained above, Powell's coaches and a player quit the team in quick succession, and the litany of complaints against Powell made AD Franzen and Director Northup "afraid that more players w[ould] start quitting." Filing 85 at 10 (¶ 52). Given the proximity of the events immediately preceding her termination, the volume and intensity of the complaints against her, and the apparent suffering of her student-athletes and coaches, the Court holds that Powell cannot "persuade a reasonable jury" to find that Doane did not believe the allegations against her were true, even if she may be able to persuade a jury that this belief was ultimately mistaken. *Schlif*, 687 F.3d at 948. Thus, Powell cannot demonstrate pretext.

### ii. Doane Did Not Fail to Follow Its Own Policies

Powell directs the Court to Doane's "Performance Improvement Policy." Filing 100-1 at 22. This policy states the following:

> Certain standards of performance and conduct must be maintained in any team. Generally these standards are recognized and observed by individual members of the team without any need for action by a supervisor. However, correcting unsatisfactory performance is a vital function of management.

> Except in cases of serious misconduct, the following procedures should be followed when dealing with performance issues. The steps are designed to encourage employees to succeed and to correct the employee's conduct and work performance. Supervisors should assume that all employees want to be productive. The first step is verbal counseling the employee regarding the unsatisfactory performance. In most cases, no further

action will be required. If, however, the unsatisfactory performance has not been corrected, the employee should receive a written reminder emphasizing the importance of the situation, describing the deficiency, specifying the time to correct the deficiency, and describing the consequences of failing to correct the deficiency, including possible loss of pay or discharge. If the deficiency has still not been corrected, a final warning should be given with continued unsatisfactory performance resulting in formal discipline including, without limitation, loss of pay or discharge. Ultimately, the immediate supervisor, along with consultation with the vice president in charge of their department and the Human Resources department, will determine the appropriate discipline based upon the circumstances in each case.

> In cases involving dereliction of duty or serious misconduct, you may be suspended without prior notice, pending review. In such cases, your salary may be terminated immediately. The University may also terminate the employment relationship without following any particular series of steps whenever it determines, at its own discretion, that such action should occur.

**\*17** Filing 84-9 at 3 (Exhibit R).

Powell contends that she "was not afforded a conversation with [Director] Northup regarding the complaints made against her by assistant coaches Marissa Webb and Daymarcco Green." Filing 100-1 at 20. In addition, Powell contends that "[h]ad Defendant spoken with Plaintiff about these allegations, at a minimum, [Director] Northup would have learned that the allegations were false or disputed, either way requiring further investigation." Filing 100-1 at 21. Powell repeatedly asserts that she was unaware of the complaints against her. *See generally* Filing 100-1. Finally, Powell argues that Doane "failed to follow its own policies and procedures by failing to provide Plaintiff with corrective action." Filing 100-1 at 22. Doane responds that "it is true Doane attempts to improve the performance or behavioral issues of an individual—however, Doane's policy is clear: 'the University may also terminate the employment relationship following any particular series of steps whenever it determines, at its own discretion, that such action should occur.' " Filing 113 at 26 (citing Filing 84-9 at 3).

The Court concludes that the second paragraph of the policy on which Powell relies is at best discretionary and at worst hortatory; in either case, it does not purport to bind Doane officials to any particular course of action. It states that

"the following procedures should be followed," that "the employee should receive a written reminder," and that "a final warning should be given," not that these actions "must" or "shall" be taken in succession. Filing 84-9 at 3. Furthermore, the policy provides that any punishment given is "based upon the circumstances in each case." Filing 84-9 at 3. The Court's conclusion that this policy did not bind AD Franzen or Director Northup to any particular procedure is buttressed by a sentence in the following paragraph, which states, "The University may also terminate the employment relationship following any particular series of steps whenever it determines, at its own discretion, that such action should occur." Filing 84-9 at 3. In sum, Doane's policies afford its officials discretion to handle employment situations using whatever means the officials choose, even if the policies suggest that one method is preferred. Therefore, Powell cannot "persuade a jury" that AD Franzen and Director Northup failed to follow Doane's policies in a way that can show pretext. *Schilf*, 687 F.3d at 948.

### iii. Doane Did Not Treat Powell Worse than Any Similarly Situated Employees

Powell argues there is evidence that, like her, "male coaches [had] also received complaints," but unlike her, the male coaches "were not fired." Filing 100-1 at 27. A men's basketball coach received a complaint about "leaving players at the airport while Coach made it back to Crete" and that "[m]issing the first day of class was frustrating." Filing 100-1 at 27–28. According to Powell, this shows Doane's "motivation and opportunity to hold Plaintiff to a higher standard than male coaches." Filing 100-1 at 28.

**\*18** "Whether the employees are 'similarly situated' is a rigorous test because the employees used for comparison must be 'similarly situated in all relevant respects.' " 📁 *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 970 (8th Cir. 2014) (citation omitted). However, the "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." 📁 *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013) (citation omitted). Instead, Powell must "establish that ... she was treated differently than other employees whose violations were of comparable seriousness." *Id.* (citation omitted).

Powell cannot show that she was treated worse than similarly situated male coaches. The player on the male coach's team

reported that he was "frustrated." Filing 100-1 at 28. Both of Powell's coaches and one of her players quit the team not long after she began coaching, and the rest of the team felt "dread" about playing for her. *See* Filing 85 at 9 (¶ 48). Thus, no reasonable juror could find that the single complaint against the male basketball coach is of "comparable seriousness" to the numerous complaints against Powell of degrading conduct and creating an unsafe environment for student-athletes. *Schilf*, 687 F.3d at 948; *see, e.g.*, Filing 76 (Exhibit C); Filing 77 (Exhibit D).

### iv. None of Powell's Other Allegations Show Pretext

Powell contends that Doane "has misplaced or destroyed" comparator evidence. Filing 100-1 at 27. Powell argues that "this reason alone" is sufficient that "summary judgment can be denied." Filing 100-1 at 27. Magistrate Judge Bazis for the Court found "no evidence that Defendant lost or destroyed these documents to prevent their use in this lawsuit." Filing 118 at 8. The Court sees no need to revisit this issue and therefore does not credit this unsupported and conclusory allegation, *i.e.*, the Court finds there is no genuine dispute of material fact on this issue. Fed. R. Civ. P. 56(a).

Powell also contends that AD Franzen's "female thing" comment shows pretext. Filing 100-1 at 15. Powell contends that AD Franzen's comment is "[e]vidence of a discriminatory attitude in the workplace." Filing 100-1 at 26. For the reasons discussed above, Powell cannot rely on this single comment to "persuade a jury" that the legitimate, nondiscriminatory reasons for her termination were pretextual. *Schilf*, 687 F.3d at 948.

Finally, Powell contends that Doane "has improperly twisted, spun, or exaggerated" facts in its briefs supporting its Motion for Summary Judgment, and this shows pretext. Filing 100-1 at 15, 25–26. The Court rejects this contention. Powell disputes many of the factual allegations in Doane's Statement of Undisputed Material Facts, often in bizarre ways. For example:

[Doane's Statement of Undisputed Material Fact] 57. During this meeting, student-athletes cried and expressed fear of going to practice without a "buffer." The team was assured that Mr. Franzen would be around, and Mr. Franzen would ask for an athletic trainer to be present.

[Powell's] Answer: Undisputed and Disputed. It is undisputed that this meeting occurred, and Mr. Franzen

informed the team Ms. Webb was resigning. It is disputed that this was appropriate as it undermined Coach Powell and showed a lack of support for her. Additionally, what the athletes were reporting was also false. For instance, the athletes reported that Plaintiff said they had demons in them. Plaintiff never said that. Defendant knows that they have exaggerated it and have now downplayed it to the Court by not using the word demon.

**\*19**  Filing 100-2 at 27 (¶ 57) (citations to the record omitted) (emphasis omitted). The Court observes that Powell does not dispute the facts alleged but instead the inferences that she draws from them, but inferences are not contained in Doane's statement. Powell disputes the "appropriate[ness]" of Doane's factual allegation but not that it occurred. Powell argues that "what the athletes were reporting was also false," but Doane did not allege that what the students were reporting (*e.g.*, fear) was true; Doane only alleged that they reported it, which Powell does not dispute. Powell accuses Doane of "hav[ing] exaggerated it," but she does not dispute that this meeting occurred or that the student-athletes reacted as alleged, so the Court does not see what could be "exaggerated." Finally, Powell alleges that Doane "downplayed it to the Court by not using the word demon." Contrary to Powell's arguments, the Court concludes that Doane has not simultaneously "exaggerated" and "downplayed" its factual allegations. If anything, Powell herself has repeatedly and systematically ventured beyond the reasonable inferences from the factual allegations in her answers to Doane's Statement of Undisputed Material Facts. *See generally*, Filing 100-2. Even if "improperly twist[ing]" factual allegations in briefs to the Court could be evidence of pretext, no reasonable jury could find this occurred here. *Schilf*, 687 F.3d at 948.

In sum, Powell does not have any evidence with which she can "persuade a jury" that Doane's decision to fire her was pretextual. *Id.* Accordingly, there is no genuine dispute of material fact and Doane is entitled to judgement as a matter of law. Fed. R. Civ. P. 56(a).

### D. Retaliation under Title VII and Title IX

Doane and Powell state that the analysis for Powell's retaliation claims is the same under Title VII and Title IX. Filing 86 at 16; Filing 100-1 at 29. Under Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he

has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a). Title IX is silent on the availability of retaliation claims, but the Supreme Court has held that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Although the Eighth Circuit has not stated that the retaliation analysis is identical under Title VII and Title IX, it has provided similar descriptions for the prima facie cases of retaliation under both provisions. *Compare Schottel v. Nebraska State Coll. Sys.*, 42 F.4th 976, 983 (8th Cir. 2022) ("To establish a prima facie case of retaliation [under Title VII], an employee-plaintiff must show that (1) she engaged in protected conduct, (2) she suffered a materially adverse employment act, and (3) the adverse act was causally linked to the protected conduct.") (internal quotations and citation omitted), *with Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 579 (8th Cir. 2021) ("To plead prima facie retaliation claims, the Does must allege they participated in activity protected by Title IX, and the University took adverse action against them because of their participation in that activity.") (citation omitted). Thus, the analysis of the two kinds of claims is similar but not identical.

There are two major differences between retaliation claims under Title VII and retaliation claims under Title IX which prove dispositive in this case. First, the Eighth Circuit has held that Title VII only authorizes retaliation claims where a plaintiff complained of discrimination on behalf of a third party if the reported discriminatory action was an "employment practice." *Warren v. Kemp*, --- F.4th ---, No. 22-2067, 2023 WL 5356630, at \*4 (8th Cir. Aug. 22, 2023). In *Warren*, the plaintiff claimed retaliation because she reported discrimination against students, not fellow employees, and the Eighth Circuit determined that reporting discrimination unrelated to employment was not statutorily protected conduct under Title VII. *Id.*, at \*4–5. Second, the Supreme Court has determined that Title IX dictates that "individuals ... may not bring suit under the statute unless the [federal funding] recipient has received 'actual notice' of the discrimination." *Jackson*, 544 U.S. at 181. Subject to these two differences, the Court applies the same test to the retaliation claims under Title VII and Title IX. To succeed on a retaliation claim, "a plaintiff must prove (1) he engaged in statutorily protected activity, (2) suffered an adverse employment action, and (3) that the engagement in a protected activity is the but-for cause of

the adverse employment action." *Warren*, 2023 WL 5356630, at *3. As discussed above, the parties do not dispute that Powell suffered an adverse employment act when she was terminated. Thus, Powell must be able to show that she engaged in statutorily protected conduct that was the but-for cause of her termination.

### 1. Powell Did Not Engage in any Statutorily Protected Conduct under Title IX

**\*20** Under Title IX, "complain[ing] of sex discrimination" is protected activity. *Jackson*, 544 U.S. at 173 ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action."). However, plaintiffs are required to provide "actual notice" of discrimination in order to recover on Title IX retaliation claims. *Id.* at 181. "The actual notice standard is quite onerous." *KD v. Douglas Cnty. Sch. Dist. No. 001, 1 F.4th 591, 598 (8th Cir. 2021)*. Powell cannot meet the "onerous" standard of showing that she filed "actual notice" of discrimination. Filing 100-1 at 30 (Powell conceding that she did not "say the actual words 'discrimination' or 'Title IX' when bringing forward her concerns to AD Franzen" because "magic words are not required"); see also *KD, 1 F.4th at 599* (noting that despite numerous reports of circumstantial evidence of sexual abuse, "none of these complaints alleged sexual abuse," and therefore did not constitute actual notice, making summary judgment in favor of the employer appropriate). Thus, there is no genuine dispute of material fact that Powell never provided "actual notice" of discrimination, as required to recover on a retaliation claim under Title IX. Fed. R. Civ. P. 56(a). Doane is entitled to summary judgment on Powell's Title IX retaliation claim.

### 2. Powell Did Not Engage in any Statutorily Protected Conduct under Title VII

Powell contends that she engaged in statutorily protected conduct under Title VII. Filing 100-1 at 30. Powell argues that she "put [Doane] on notice of her concerns" about several problems she encountered during her employment: "The provision of equipment and supplies"; "[o]pportunity to receive coaching and academic tutoring"; "[p]rovision of locker rooms, practice and competitive facilities"; and "[p]rovision of medical and training facilities and services." Filing 100-1 at 30 (citing 34 C.F.R. § 106.41(c)).

"Under Title VII, 'protected activity' includes opposition to discriminatory employment practices prohibited under Title VII," including practices "that discriminate ... because of ... sex." *Warren*, WL 5356630, at *4. The Supreme Court has explained that "discriminate" means "treating that individual worse than others who are similarly situated" and that "the difference in treatment based on sex must be intentional." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1740 (2020). Moreover, the Eighth Circuit "reject[s] Title VII retaliation claims where the plaintiff opposed conduct other than a discriminatory employment practice." *Warren*, 2023 WL 5356630, at *4 (noting that a plaintiff does "not engage in a protected activity when opposing conduct that was not itself a discriminatory employment practice."). "A plaintiff need not establish that the conduct he opposed was in fact prohibited under Title VII; rather, he need only demonstrate that he had a 'good faith, reasonable belief that the underlying challenged conduct violated Title VII.' " *Id.* (internal quotations and citation omitted). The plaintiff must "report an underlying discriminatory practice." *Id.* However, "simply performing one's job duties is not itself a protected activity under Title VII." *Id.* In addition, the allegation must be about the "employees' rights" as opposed to allegations about the rights of others, such as "students' rights." *Id.* In sum, the Court must determine whether Powell can show that she engaged in protected conduct by reporting discriminatory employment practices by Doane. The Court will evaluate each instance that Powell contends constituted protected activity before considering whether Powell's protected activity was connected to her termination.

### a. Complaints about Provision of Uniforms

Powell cannot show that she reported any discriminatory employment practice regarding the "provision of equipment and supplies." Powell alleges that she "raised with AD Franzen [ ] that her female basketball team was void of any practice uniforms and game uniforms. They did not have shoes. They did not have backpacks. They did not have travel suits." Filing 100-1 at 31. She alleges that she "saw and confirmed through a conversation with a men's basketball coach" that "the men's team had more than enough uniforms to suit their needs." Filing 100-1 at 31. Powell also alleges that she "communicated with AD Franzen about all of the uniforms she needed to order because he had to sign off on her budget, which meant he knew the uniforms were taking up most of her budget." Filing 100-1 at 31. Further, it is

undisputed that Powell used her team's budget to purchase the uniforms and that she herself ordered the uniforms from a third-party vendor. Filing 85 at 3 (¶¶ 15–16). Powell does not allege that the men's basketball team had a larger budget than the women's team, nor that the men's team ordered its uniforms and equipment through a different vendor.

**\*21** The Court concludes that while Powell may have complained of discrimination against her student-athletes, she did not complain of employment discrimination. At most, Powell complained that her student-athletes had worse uniforms than the men's basketball team. This cannot support a retaliation claim under Title VII because the inequities experienced by her players do not constitute a "discriminatory employment practice" Warren, 2023 WL 5356630, at \*4.

Alternatively, if Powell did complain of employment discrimination, she nonetheless cannot succeed on her retaliation claim under Title VII. Powell acknowledges that "the original problems of the shrinking uniforms and the vendor sending used and stained shoes was not Doane's fault." Filing 85 at 4 (¶ 20). Powell instead claims that "addressing [her] concerns about the uniforms, including the shoes, is Doane's responsibility and therefore ... Doane's fault." Filing 85 at 4 (¶ 20). Accordingly, Powell's claim is not that she received inferior equipment as compared to the men's team but instead that Doane treated her worse than the men's team by not "addressing her concerns" regarding the uniforms. However, Powell also acknowledges that the men's team did not "raise similar concerns." See Filing 100-1 at 31 (noting that "the men's team had more than enough uniforms to suit their needs"). Therefore, without a comparator, Powell cannot show a "discriminatory employment practice"—that she was treated worse than male coaches—with respect to the provision of uniforms. Warren, 2023 WL 5356630, at \*4.

### b. Opportunity to Receive Coaching

Powell claims that she engaged in protected conduct when she "complained about her assistant coach," Marissa Webb, as "insubordinate [and] undermining her." Filing 100-1 at 35. Powell alleges she suffered discrimination when AD Franzen responded to her complaints by saying Powell's dispute with Assistant Coach Webb was a "female thing." Filing 100-1 at 35.

To begin, the Court notes that the "opportunity to receive coaching" is more likely a benefit afforded to student-athletes

than one afforded to University employees. Therefore, Powell did not complain about a "discriminatory employment practice" with respect to the "opportunity to receive coaching." Warren, 2023 WL 5356630, at \*4. Alternatively, even assuming that Powell did complain of an employment practice, she offers nothing by way of comparison to male coaches, such as evidence that male coaches receive better assistance from Doane officials when dealing with subordinates. Therefore, Powell cannot show that she reported a "discriminatory employment practice" because she did not complain that Doane officials treated her worse because of her sex. Id.

### c. Provision of Facilities and Equipment

Powell alleges that she asked AD Franzen for an iPad, where the men's team had two, and AD Franzen told Powell to purchase one with her budget, knowing that she had already depleted the budget. Filing 100-1 at 33–34. Again, Powell is complaining about discrimination against her students and not employment discrimination. Filing 100-3 at 4 (¶¶ 29–30) ("[T]he women's basketball team was not able to use the facilities (scoreboard) like the men's team because there was no iPad for the women's team.... [T]hey could not properly train without a clock and working scoreboard."). Accordingly, Powell did not complain about a "discriminatory employment practice" with respect to the "provision of facilities and equipment." Warren, 2023 WL 5356630, at \*4.

**\*22** Alternatively, even assuming that Powell complained of an employment practice, there is no suggestion this is discriminatory: Powell does not allege that the men's team did not have to use its budget to purchase iPads; instead, she merely alleges that she did not have sufficient remaining budget to purchase an iPad for her team. However, even assuming that this could be considered discriminatory, Powell does not allege that she ever "report[ed]" this instance as "an underlying discriminatory practice"—Powell alleges that she complained about not having an iPad, not that she lacked the opportunity to obtain one, unlike male coaches. Warren, 2023 WL 5356630, at \*4. Because she did not report any sex discrimination, Powell did not engage in statutorily protected conduct with respect to the iPad.

### d. Medical and Training Services

Powell alleges that "athletic trainers were not properly providing her with information regarding her team," that "her team was having many injuries," and that "she had to physically carry a player to the training room during a game to receive medical attention." Filing 100-1 at 34–35. Powell alleges that the men's team never had these issues. Filing 100-1 at 34–35. However, Powell made clear that she did not allege employment discrimination but instead complained that her female players "weren't treated fairly in terms of men/women equity." When asked to explain, Powell responded:

A. [Powell] Their equipment, the gear, the things they didn't have. They didn't have the iPad that they needed for their practices to run. The men had two iPads. The assistant, I later learned, they had two iPads. We didn't have that. And they told me to get it out of the budget that I don't have.

They were not treated as an important or valued. Their medical treatment was never updated or made aware. I had a young lady who fainted on two occa- --- on three occasions in two days, and she could have hit her head and killed herself and died under my care, and I had no idea she had a medical concern.

I don't think that's something that would have happened with the male sports, football, et cetera, that really have to have medical information from them even to compete. I think it was treated very passively.

And when I brought it to the attention, it was just work it out with the trainers. And I never received any medical information on our players after requesting it at least two times, one verbally and one in an e-mail.

Filing 100-6 at 53–54. Powell does not allege that the training and medical staff were more available to male coaches than to her; rather, she alleges that the training and medical staff treated her female players worse than the staff treated male players on different teams. [5] Accordingly, Powell's complaints were about alleged discrimination by the training and medical staff against third parties (the student-athletes) and not complaints about alleged discrimination by the training and medical staff against Powell.

Powell's alleged reports "did not constitute opposition to a discriminatory employment practice because the disparity in the [treatment] had nothing to do with 'compensation, terms, conditions, conditions, or privileges of employment.'" *Warren*, 2023 WL 5356630, at *4 (citing 42 U.S.C. § 2000e-2(a)(1)). Powell "never testified that she believed she

was reporting discrimination against employees." *Id.*, at *5. Instead, her complaints were, at most, "about [ ] violation[s] of the students' rights, not employees' rights." *Id.*, at *4. Finally, "there is no other evidence from which a jury could infer that she had a good-faith belief that she believed she reported discrimination against employees." *Id.*, at *5. In sum, Powell cannot "persuade a reasonable jury" that she engaged in any statutorily protected conduct under Title VII. *Schilf*, 687 F.3d at 948. Because Powell did not engage in statutorily protected conduct, Doane is entitled to judgment as a matter of law on Powell's retaliation claim. Fed. R. Civ. P. 56(a).

### 3. Alternatively, If Powell Can Show that She Engaged in Statutorily Protected Conduct, It Was Not the But-For Cause of Her Termination

**\*23** Even if Powell can show that she engaged in statutorily protected conduct, summary judgment is still appropriate because Powell cannot show that any protected conduct was the but-for cause of her termination—the allegedly retaliatory action. Powell contends that "there is a causal connection between the complaint[s] and [her] termination." Filing 100-1 at 35 (capitalization omitted). Powell argues that she "has timing" on all her complaints: "complaints regarding the uniforms were in October—just a month prior to termination"; "complaints regarding the athletic trainers occurred on August 27, 2019, and ... extended into the basketball season during games when she still was not receiving proper medical care or information for her student athletes"; and the "complaint to AD Franzen regarding her assistant coach was on October 25, 2019 ... [and] additional complaints and requests for help regarding her assistant coach [were made] in mid-November." Filing 100-1 at 36. Powell implies that the proximity of these complaints to her termination can demonstrate that the complaints were the but-for cause of her termination.

The Court disagrees. Powell only has temporal proximity in her favor. The Eighth Circuit has explained that "a plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events." *Wilson v. Arkansas Dep't of Hum. Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (cleaned up). This holding does not mean that proximity alone can establish but-for cause. To the contrary, the Eighth Circuit has held that a "theory of causation based on temporal proximity [is] implausible" where an employer "presents a lawful, obvious alternative explanation" for the adverse employment action. *See Schottel*, 42 F.4th at 984. Moreover, several other courts

that have considered the issue have held that "[u]nder the strict[ ] 'but-for' causation standard, temporal proximity, standing alone, is not enough." *Williams v. Serra Chevrolet Auto.*, LLC, 4 F. Supp. 3d 865, 879 (E.D. Mich. 2014); *see also* 🔖 *Montgomery v. Bd. of Trustees of the Univ. of Alabama*, 2015 WL 1893471, at *4 (N.D. Ala. Apr. 27, 2015) ("temporal proximity alone does not meet the new 'but for' causation standard"); *Drottz v. Park Electrochemical Corp.*, 2013 WL 6157858, at *15 (D. Ariz. Nov. 25, 2013) ("While ... proximity in time certainly remain[s] relevant when inferring but-for causation, in this case [it] cannot be enough to satisfy Plaintiff's prima facie burden."). The Court similarly doubts that temporal proximity alone could show but-for cause in any case. However, temporal proximity certainly does not satisfy Powell's but-for causation requirement because, as discussed above, no reasonable juror could conclude that Doane terminated Powell for her complaints about uniforms, an iPad, or trainers rather than for the complaints lodged against her, members of her team quitting, and the fear that more players would quit. In other words, Doane's "lawful, obvious alternative explanation" for terminating Powell makes her "theory of causation based on temporal proximity implausible. *See Schottel*, 42 F.4th at 984. No reasonable juror could determine otherwise. *See Schilf*, 687 F.3d at 948. Therefore, Doane is entitled to judgment as a matter of law on Powell's retaliation claim. Fed. R. Civ. P. 56(a).

### III. CONCLUSION

For these reasons, the Court grants Doane University's Motion for Summary Judgment. There is no genuine issue of material fact, and Doane is entitled to judgment as a matter of law that Doane is not liable for unlawful sex discrimination or retaliation against Powell. The Court also denies Doane's Motion to Exclude Expert Testimony as moot. Accordingly,

IT IS ORDERED:

1. Defendant's Motion for Summary Judgment, Filing 83, is granted; and

2. Defendant's Motion to Exclude Expert Testimony, Filing 80, is denied as moot.

IT IS FURTHER ORDERED that a separate judgment shall enter accordingly.

Dated this 3rd day of October, 2023.

**All Citations**

Slip Copy, 2023 WL 6445830

---

### Footnotes

1    Powell does not allege that the men's team had a larger budget than the women's team.

2    The Court will omit the thirteen names of the student-athletes that appear in the document because the student-athletes are not parties to this suit.

3    Relevant portions of the letter sent to AD Franzen and Director Northup by the anonymous parents of one of Powell's student-athletes are as follows:

Coach Powell has told the players that they were not to schedule classes from 2-4 in the afternoons as that is when practice will be. Some classes are only offered once a semester and only during that time period. When players asked about this, Coach Powell told the players that basketball comes first, then school and family after that.

...

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

The players will reach out to Coach Powell and ask for additional time in the gym or to work one on one with the coaching staff. She will respond with a time that will work but then not show up. However, Coach Powell will then get upset with the players because none of them want to come in and get additional help.

As we write this, there is a practice scheduled on Thanksgiving day in the morning and then a required study hall late in the afternoon.

...

Doane had their first varsity game on Tuesday, October 29 at Bethel College. They got home at approximately 3 am from that trip. Coach Powell scheduled a practice for 6 am on Wednesday, October 30?

The players are routinely put down and humiliated by Coach Powell at practice. We understand that Athletic Director Matt Franzen has attended a few practices recently. However, his presence was very well known and Coach Powell's behavior at those practices was dramatically different than when he does not attend.

...

Many of the players are looking to transfer to other schools. Daymarcco Green is leaving very soon due to this hostile environment.... The players are beat down to the point where many have lost confidence in their playing abilities.

...

[B]e sure, that most if not all of the players and parents have similar feelings and the women's basketball program is in real trouble.

Filing 76 (Exhibit C).

4    🚩 *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

5    Although Powell's testimony is unclear, the Court assumes that Powell reported this alleged discrimination to AD Franzen or Director Northup. Filing 100-6 at 53–54 ("And when I brought it to the attention, it was just work it out with the trainers.").

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.