IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SHANNON SCHWEYEN, | CV 21–138–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| UNIVERSITY OF MONTANA-MISSOULA, | |
| Defendant. | |

Before the Court are Defendant University of Montana-Missoula's (the "University") Motion for Summary Judgment (Doc. 55), First Motion to Strike (Doc. 76), and Second Motion to Strike (Doc. 95). The Court grants in part and denies in part the University's First Motion to Strike, denies the University's Second Motion to Strike, and grants the University's Motion for Summary Judgment.

## FACTUAL BACKGROUND[1]

Plaintiff Shannon Schweyen ("Schweyen") was an employee of the University from 1992 to June 30, 2020. (Doc. 72 ¶ 5.) Schweyen began as a student assistant to the University's women's basketball team, the "Lady Griz," in

---

[1] Per the discussion below, certain responses in Schweyen's Statement of Disputed Facts (Doc. 72) have been stricken and/or deemed undisputed. The facts set forth below consist of those facts which are undisputed or have been deemed undisputed by the Court.

1992 and became an assistant coach in 1993, a position she held for 24 years. (*Id.* ¶¶ 5, 7.) The University appointed Kent Haslam as Director of Athletics in 2012. (*Id.* ¶ 9.) In July 2016, Robin Selvig, head coach of the Lady Griz for 38 years, announced his retirement. (*Id.* ¶¶ 6, 10.) Under Coach Selvig, the Lady Griz had developed into a nationally renowned mid-major program, posting an overall win-loss record of 865-286 (75%), winning the Big Sky regular season a record 23 times, wining the Big Sky Conference tournament 24 times, and making the NCAA tournament 21 times. (*Id.* ¶ 6.)

In August 2016, the University hired Schweyen to replace Selvig as head coach of the Lady Griz. (*Id.* ¶ 16.) The parties entered into an employment agreement making Schweyen head coach from September 2016 to June 2019 at a base salary of $130,000. (*Id.* ¶ 22.) Around this same time, Travis DeCuire was offered a three-year contract to be head coach of the men's basketball team at a base salary of $155,000. (Doc. 36 ¶ 9.) Both Schweyen and DeCuire reported directly to Haslam. (*See* Doc. 72 ¶ 25.)

In Schweyen's first year as head coach (2016-2017 season), the team's record was 7-23 overall and 4-14 in the Big Sky Conference. (*Id.* ¶ 29.) During this first year, a starting player left the team. (*Id.* ¶ 31.) That player's parent sent a complaint letter to Schweyen in February 2017 and another to Haslam in March 2018 in which he complained about Schweyen's conduct, including allegations that

Schweyen caused emotional and psychological damage by bullying his daughter, made suggestive comments about a player's brother, and drank on road trips with the team. (*Id.* ¶¶ 32–33.) The parent also alleged that his daughter had left the team because of the team culture Schweyen had created, and not because of playing time. (*Id.* ¶ 34.)

In Schweyen's second year as head coach (2017-2018 season), the team's record was 14-17 overall and 9-9 in the Big Sky Conference. (*Id.* ¶ 36.) In March 2018, another player's parent sent Haslam a letter raising concerns about Schweyen, including allegations that Schweyen alienated and injured players, used negative and vulgar sarcasm, and failed to communicate with or develop certain players. (*Id.* ¶¶ 40–41.) A third parent contacted Haslam in March and raised allegations of verbal abuse, harassment, bullying, intimidation, manipulation, inappropriate sexual behavior, and alcohol abuse by Schweyen. (*Id.* ¶ 42.) Haslam also received a complaint about Schweyen from at least one Lady Griz player regarding Schweyen's constant negativity, failure to communicate with players, and favoritism. (*Id.* ¶ 50.)

In the spring of 2018, Haslam informed Schweyen of the complaints he had received and that he was going to investigate, or inquire into, the allegations. (*Id.* ¶¶ 51, 53.) Haslam and Jean Gee, Senior Associate AD (Student Affairs and Compliance/SWA), interviewed all but one of the Lady Griz team members, the

strength and conditioning coach for the team, and a student-athlete academic advisor. (*Id.* ¶¶ 13, 53–55; *see also* Docs. 62-1, 62-2, 62-3.) Haslam produced a memorandum summarizing the results of his investigation and provided Schweyen with a copy. (Doc. 72 ¶ 57.) Haslam and Gee also met with Schweyen and her assistant coaches to discuss the findings. (*Id.*) Haslam's memorandum summarized the general themes that emerged from the investigation:

- Student-athletes value their time as a member of the Lady Griz basketball team. They appreciate the opportunity and understand they have a great responsibility to represent the university and the community with integrity. They are grateful for the opportunity they are given.
- Lack of trust in the head coach and to a less extent in the coaching staff.
- Lack of trust manifests through perceived favoritism and an inability to communicate openly and honestly with head coach, coaching staff and at times with teammates.
- Student-athletes want to be pushed to get better and corrected, however often times it felt the corrective language became personal and often became about more than their basketball ability.

(Doc. 62-3 at 2.) Haslam concluded that allegations regarding Schweyen and coaching staff consuming alcohol with student-athletes were unsubstantiated. (*Id.*) Haslam also included recommendations for improvement. (*Id.* at 2–3.) No other disciplinary actions were taken as a result of the investigation. (*See* Doc. 72 ¶ 66.)

In Schweyen's third year as head coach (2018-2019 season), the team's record was 14-16 overall and 9-11 in the Big Sky Conference. (*Id.* ¶ 67.) In

February 2019, a player's parent reached out to Haslam to express concerns about Schweyen and the "health and future" of the Lady Griz program. (*Id.* ¶ 68.) At the end of the season, a player who had started eight games and averaged 24 minutes per game transferred to another school. (*Id.* ¶ 69.) That player's parents complained directly to Schweyen about how she had treated their daughter. (*Id.* ¶ 70.)

At the end of Schweyen's three-year contract, Haslam offered to renew Schweyen's contract for one year, to run from July 1, 2019, through June 30, 2020, at an increased base salary of $134,589. (*Id.* ¶¶ 74, 79–80.) DeCuire was offered another three-year contract at the end of his initial three year contract. (Doc. 36 ¶ 14.) In Schweyen's fourth year (2019-2020 season), the team's record was 17-13 overall and 12-8 in the Big Sky Conference and the team won a single game at the Big Sky Conference Tournament. (Doc. 72 ¶ 81–82.) During the 2019-2020 season one player transferred from the team. (*Id.* ¶ 86.)

Schweyen and Haslam met on or about March 12, 2020, and discussed her potential return as head coach of the women's basketball program for the next two years as well as returning and departing players. (*Id.* ¶ 88.) Haslam also asked Schweyen about the team environment and whether it had improved, and Schweyen responded that it was really good. (*Id.* ¶ 90.) Schweyen also informed Haslam that she believed only one player would be transferring out of the program.

(*Id.* ¶ 91.)  Haslam indicated that Schweyen's contract would be "ironed out" after she returned from her family vacation.  (*Id.* ¶ 93.)  There is no dispute that, as of March 12, Haslam intended to offer Schweyen a contract.  (*Id.* ¶ 92.)

In the weeks following the March 12 meeting between Haslam and Schweyen, two Lady Griz players entered the transfer portal and several other players contacted Haslam to express their desire to transfer and concerns they had about Schweyen's return.  The two players who entered the transfer portal met with Haslam in late March to discuss their decision to transfer; during those conversations, each player shared complaints they had about Schweyen and indicated that Schweyen was the reason they were transferring.  (Doc. 60-4 ¶ 30; Doc. 64-2 ¶ 38.)  A third player contacted Haslam to explain that she would likely transfer if Schweyen returned as head coach.  (Doc. 64-4 ¶ 5.)  A fourth player reached out to Haslam to inform him that she was on the fence about staying and that she knew of two others who were also considering leaving.  (Doc. 64-5 at 4.)  A fifth player and her parents met with Haslam at the end of March to express their concerns about Schweyen returning as head coach and their opinion that there were ongoing issues with the team culture.  (Doc. 72 ¶ 102.)

Schweyen and Haslam spoke again on March 30 and discussed the student-athletes entering the transfer portal.  (*Id.* ¶ 109.)  During this conversation, Haslam told Schweyen she needed to meet with her assistants and "figure out why all these

girls are leaving." (*Id.* ¶ 110.) On April 1, 2020, Haslam called Schweyen and informed her that he was not offering her a new contract. (*Id.* ¶ 116.) During this phone call, Haslam referenced player retention and student-athletes entering the transfer portal. (*Id.*) Schweyen's contract expired as scheduled in June 2020. (*Id.* ¶ 117.)

The University appointed Mike Petrino to the position of interim head coach of the women's basketball team and announced that it would conduct a national search for a head coach after the 2020-2021 season. (*Id.* ¶ 132–33.) At the time, Petrino was the most senior assistant coach for the Lady Griz. (*Id.* ¶ 134.) After learning that Schweyen would not be returning as head coach, three of the players who had reached out to Haslam decided not to transfer, including one player who had already entered the transfer portal. (Doc. 64-2 ¶¶ 39–42; Doc. 64-4 ¶ 9; Doc. 64-5 at 17–18.) In April 2021, the University named Brian Holsinger head coach of the women's basketball program. (Doc. 72 ¶ 147.)

**PROCEDURAL BACKGROUND**

Schweyen filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 8, 2020, asserting that she was subjected to discrimination in violation of Title VII of the Civil Rights Act of

1964.[2]  (Doc. 1 ¶ 7.)  On August 16, 2021, the EEOC issued a Notice of Right to Sue.  (*Id.* ¶ 8.)

Schweyen filed this action in November 2021, alleging discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.  (Doc. 1.)  Schweyen's single claim alleges that the University unlawfully discriminated against her by "evaluat[ing] [her] performance more harshly that her male counterparts because of her gender, . . . target[ing] [her] for criticism because of her sex . . . , [and] decid[ing] not to renew [her] contract . . . because of her gender."  (Doc. 1 at 21.)  The University denies the allegation, (Doc. 33), and has moved for summary judgment, (Doc. 55).  The University has also moved to strike portions of Schweyen's Statement of Disputed Facts as well as affidavits and an exhibit filed in support of her opposition to the motion for summary judgment.  (Docs. 76, 95.)   The Court will address each motion to strike before addressing the summary judgement motion.

---

[2] A complainant must file a discrimination charge with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice, unless the complainant initially institutes proceedings with a state or local agency with authority to grant or seek relief from the practice charged, in which case the time limit for filing with the EEOC is extended to 300 days.  42 U.S.C. § 2000e-5(e).  Schweyen did not initially institute proceedings with a state or local agency, and therefore the 180 day limitation applies.  Schweyen filed her complaint with the EEOC within 180 days of the alleged unlawful employment practice: the April 1, 2020, decision to not renew her contract.

**DISCUSSION**

## I. First Motion to Strike

The University seeks to "strike portions of the materials submitted by [Schweyen] in opposition to the University's motion for summary judgment and requests the Court order the payment of the University's reasonable attorneys' fees or other appropriate sanctions against Plaintiff and her counsel as provided under the rules." (Doc. 76 at 2.) Specifically, the University seeks to strike the declarations of James O'Day, Sonya Stokken, Abby Anderson, and Carmen Gfeller, and certain responses to the University's Statement of Undisputed Facts. (*Id.* at 2–3.)

### A. Declarations of James O'Day, Sonya Stokken, Abby Anderson, and Carmen Gfeller

Parties must disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1). Parties must also supplement their disclosures in a timely manner if "in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed R. Civ. P. 26(e)(1). "If a party fails to provide information or identify a witness as required

by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Court may also impose sanctions and/or order the payment of fees and costs associated with the failure to disclose. Fed. R. Civ. P. 37(c)(1)(A).

In support of her opposition to the University's motion for summary judgment, Schweyen offered declarations from former Athletic Director James O'Day, former Lady Griz Assistant Coach Sonya Stokken, and former Lady Griz players Abby Anderson and Carmen Gfeller. (Doc. 71-1 at 121, 208, 432, 461.) The University argues that these declarations should be stricken pursuant to Rule 37(c) because Schweyen failed to disclose these individuals as potential witnesses under Rule 26(a) and (e). (Doc. 77 at 7–8.) Schweyen responds that Anderson and Gfeller were identified in her initial disclosures through the general category of "student athletes on the women's basketball team during Plaintiff's tenure as head coach," (Doc. 86 at 8; *see also* Doc. 87-6 at 6), and that O'Day and Stokken were named in her interrogatory answers as "individuals with knowledge of relevant facts," (Doc. 86 at 17; *see also* Doc. 60-3 at 7–9, 28–29). Schweyen also responds that any failure to disclose is substantially justified or harmless. (Doc. 86 at 16–22.)

The four witnesses at issue were not disclosed in Schweyen's initial Rule 26

disclosures made on August 4, 2022. Nor were these witnesses identified in

supplemental disclosures. The Court is not convinced by Schweyen's argument

that Anderson and Gfeller were sufficiently disclosed under the broad category of

"student athletes on the women's basketball team during Plaintiff's tenure as head

coach"—a category that includes approximately 30 players. Nor were O'Day and

Stokken properly disclosed. Rule 26's requirements are clear: the *name* of

individuals known to have discoverable information along with the *subjects of that*

*information* must be provided. General references to categories of people and

passing references to individuals in interrogatory answers do not satisfy this

requirement. *See, e.g.*, *McKnight v. Hagel*, No. 14-cv-1214 H (BLM), 2015 WL

11438190, at *3 (S.D. Cal. June 25, 2015) (holding that the "reserv[ation of] the

right to call as witnesses all persons listed on Miramar Commissary—Employees

of Board as of 12/31/2012" is insufficient under Rule 26); *Watts v. 84 Lumber Co.*,

No. 14-cv-327-SMY-DGW, 2016 WL 7732936, at *1 (S.D. Ill. Feb. 12, 2016)

("The Court finds that the vague and boilerplate identification of categories of

potential witnesses is insufficient and inconsistent with the spirit and purpose of

Rule 26."); *Geico Cas. Co. v. Beauford*, No. 8:05-cv-697-T-24 EAJ, 2007 WL

2412953, at *5 (M.D. Fla. Aug. 21, 2007) (finding that "naming a general category

such as 'corporate representative' is not a sufficient disclosure under Rule 26");

*Dykes v. Cleveland Nursing & Rehab. Ctr.*, No. 4:15-cv-76-DMB-JMV, 2018 WL 3058870, at *3 (N.D. Miss. June 20, 2018) (explaining that "courts have routinely found broad categorizations of witnesses . . . to be insufficient to identify witnesses") (collecting cases); *Chinn v. Elmwood Franklin Sch.*, 15-cv-938-FPG-JJM, 2018 WL 6738326, at * 2 (W.D.N.Y. Nov. 1, 2018), *report and recommendation adopted*, No. 15-CV-938-FPG, 2018 WL 6266193 (W.D.N.Y. Nov. 29, 2018) (holding that it is not sufficient to identify witnesses through the use of a collective description, such as "employees or representatives of the defendant"). As such, the Court finds the disclosure of these four witnesses deficient under Rule 26 and must decide if relief is warranted under Rule 37.

To determine whether a failure to disclose is substantially justified or harmless, courts consider several factors, including: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or willfulness in not timely disclosing the evidence." *Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1192 (9th Cir. 2022). "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012).

Schweyen failed to demonstrate that her failure to disclose was substantially justifiable or harmless. First, the University suffered actual prejudice as a result of Schweyen's failure to disclose because the University was denied an opportunity to depose or cross-examine these witnesses. *See Cargill Inc. v. Progressive Dairy Sols., Inc.*, No. CVF-07-0349-LJO-SMS, 2008 WL 2235354, at *10 (E.D. Cal. May 29, 2008) (holding that a party "may not submit declarations containing previously undisclosed information in opposition to a summary judgment motion to raise triable issues of fact"); *Acosta v. Hoa Salon Roosevelt, Inc.*, No. C17-0961JLR, 2019 WL 330197, at *7 (W.D. Wash. Jan. 25, 2019) (holding that the production of an undisclosed witness's declaration in opposition to a motion for summary judgment was not harmless). The next question is whether this harm can be cured, and the answer is no. Although, as Schweyen points out, there is still time for the University to depose these witnesses before trial,[3] (Doc. 86 at 20), that does not cure the prejudice to the University as it relates to the present motion for summary judgment that is fully briefed and now before the Court.

Finally, the Court is unpersuaded by Schweyen's justification for failing to timely disclose these witnesses. Schweyen argues that the declarations were necessary to rebut the University's "tardily disclosed . . . affidavits and the

---

[3] Trial was originally set for November 13, 2023, approximately eight months after the University filed its motion for summary judgment. Trial has since been vacated, to be reset, if necessary, pending the outcome of the University's summary judgment motion.

allegations [the University] presented to the Court" in its summary judgment motion." (Doc. 86 at 10.) However, all of the affidavits relied upon in the University's motion for summary judgment had been produced in advance of the discovery deadline except for that of Kent Haslam.[4] Although four of these affidavits were provided the day before the close of discovery, the University represents that it requested an extension of the discovery deadline as recently as March 2, 2023, and Schweyen refused. (Doc. 77 at 13.) Schweyen does not claim that her failure to disclose was the result of her lack of knowledge of the witnesses and the nature of their testimony or due to some honest mistake. *See, e.g.*, *Silchia v. MCI Telecoms. Corp.*, 942 F. Supp. 1369, 1377 (D. Colo. 1996) (finding late disclosure substantially justified where party only learned of witness's existence after the discovery deadline and opposing party did not seek leave to depose before summary judgment motion hearing). In fact, following Schweyen's own argument on disclosure, it is clear that she knew these witnesses had relevant information and, nonetheless, failed to disclose their names or the subject of that information.

Accordingly, the Court finds that Rule 37 sanctions are appropriate here and strikes the declarations of O'Day, Stokken, Anderson, and Gfeller. The Court does not find further sanctions necessary or appropriate.

---

[4] The University states that the affidavits of Mekayla Davico, Emma Stockholm, Gabi Harrington, and Sophia Stiles were produced on February 27, 2023, and the affidavits of Kylie Frohlich, Julie Tonkin, Mike Petrino, and Allison Lawrence were produced on March 9, 2023. (Doc. 93 at 3.) Haslam's affidavit was produced in connection with the motion for summary judgment. (*Id.*)

## B. Statement of Disputed Facts

This Court's Local Rules require that a party moving for summary judgment "simultaneously file a Statement of Undisputed Facts" that sets forth "in serial form each fact on which the party relies to support the motion" with a pinpoint citation to a specific document in the record to support each fact. D. Mont. L.R. Civ. 56.1(a). Reciprocally, a party opposing a motion for summary judgment "must file a Statement of Disputed Facts" that sets forth "*only* . . . whether each fact in the moving party's Statement [of Undisputed Facts] is 'undisputed' or 'disputed,'" and, if disputed, provide a pinpoint cite to a specific document in the record to oppose each fact. D. Mont. L.R. Civ. 56.1(b)(1) (emphasis added). An opposing party may also "set forth in serial form . . . each additional fact on which the party relies to oppose the motion," with corresponding pinpoint citations. D. Mont. L.R. Civ. 56.1(b)(2). Failure to properly support an assertion of fact or address another party's assertion of fact may result in a court treating the fact as undisputed for purposes of the summary judgment motion. D. Mont. L.R. Civ. 56.1(d) ("Failure to file a Statement of Disputed Facts will be deemed an admission that no material facts are in dispute."); *see also Lechowski-Mercado v. Seeley Swan High Sch.*, No. CV 21-10-M-DLC, 2022 WL 3357419, at *1 n.1 (D. Mont. Aug. 15, 2022) (explaining that the Court will treat a party's failure to follow L.R. 56.1 as an admission that a fact is undisputed).

The University seeks to strike numerous paragraphs and portions of Schweyen's Statement of Disputed Facts for failing to comply with L.R. 56.1, including statements lacking any citation to the record,[5] statements adding additional facts,[6] statements adding legal argument,[7] assertions that facts are disputed because Schweyen lacks personal knowledge,[8] and statements disputing stipulated facts.[9] (Doc. 77 at 13–21.)

First, the Court notes that the factual record in this matter is extensive, as demonstrated by the 273 paragraphs in the University's 65 page Statement of Undisputed Facts, (Doc. 53), 47 exhibits in support of the University's summary judgment motion, (Docs. 59–66), and Schweyen's 61 exhibits filed in conjunction with her opposition to summary judgment, (Docs. 71, 90). As the Court has previously explained, where a party has "created (perhaps intentionally) a factual morass by failing to adhere to" L.R. 56.1, "[t]he Court will not do [the parties'] work for them by searching the record for factual disputes." *Lechowski-Mercado*, 2022 WL 3357419, at *1 n.1. Similarly, the Court has explained that L.R. 56.1

---

[5] Paragraphs 8, 11, 18, 19, 20, 21, 33, 34, 39, 41, 47, 50, 52, 54, 55, 56, 61, 63, 65, 74, 75, 76, 78, 79, 80, 81, 86, 91, 99, 100, 102, 105, 106, 107, 108, 109, 111, 112, 117, 118, 121, 123, 136, 140, 141, 142, 148, 150, 159, 160, 161, 164, 170, 171, 172, 174, 177, 178, 179, 180, 197, 198, 199, 204, 205, 208, 214, 217, 218, 219, 220, 222, 232, 233, 236, 240, 243, 245, 248, 249, 251, 259, 260, 261, 263, and 267. (Doc. 77 at 13 n.4.)

[6] Paragraphs 12, 17, 22, 23, 25, 26, 28, 30, 32, 33, 34, 37, 38, 39, 41, 42, 43, 44, 45, 46, 51, 53, 56, 58, 60, 62, 64, 70, 71, 72, 81, 82, 83, 84, 85, 96, 97, 98, 101, 103, 104, 114, 122, 123, 124, 125, 126, 139, 145, 149, 151, 152, 154, 156, 157, 163, 165, 173, 174, 176, 177, 179, 181, 183, 185, 186, 196, 198, 201, 202, 204, 205, 209, 214, 216, 217, 220, 222, 225, 229, 230, 234, 237, 239, 240, 242, 247, 250, 253, 254, 256, 257, 258, and 259. (*Id.* at 15 n.5.)

[7] Paragraphs 44, 60, 138, 151, 159, 180, 201, 217, 229, 256, 247, 258, and 260. (*Id.* at 18 n.6.)

[8] Paragraphs 11, 12, 17, 23, 76, 77, 86, 114, 153, and 171. (*Id.* at 19 n.7.)

[9] Paragraphs 22, 74, 75, 81, and 109. (*Id.* at 20 n.8.)

"does not allow for tangential flourishes to be tacked on to a response when a fact is undisputed. . . . If additional facts are relied on to oppose a motion for summary judgment, those may be added separately, as provided in L.R. 56.1(b)(2)." *Flathead Irrigation Dist. v. Jewell*, 121 F. Supp. 3d 1008, 1010 n.1 (D. Mont. 2015), *aff'd sub nom. Flathead Irrigation Dist. v. Zinke*, 725 F. App'x 507 (9th Cir. 2018). Also, "legal theories and arguments are not facts." *Id.*

Although not in strict compliance with L.R. 56.1, the Court will not strike those paragraphs where Schweyen clearly relies on the same citations used by the University. Similarly, the Court finds that Schweyen inappropriately raised legal arguments in some paragraphs, but not others, and in some instances properly challenged the University's characterization of particular facts. Consequently, the Court strikes paragraphs 44, 60, 65, 76, 77, 78, 108, 111, 117, 136, 140, 141, 142, 150, 151, 159, 171, 178, 201, 208, 217, 218, 219, 229, 233, 256, 257, 258, 260, and 261 for failing to comply with L.R. 56.1 and treats these statements of fact as undisputed for purposes of the summary judgment motion.

The Court also strikes all factual statements contained in Schweyen's Statement of Disputed Facts that are not properly set forth as described in L.R. 56.1(b)(2). The Court considers any statements of stipulated fact to be undisputed, even if Schweyen's Statement of Disputed Facts indicates otherwise. Finally, Schweyen failed to respond to paragraphs 29, 113, 168, 191, 192, 193, 200, 203,

210, 211, 212, 213, 215, 221, 223, 226, 227, 228, 231, 241, 244, 246, 264, 266, 268, 269, 270, 271, 272, and 273, which are therefore deemed undisputed.

Accordingly, the Court grants in part and denies in part the University's First Motion to Strike. This ruling does not reflect the entirety of the Court's determination as to what facts are material, what facts are actually in dispute, and what facts are supported by admissible evidence.

## II.     Second Motion to Strike

The University also moves to strike Schweyen's Exhibit 61—Dr. Lopiano's expert report—on the grounds that: (1) it was untimely disclosed under D. Mont. L.R. Civ. 7.1(d)(1)(D); (2) the unnecessary delay in filing caused the University actual prejudice; (3) the contents of the report are impertinent and immaterial to the issues before the Court on the summary judgment motion; and (4) the report was not timely disclosed per the Court's scheduling order because the report does not solely contradict or rebut the University's liability expert report. (Doc. 96 at 4.)

The Court set a deadline of January 30, 3023, for simultaneous disclosure of liability experts. (Doc. 41 at 1.) However, the parties were permitted to stipulate to the extension of this deadline without a court order, (*id.* at 3), and agreed to a new deadline of March 16, 2023, (Doc. 97-2 at 2). The University disclosed its liability expert, Cheryl Levick, by the deadline, but Schweyen did not disclose a liability expert. (Doc. 96 at 2.) The University then filed its motion for summary

judgment on March 20, 2023, and relied on Ms. Levick's report to support its motion.  (*See* Docs. 55, 66-7.)  On April 10, Schweyen filed her brief in opposition to the motion for summary judgment, supporting exhibits, and Statement of Disputed Facts.  (Docs. 70, 71, 72.)  The University filed its reply in support of its motion for summary judgment on April 24.  (Doc. 78.)

Sixteen days later, on May 10, Schweyen filed a Notice of Supplemental Exhibit for Plaintiff's Opposition to Defendant's Motion for Summary Judgment with Exhibit 61 attached.  (Docs. 90, 90-1.)  Exhibit 61 consists of an expert report from Dr. Donna Lopiano.  Schweyen states that the report is offered to rebut Ms. Levick's opinions cited in the University's motion for summary judgment and represents that the report was not available at the time she filed her opposition brief.  (Doc. 90 at 2.)

Rebuttal experts "must be disclosed within thirty (30) days of the date set forth . . . for expert disclosure."  (Doc. 41 at 10.)  Because the parties stipulated to a liability expert disclosure deadline of March 16, the deadline for Schweyen to disclose Dr. Lopiano as a rebuttal expert was April 17.  Dr. Lopiano's report was disclosed to the University on April 14.  (*See* Doc. 90-1.)  Thus, if Dr. Lopiano's expert report is properly characterized as a rebuttal expert report, then it was timely disclosed.  The University argues that Dr. Lopiano's report "goes well beyond

solely contradicting or rebutting the Levick report," and should therefore be stricken for untimely disclosure. (Doc. 96 at 7.)

Ms. Levick opined on whether "a reasonable and prudent Athletics Director of a Division I Institution in Kent Haslam's position would have had legitimate, non-discriminatory reasons" for taking the employment actions that Schweyen challenges in this lawsuit. (Doc. 66-7 at 4.) Ms. Levick concluded that these employment actions were all prudent, reasonable, and based on legitimate, non-discriminatory reasons. (*Id.*) Dr. Lopiano addressed the bases for Ms. Levick's opinions and offered her own opinion as to whether the employment actions were consistent with best practices or industry standards. (Doc. 90-1 at 9–37.) Dr. Lopiano concluded that the employment actions taken by Kent Haslam were not consistent with best practices and that Ms. Levick's opinions were unfounded. (*Id.*)

The Court disagrees with the University's argument that Dr. Lopiano's report is not a rebuttal expert report and, therefore, was not timely disclosed. Each opinion offered by Dr. Lopiano rebuts and/or contradicts an opinion offered by Ms. Levick. To the extent portions of Dr. Lopiano's report may exceed the scope of rebuttal evidence, this issue is more appropriately addressed through a motion in limine prior to trial. (Doc. 41 at 9 ("Objections related to expert witnesses or

testimony on any grounds other than the timeliness or sufficiency of a Rule 26(a)(2)(B) report are appropriately raised through motions in limine.").)

The University also seeks to strike Dr. Lopiano's report on the grounds that it was improperly filed without leave of the Court. This Court's Local Rules require that once a motion is fully briefed—brief in support, response, and reply have been filed—"no further briefing is permitted without prior leave." D. Mont. L.R. Civ. 7.1(d)(1)(D). The Court may strike a filing that fails to comply with this rule. *See Jonas v. Hagadone Mont. Publ'g*, No. CV 13-10-M-DLC-JCL, 2013 WL 12164765, at *2 (D. Mont. Dec. 6, 2013), *report and recommendation adopted*, No. CV 13-30-M-DLC, 2014 WL 12629381 (D. Mont. Apr. 1, 2014).

The primary issue with the late filing of Dr. Lopiano's report is that "[t]he factual record on a summary judgment motion is deemed complete and the motion is ripe for ruling after the party opposing the motion has filed their response and statement of disputed facts." *Duringer v. Hartford Life Ins. Co.*, No. CV 13-74-M-DWM, 2013 WL 12137710, at *1 (D. Mont. Aug. 20, 2013); *see also* D. Mont. L.R. Civ. 7.1(d)(1)(D) ("A motion is deemed ripe for ruling at the close of the time for response."). Regardless of whether Dr. Lopiano's report is "further briefing" under L.R. 7.1(d)(1)(D), the report was not before the Court at the time the factual record on the summary judgment motion was deemed complete, and Schweyen's notice of supplemental exhibit was filed without first seeking leave of the Court.

In her notice, Schweyen cites D. Mont. L.R. Civ. 7.4, which allows a party to file

notice of supplement authority. However, the more appropriate vehicle for seeking

to supplement the record on the motion for summary judgment would have been a

motion under Fed. R. Civ. P. 56(d), which provides:

> If a nonmovant shows by affidavit or declaration that, for specified
> reasons, it cannot present facts essential to justify its opposition [to a
> summary judgment motion], the court may:
>     (1) defer considering the motion or deny it;
>     (2) allow time to obtain affidavits or declarations or to take
>     discovery; or
>     (3) issue any other appropriate order.

Despite Schweyen's improper approach to supplementing the record, the

Court finds that it would be inequitable to prohibit Schweyen from relying on Dr.

Lopiano's report to oppose the motion for summary judgment. Dr. Lopiano's

report was disclosed to the University ten days before it filed its reply brief on the

motion for summary judgement and, therefore, the University could have

addressed Dr. Lopiano's report in its reply brief. Although the report was filed

with the Court after the time permitted under L.R. 7.1, the report was disclosed

before the deadline to disclose rebuttal experts and is before the Court now as it

considers the motion for summary judgment. The conflict between the deadline

for filing a fully briefed motion for summary judgment and the deadline for

disclosing rebuttal experts, while unfortunate, is a result of the stipulation between

the parties to adjust the deadline for disclosure of liability experts.

For the foregoing reasons, the Court denies the University's Second Motion to Strike and declines to strike Dr. Lopiano's report.

## III.  Motion for Summary Judgment

### A. Standard of Review

The Court can resolve an issue summarily if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party. *Id.*  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's [membership in a protected class]." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

### B. Legal Standard

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Disparate treatment—i.e., adverse employment actions motivated by sex—is one type of sex discrimination claim under Title VII. *See Maner v. Dignity Health*, 9 F.4th 1114, 1120 (9th Cir. 2021); *see also Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020). To establish disparate treatment a plaintiff "must offer evidence that 'gives rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent." *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir. 2021) (quoting *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003)).

Direct evidence of discriminatory intent is evidence that, "if believed, proves the fact of discriminatory animus without inference or presumption," such as discriminatory remarks about the plaintiff's sex or gender. *Vasquez*, 349 F.3d at 640; *see also E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1050 (9th Cir. 2009). Circumstantial evidence is evidence that creates an inference of discriminatory

animus, such as complaints of discrimination against the defendant made by other individuals. *See Metoyer v. Chassman*, 504 F.3d 919, 938 (9th Cir. 2007).

Under the *McDonnell Douglas* framework, a plaintiff can establish a presumption of discriminatory intent through proof that: (1) "the plaintiff belongs to a class of persons protected by Title VII;" (2) "the plaintiff performed . . . her job satisfactorily;" (3) "the plaintiff suffered an adverse employment action;" and (4) "the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff." *Cornwell*, 439 F.3d at 1028; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "[T]he requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . claims [under step one of the *McDonnell Douglas* framework] on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994), *as amended on denial of reh'g* (July 14, 1994).

If a plaintiff can establish a *prima facie* case under the *McDonnell Douglas* framework, the burden of proof then shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct." *Vasquez*, 349 F.3d at 640. If the defendant meets this burden, "then the *McDonnell Douglas* framework drops out of the picture entirely, and the plaintiff bears the full

burden of persuading the factfinder that the employer intentionally discriminated against [her]." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094 (9th Cir. 2005).

### C. Discussion

The University argues that the *McDonnell Douglas* framework should apply because Schweyen has offered no direct evidence of discrimination. (Doc. 52 at 11.) Schweyen does not contend that she offers direct or circumstantial evidence of discriminatory intent and appears to adopt the burden-shifting framework of *McDonnell Douglas*. (*See* Doc. 70.) "[W]hen responding to a summary judgment motion, the plaintiff is presented with a choice regarding how to establish his or her case." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004); *see also Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002), *aff'd*, *Desert Palace, Inc. v. Costa.*, 539 U.S. 90 (2003). Ultimately, regardless of the approach taken, it is Schweyen's burden to "produce some evidence suggesting that" the University's decision to not renew her contract "was due in part or whole to discriminatory intent, and so must counter" the University's explanation for its decision. *McGinest*, 360 F.3d at 1123.

There is no genuine dispute that Schweyen is a member of a protected class based on her gender or that the decision not to renew her contract constitutes an

adverse employment action under Title VII.[10]  However, the Court need not and does not decide whether Schweyen can meet the minimal showing required to establish a *prima facie* case under the *McDonnell Douglas* framework because, even assuming *arguendo* that she can, her claim fails at the pretext stage of the analysis.

### 1.  Legitimate, Non-Discriminatory Reason

The University maintains that Haslam did not renew Schweyen's contract because of the "poor performance of the women's basketball team, the numerous and serious complaints regarding the unacceptable environment fostered by Schweyen for the student-athletes on her team, and the intent of many of those student-athletes to leave the program if Schweyen remained as head coach."  (Doc. 55 at 3–4.)  These are legitimate, non-discriminatory reasons to non-renew Schweyen's contract.

Moreover, the University benefits from a "strong inference" of nondiscrimination under the "same-actor doctrine" because Haslam was responsible for the initial hiring, rehiring, and termination of Schweyen, and these actions occurred within a short period of time.  *Coghlan*, 413 F.3d at 1098

---

[10] An "adverse employment action is one that materially affect[s] the compensation, terms, conditions, or privileges . . . of employment."  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  Case law supports, and the University does not dispute, that non-renewal of an employment contract constitutes an adverse employment action.  *See MacIntyre v. Carroll Coll.*, 48 F.4th 950, 956 (9th Cir. 2022) (explaining that, in the context of a Title IX action, "even if an employer is under no legal obligation to renew an employment contract, its decision not to do so may be an adverse action"); *Jadwin v. Cnty. of Kern*, 610 F. Supp. 2d 1129, 1171 (E.D. Ca. 2009) (holding that the failure to renew a contract can qualify as an adverse employment action under Title VII and collecting cases).

(applying the same-actor doctrine in a situation where the same actor had taken favorable action toward the individual within a year of the alleged discrimination); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1286 (9th Cir. 2000) (taking the same-actor inference into account when the positive action occurred more than a year earlier than the negative action).

Schweyen argues that the same-actor inference would not apply if a jury were to believe her "corroborated testimony that Haslam did not want to hire her but felt forced to by boosters and because of her prominence in the women's basketball community." (Doc. 70 at 30.) The Court is unconvinced by this argument because the evidence shows Haslam made the decision to hire Schweyen for the initial three-year contract, then renewed Schweyen's contract for another year after that. While there may have been multiple motives behind Haslam's decision to hire Schweyen, this can be said of many hiring situations and does not necessarily undermine the rationale behind the same-actor doctrine. As the Ninth Circuit has explained, "[t]he question is simply whether the nature of the employment action . . . is such that it would have been unlikely if the decisionmaker were truly biased against the employee's class." *Coghlan*, 413 F.3d at 1098. Here, the answer to that question is yes.

### 2. Pretext

"A plaintiff can show pretext directly, by showing that discrimination more

likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez*, 349 F.3d at 641. Schweyen offers no direct evidence of discrimination; therefore, she must provide "specific and substantial [circumstantial] evidence challenging the credibility of the employer's motives." *Id.* at 642. Because the same-actor inference applies, Schweyen must make an "extraordinarily strong showing of discrimination." *Coghlan*, 413 F.3d at 1097.

### i. Schweyen has not demonstrated that she was treated worse than similarly situated employees.

First, Schweyen offers evidence that she was similarly situated to, but treated less favorably than, male coaches of the University's men's basketball and football teams who "have had several athletes in their programs enter the transfer portal and leave [the University] over the past five academic years, but . . . have not been fired." (Doc. 1 ¶ 50.) Specifically, Schweyen compares her treatment to that of Coach DeCuire, head coach of the men's basketball team, who had multiple players enter the transfer portal from 2016 to 2020 and was not fired. (*Id.* ¶¶ 51–53.) Schweyen also compares her treatment to that of Coach Hauck, head coach of the football team, who had many players leave the team after the 2018-2019 season. (*Id.* ¶ 54.)

Schweyen's evidence of male head coaches retaining their position after students entered the transfer portal is not compelling. Schweyen ignores the fact

that the University was not just concerned about players leaving the team generally but was concerned that players were transferring or considering transferring specifically because of Schweyen's behavior. The University also had broader concerns about the team culture and Schweyen's treatment of players—an issue that arose early in Schweyen's time as head coach and continued through her last year—and the team's overall performance under Schweyen's leadership. Schweyen has not offered evidence that either Coach Hauck or Coach DeCuire received similar complaints or that players were leaving their respective teams due to concerns about team culture. Schweyen has also not offered any evidence that the University felt Coach DeCuire or Coach Hauck had underperformed in their roles.

Moreover, since his appointment to the position of Athletic Director in 2012, Haslam has only terminated five head coaches: four male (Jerry Wagner, Brian Doyon, Mark Plakorus, and Bob Stitt) and one female (Schweyen). (Doc. 72 ¶¶ 246, 253, 254, 256, 259.) Wagner and Doyon, former head coaches of the women's volleyball team, and Mark Plakorus, former head coach of the women's soccer team, were terminated from their positions due, at least in part, to complaints from student-athletes. (Doc. 52 at 14–15; *see also* Doc. 72 ¶¶ 248–56.) Similarly, Bob Stitt, former head coach of the football team, was relieved of his position due to underperformance, despite the football team having a better overall

record than Schweyen.  (Doc. 52 at 15; *see also* Doc. 72 ¶ 259.)

### ii. The veracity of the complaints against Schweyen is not relevant to the question of pretext.

Second, Schweyen argues that the University "did not contemporaneously—and still has not—verified in any way any allegation against [her]." (Doc. 70 at 26.)  Although Schweyen may disagree with the concerns raised by student-athletes and parents, the veracity of those concerns is not at issue.  There is no genuine dispute that both student-athletes and parents complained to Haslam and others about Schweyen's conduct and there is no evidence to suggest that Haslam did not give credence to the complaints.  Haslam had received complaints beginning in the first year of Schweyen's term as head coach.  Further complaints led to an investigation, which led Haslam to conclude there were legitimate issues that needed to be addressed.  Haslam communicated those issues to Schweyen along with steps she could take to improve.  Nonetheless, Haslam continued to receive complaints and the evidence shows that he received several complaints from members of the Lady Griz team regarding Schweyen's tentative return as head coach in the weeks preceding the non-renewal decision.  These facts are not in genuine dispute, and they support the University's explanation for its decision not to renew Schweyen's contract.

### iii. None of Schweyen's other allegations show pretext.

Finally, Schweyen offers a number of other instances of alleged

discriminatory or disparate treatment as evidence that the University's basis for terminating her employment was pretextual. While other discriminatory actions may be used as evidence of pretext, *see Lyons v. England*, 307 F.3d 1092, 1110–12 (9th Cir. 2002), Schweyen does not offer specific or substantial evidence sufficient for a reasonable juror to conclude that the University's reasoning is pretextual.

First, the fact that the University hired Petrino, a male, as interim head coach does not demonstrate pretext. (*See* Doc. 1 ¶ 89–91.) At the time, Petrino was the most senior assistant coach for the Lady Griz, and his temporary role as interim head coach does not constitute a "replacement" under Title VII. *See Potera-Haskins v. Gamble*, 519 F. Supp. 2d 1110, 1118–19 (D. Mont. 2007), *aff'd*, 447 F. App'x 813 (9th Cir. 2011). There is no genuine dispute that Brian Holsinger, who the University hired to fill the head coach position after a national search, is qualified to be a head coach. (Doc. 72 ¶¶ 147–48.)

Next, the fact that DeCuire was paid an initial base salary higher than Schweyen's does not demonstrate pretext. (*See* Doc. 1 ¶ 21.) DeCuire's salary was below the conference average for men's basketball teams, while Schweyen's salary was above the conference average for women's basketball teams. (Doc. 66-7 at 5–6.) Even ignoring the relative compensation of each coach to the conference averages, other factors support the difference in salary, including the fact that DeCuire had previous head coaching experience and two years of experience as an

32

assistant head coach.  (Doc. 72 ¶¶ 210–11.)  DeCuire also had other coaching offers that the University had to compete against, whereas Schweyen had none. (*Id.* ¶¶ 213–14.)

Schweyen also argues that her team was treated worse than the men's teams in various respects.  For instance, Schweyen raises allegations regarding a practice time dispute, differences in the quality of the locker rooms, and the degree of Haslam's involvement and interaction with the women's basketball team.  (Doc. 1 ¶¶ 72–74, 81–85, 88.)  Courts have rejected the argument that allegations of disparate treatment between men's and women's sports teams create an inference of discriminatory animus under Title VII.  *See, e.g.*, *Warmington v. Bd. of Regents of the Univ. of Minn.*, 455 F. Supp. 3d 871, 883 (D. Minn. 2020), *aff'd*, 998 F.3d 879 (8th Cir. 2021) (holding that allegations of unequal treatment of female athletes "say[s] nothing about whether [their female coach's] sex was a motivating factor in the University's decision to terminate her employment" and does not "plausibly permit an inference" of discriminatory motive under Title VII); *Lamb-Bowman v. Del. State Univ.*, 39 F. App'x 748, 750 (3d Cir. 2002) (upholding a district court's grant of summary judgment and explaining that "opposition to [a university's] funding and resource disparities between the women's and men's athletic programs . . . fail[s] to establish that [the plaintiff] was discriminated against because of her sex"); *Powell v. Doane Univ.*, No. 8:20-cv-0427, 2023 WL

6445830, at *21 (D. Neb. Oct. 3, 2023) (stating that "inequities experienced by . . . players do not constitute a 'discriminatory employment practice'" under Title VII). Additionally, Schweyen's complaints regarding the practice time for the men's and women's basketball teams largely center around DeCuire's conduct, not Haslam's, and therefore do not tend to show discriminatory animus on Haslam's part.

Schweyen references various comments made by Haslam that she argues demonstrate a discriminatory motive, such as comments that she should not hire an agent during contract negations because Haslam would not be giving her more money and that Haslam didn't want to hire her but was "made" to by others. (*See* Doc. 72 at 133–55.) None of these statements are direct evidence of discriminatory intent nor do they support an inference of discriminatory motive.

Finally, Schweyen argues that evidence of altered or missing documents supports her claim. (Doc. 70 at 28–29.) The Court finds the allegations of destroyed or altered documents neither persuasive nor material. Even taking the allegations as true, the evidence would not be sufficient to overcome the strong presumption that the University acted without discriminatory intent.

### D. Conclusion

Based on the undisputed evidence in the record, a reasonable jury could not conclude by a preponderance of the evidence that the University terminated

Schweyen's employment because of her gender.

**CONCLUSION**

Accordingly, IT IS ORDERED that Defendant's First Motion to Strike (Doc. 76) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Defendant's Second Motion to Strike (Doc. 95) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (Doc. 55) is GRANTED.

IT IS FURTHER ORDERED that all other pending motions are DENIED as moot.

The Clerk of Court is directed to enter judgment in Defendant's favor by separate document and close the case file.

DATED this 31st day of October, 2023.

Dana L. Christensen, District Judge
United States District Court